IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NCR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-395-GMS |
| | ) | |
| DOCUMOTION RESEARCH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF NCR CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
Matias Ferrario
Andrew W. Rinehart
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
(336) 607-7300

Christina E. Fahmy
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street NW
Washington, D.C. 20005
(202) 508-5800

John W. Shaw (No. 3362)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff NCR Corporation*

Dated: May 14, 2015

# TABLE OF CONTENTS

I.      Introduction........................................................................................................................1

II.     Principles of Claim Construction....................................................................................1

III.    Claim Terms in Dispute...................................................................................................3

        a.      "…single column…" terms (Joint Claim Construction Chart ("JCCC")
                Nos. 1-2) ...............................................................................................................3

        b.      "minor area" and "major area" terms (JCCC Nos. 3-4)........................................4

        c.      "devoid of adhesive" (JCCC No. 5)......................................................................6

        d.      "cantilever" term (JCCC No. 6).............................................................................7

        e.      "reducing surface area exposure along said feedpath" (JCCC No. 7) ...................8

        f.      "differently sized" terms (JCCC Nos. 8-9)............................................................9

        g.      "vary in width" term (JCCC No. 10) ...................................................................10

        h.      "index marks" (JCCC No. 11) ..............................................................................12

        i.      "the adhesive layer is variably patterned" (JCCC No. 12) ...................................12

        j.      "vary locations of contact" and "variably located lateral cuts" terms
                (JCCC Nos. 13-14)...............................................................................................14

        k.      "adhesive free lanes" term (JCCC No. 15) ..........................................................15

        l.      "elongated diamond shape" terms (JCCC No. 16) ...............................................16

        m.      "repeat length" & "repeat distance" (JCCC Nos. 17, 21) ....................................16

        n.      "custom" term (JCCC No. 18)...............................................................................17

        o.      "the front portion displaying information for a transaction" (JCCC No. 19) ........18

        p.      "pattern for adhesive material" / "adhesive pattern" (JCCC No. 20) ...................18

        q.      "providing the pattern…" terms (JCCC No. 22-23) ..............................................19

        r.      "reducing" and "evenly distributing" terms (JCCC No. 24-25) ...........................20

IV.     Conclusion......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Hill-Rom Servs., Inc. v. Stryker Corp.,*
   755 F.3d 1367 (Fed. Cir. 2014)...................................................................... 2, 6

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
   222 F.3d 951 (Fed. Cir. 2000)........................................................................ 2

*KCJ Corp. v. Kinetic Concepts, Inc.,*
   223 F.3d 1351 (Fed. Cir. 2000)...................................................................... 9, 20

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995) (en banc),
   *aff'd,* 517 U.S. 370 (1996) ............................................................................ 2

*Merck & Co. v. Teva Pharm. USA, Inc.,*
   395 F.3d 1364 (Fed. Cir. 2005)...................................................................... 2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
   521 F.3d 1351 (Fed. Cir. 2008)...................................................................... 1, 10

*Oatey Co. v. IPS Corp.,*
   514 F.3d 1271 (Fed. Cir. 2008)...................................................................... 10

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003)...................................................................... 2

*Panduit Corp. v. Dennison Mfg. Co.,*
   810 F.2d 1561 (Fed. Cir. 1987)...................................................................... 4

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)............................................................... *passim*

*Renishow PLC v. Marposs Societa' Per Azoini,*
   158 F.3d 1243 (Fed. Cir. 1998)...................................................................... 2

*SanDisk Corp. v. Memorex Prods., Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005)...................................................................... 3, 9

*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
   775 F.2d 1107 (Fed. Cir. 1985)...................................................................... 5

*TurboCare Div. of Delmag Delaval Turbomachinery Corp. v. Gen. Elec. Corp.,*
   264 F.3d 1111 (Fed. Cir. 2001)...................................................................... 8

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997)...................................................................... 6

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996)........................................................................ 3, 11

*W.E. Hall Co. v. Atlanta Corrugating, LLC,*
   370 F.3d 1343 (Fed. Cir. 2004)...................................................................... 6

## I.      Introduction.

The patents-in-suit are the result of a tradition of innovation at NCR beginning with the

company's founding in 1884. For the past 130 years, NCR has been a leading researcher and

developer of consumer transaction technologies. Among other innovations, NCR invented a

customer food/beverage order product known as "NCR Sticky Media".

NCR's Sticky Media product was born from NCR's recognition of the operational

pressures facing quick-service restaurants stemming from growing menu choices, custom orders,

and increased to-go traffic.  Faced with these operational pressures, NCR recognized that a

receipt label was needed that could be easily printed and then placed on these special orders to

identify and correctly fill orders. Prior art labels proved unacceptable because the liners removed

from the label had to be discarded, creating waste and delay. Even prior linerless label rolls were

unacceptable because the adhesive on the reverse side of the roll would gum up point-of-sale

("POS") printers and cause printer failures. NCR's solutions, which are reflected in the asserted

patents, led to the widespread adoption of NCR's Sticky Media.

The purpose of claim construction is to clarify the meaning of patent claims for the

jury—if the meaning is clear, no construction is necessary. *O2 Micro Int'l Ltd. v. Beyond

Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). If a construction will help the jury

understand the claim terms, that construction must be supported by the intrinsic record.

NCR's proposed constructions follow the plain and ordinary meaning of the terms and

are supported by the intrinsic record.  DRI's proposed constructions myopically focus on select

parts of the intrinsic record in a litigation driven effort to avoid infringement.

## II.      Principles of Claim Construction.

Claim construction is a question of law exclusively within the province of this Court.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517

U.S. 370 (1996). The claim construction process "begins and ends in all cases with the actual words of the claim." *Renishow PLC v. Marposs Societa' Per Azoini*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[W]ords of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).

The Federal Circuit has established a "hierarchy" wherein courts should analyze the intrinsic record of the patent—the claim language, the specification, and the prosecution history—in determining the proper construction of a disputed claim term. *See, e.g.*, *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000). "If the meaning of a claim is unambiguous from the intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim construction." *Id.*

"[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. Unless the specification "clearly, deliberately, and precisely" spells out how a claim term is to be used, the plain and ordinary meaning controls. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1379 (Fed. Cir. 2005) (Rader, J., *dissenting*); *see also* *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014), *cert. denied* 135 S. Ct. 719.

Although the prosecution history may inform claim construction, "for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Moreover, although the prosecution may be used in construing claims, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

Finally, while extrinsic evidence may be used to confirm the proper meaning of a claim term, it is not proper to rely on extrinsic evidence where the intrinsic evidence alone resolves any ambiguity. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996).

## III. Claim Terms in Dispute.

### a. "…single column…" terms[1] (Joint Claim Construction Chart ("JCCC") Nos. 1-2)[2]

Although DRI has identified three long clauses for construction, the parties' dispute can be distilled down to the phrase "a single column."  DRI contends that the word "single" should negate basic canons of claim construction and that this Court should import a limitation into the claim phrase that would require "not having another column of adhesive patches."

The natural reading of either of these phrases merely calls for a plurality of adhesive patches, either discrete or noncontiguous, aligned in and spaced apart longitudinally in a single column along a running axis of the web. This is what the claim language says. Joint Appendix ("J.A.") at Tab 1, col. 6:9-11; 7:54-57. The language is neither confusing nor overtly technical.

DRI's proposed construction seeks to improperly introduce limitations that contradict the express language of the claims. For example, each of the phrases identified by DRI is immediately preceded by the word "including." J.A. at Tab 1, col. 6:9; col. 7:54. "As a patent law term of art, 'includes' means 'comprising'… Neither includes, nor comprising, forecloses additional elements that need not satisfy the [claimed] limitations." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) (citations omitted).  Thus, DRI's proposal that

---

[1] The construction of the term "minor area" is in dispute between the parties, and DRI has not provided a proposed construction for that individual term.  As term 2 contains two separate issues for construction, NCR provides its discussion of the proper construction for "single column" in this section. NCR's discussion of the proper construction for "minor area" follows in Section III.b, *infra.*
[2] Citations are made to the terms as numbered and ordered in the parties' Joint Claim Construction Chart (D.I. 59).

the disputed phrases be construed to "not [have] another column" unnecessarily limits the claim language.

DRI's proposed construction also reads out recited claim elements, which violates established claim construction law. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 (Fed. Cir. 1987) (holding that a construction which dismisses structural claim limitations that define the disposition, positioning, relationship, and operation of the claimed elements is improper). DRI's construction ignores the word "longitudinally" and omits any mention of the orientation of the adhesive patches along the running axis of the web. These structural claim limitations describe a column of adhesive patches aligned parallel to the web's running axis with space between each patch of some length on the running axis (i.e longitudinal spacing). Under DRI's construction, the column of patches could be aligned and spaced apart in any direction, which contradicts the intrinsic record. *See, e.g.*, J.A. at Tab 1, Figs. 4-6, 8. In addition, DRI's proposed construction for term 2 fails to provide any clarification for the term "in a minor area of said back surface" and is thus improper because it reads out a claimed limitation. *See Panduit*, 810 F.2d at 1576.

### b. "minor area" and "major area" terms (JCCC Nos. 3-4)

The parties' dispute as to terms 3 and 4 is limited to one issue: (1) whether the "major" and "minor" areas as recited in the '811 patent must be limited to particular locations on the printing label roll. NCR's proposed constructions describe those areas in accordance with the plain meaning of the claim language and are fully supported by the intrinsic record. Meanwhile, DRI's construction is inconsistent, ambiguous, and unsupported.

With regard to what are the "minor" and "major" areas, the specification of the '811 patent provides that "the adhesive is provided solely in small patches in a ***relatively*** minor area of

the back surface, with the remaining major area of the back surface being devoid of adhesive." J.A. at Tab 1, col. 3:32-36 (emphasis added). This configuration is in contrast to "providing *full surface coverage* of the adhesive on the back surface." J.A. at Tab 1, col. 3:32-33 (emphasis added). The difference between the minor areas and major areas of the back surface is relative, as the specification states. Rather than a full surface coating of adhesive, the adhesive is confined to only a minority of the back surface, i.e. less than half (50%) of that surface area. The benefit of this "substantial reduction in surface area of the adhesive" is a decrease in adhesive buildup and less frequent maintenance of the printers. J.A. at Tab 1, col. 3:36-40.

NCR's proposed constructions simply provide that a major area is more than half of the total area, while a minor area is less than half, as described in the intrinsic record. Even DRI's proposed construction concedes that this is the correct definition for major area: "an area that is more than one half of the back surface".

Not satisfied with what is essentially the plain and ordinary meaning of the term, DRI then attempts to limit the *location* of the major to an area "opposite of the longitudinal center line from the minor area." DRI's proposed construction is nonsensical. If the total area of the back surface is divided by a "longitudinal center line" then both sides would be equal areas. How then could a major area be on one side of the center line, yet be greater than the area on the other side of the center line? DRI's proposed construction should be rejected. Nothing in the claim language, specification, or prosecution requires limiting the major or minor area to particular locations on the back surface. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (*en banc*) (citations omitted) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim.").

Where the patentee wanted to limit the patches, or minor area, to a particular location on the back surface, it knew how to claim it.  For example, Claim 2 of the '811 patent, which depends from claim 1, recites that "said patches [in a minor area] are aligned along one lateral edge of said web, and closer thereto than to an opposite lateral edge." J.A. at Tab 1, col. 6:20-22. The lack of a positional limitation in claim 1 shows that DRI's proposed construction improperly imports a limitation from dependent claim 2 into its independent claim. *See Hill-Rom*, 755 F.3d at 1374 ("[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). Furthermore, DRI's proposed construction for term 4 is logically inconsistent with that of term 3. Although DRI wants to limit the term "major area" in term 3 according to its location, DRI proposes that the term "adhesive-free major area" in term 4 be given its plain and ordinary meaning.[3]  "Adhesive-free major area" from term 4, however, refers to the "major area" of term 3.  *See* J.A. at Tab 1, col. 6:13-23. Thus, even DRI's proposed constructions between terms are inconsistent.  Consequently, the Court should reject DRI's proposals and adopt NCR's constructions for the "major" and "minor" area terms.

### c.    "devoid of adhesive" (JCCC No. 5)

"Devoid of adhesive" is a clear, unambiguous term that any lay juror would understand. Thus, construction of this term is not required. *See W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1350 (Fed. Cir. 2004) (resort to dictionary unnecessary for a sufficiently clear term); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction is "not an obligatory exercise in redundancy."). Nothing in the specification of the '811 patent suggests the patentee intended to use anything other than the plain and ordinary

---

[3] If the Court adopts NCR's proposed construction for the term "major area," NCR will concede to the plain and ordinary meaning of "adhesive-free."

meaning of devoid. The Court should therefore reject DRI's attempt to rewrite the claim term with colorful adjectives (e.g. "utterly" and "completely") that clarify little, and only serve to mislead or confuse the jury.

### d.      "cantilever" term (JCCC No. 6)[4]

The "cantilever" term of claim 2 recites the relationship between the structure of the labels and a minor area of adhesive on the back surface thereof. NCR's proposed construction clarifies this relationship in accordance with the intrinsic record by describing how a minor area of adhesive patches is biased (i.e. cantilevered) towards one edge of the label.

Claim 2 states that the "cantilever" configuration permits hand-grasping of the labels. J.A. at Tab 1, col. 6:23-24. The specification further explains that the transverse cantilever form "permits ready handling thereof [the label] … with little chance of grabbing the adhesive patch itself." J.A. at Tab 1, col. 4:13-15. The adhesive "may then be used for bonding the entire label to the package 14, in cantilever fashion for example, for permitting grasping thereof for removal and repositioning of the label if desired." J.A. at Tab 1, col. 4:15-19. This configuration biases the adhesive closer to one edge of the web than the other for the stated purpose of allowing a user of the invention to grasp and reposition labels with a decreased chance of making contact with adhesive. The embodiments in Figures 4-6 and 8 of the '811 patent further demonstrate this biased application of adhesive.

DRI, however, again seeks to improperly import a limitation from other claims of the '811 patent into this claim term.[5]  For instance, claim 3 recites a minor area of adhesive "on one

---

[4] Although DRI facially contends that several terms in the patents-in-suit are indefinite, an allegation NCR denies, DRI nonetheless is able to offer proposed constructions for those terms.
[5] While DRI argues that the term "adhesive-free major area" should be governed by its plain and ordinary meaning, *see supra* term 4, a construction for the term is now inexplicably offered here. These inconsistent positions should be rejected in favor of NCR's proposed constructions.

side only of the transverse middle" of the label roll. J.A. at Tab 1, col. 6:34-36.  Neither claim 1

nor 2 recites this limitation. Claim terms should not be read to contain a limitation where another

claim restricts the invention in exactly the same manner. *Phillips*, 415 F.3d at 1325 (citing

*TurboCare Div. of Delmag Delaval Turbomachinery Corp. v. Gen. Elec. Corp.*, 264 F.3d 1111,

1123 (Fed. Cir. 2001)).

e.      **"reducing surface area exposure along said feedpath" (JCCC No. 7)**

The '811 patent repeatedly emphasizes the benefit of reducing the exposure of POS

printer components to adhesive buildup by using a plurality of adhesive patches, which allows

the printer components to contact areas with and without adhesive. NCR's proposed construction

clarifies how this benefit is provided by having areas with and without adhesive.

The '811 patent explains that "the small adhesive patches reduce the area of adhesive,

and correspondingly reduce the associated problems of the adhesive during installation and

operation of the linerless label roll in the printer." J.A. at Tab 1, col. 5:44-49. Further, as depicted

in Figure 3, the adhesive patches in a minor area of the label roll reduce the exposure of the

printer components to only those areas contacting adhesive. The claimed invention thus reduces

the surface area exposed to adhesive by having areas with and without adhesive.

In contrast, DRI proposes a construction which again imports limitations, ignores the

express claim language, and contradicts the intrinsic record. First, DRI inserts a "longitudinal

center" limitation for the location of the minor area of adhesive patches, once again, attempting

to insert a positional limitation into the claim language where none exists. Even where the

specification uses the term "longitudinal", it does so only to refer to an orientation disposed

along, rather than across, the running axis of the web. *See, e.g.*, J.A. at Tab 1, col. 3:7-8

("permits cutting of the web along the longitudinal or running axis thereof"). More telling, DRI

cannot identify any intrinsic support for its requirement that the adhesive be located only on one side of the center-line.  In fact, DRI's construction is directly inconsistent with the intrinsic record, as explained above.[6] Lastly, as discussed in Section III.a, claim 22 recites "said back surface including…," which does not foreclose the presence of additional unclaimed elements on the back surface. *See SanDisk*, 415 F.3d at 1278. Thus, DRI's proposed construction also contradicts the express language of the open claim term "including."

      **f.**      **"differently sized" terms (JCCC Nos. 8-9)**

      The parties dispute whether the differently sized adhesive patches and free zones may be aligned in more than one column.

      DRI's proposed constructions attempt to limit the claim scope to a "single aligned column" and "patches in that column."  With respect to the "single aligned column" limitation, claim 1 of the '264 patent recites the term "comprising."  The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (citations omitted).  DRI's attempt to limit the term "a column" to a single column thus contravenes well established claim construction law.  DRI's construction further contravenes the intrinsic record.  For example, the specification expressly states "although one column of adhesive patches is preferred, ***two or more columns*** may be used if desired."  J.A. at Tab 3, col. 8:56-58 (emphasis added).  Figure 8 of the '264 patent also depicts an embodiment with patches "disposed in two columns."  J.A. at

---

[6] Assuming *arguendo* that DRI instead seeks to confine a claimed minor area of adhesive to one side of the transverse middle of the label roll, such a limitation is already recited in independent claim 3 and should not improperly be imported here.  *Phillips*, 415 F.3d at 1325.

Tab 3, col. 8:52-54.  This disclosure expressly supports NCR's proposed constructions, which do not exclude the possibility of multiple columns of adhesive patches.

With respect to the "patches in that column" limitation which DRI attempts to read into the claims, there is simply no support for such an extraneous limitation in this claim term.  The specification states that "the series of adhesive patches 44 ***in each label*** 12 have different lengths to maximize the collective surface area of the adhesive patches in each of the labels," and "the adhesive patches…have different sizes or surface area in ***each of the labels***." J.A. at Tab 3, col. 6:55-62 (emphasis added). The '264 patent thus expressly teaches that adhesive patches may differ in size or surface area within a particular label, rather than confining the differences to different patches within a single column of adhesive.  DRI's interpretation excludes the preferred embodiment depicted in Figure 8 and is incorrect.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (claims are not limited to exclude embodiments absent a clear disclaimer).

### g.   "vary in width" term (JCCC No. 10)

A person of ordinary skill in the art and a lay juror would each readily understand what it means to "vary in width" between two points, and therefore the presumption of ordinary meaning should apply here. DRI's construction excludes a preferred embodiment and is simply not supported by the intrinsic record.

Terms that are not unfamiliar or confusing to the jury, or not affected by the specification or prosecution history need no construction. *O2 Micro*, 521 F.3d at 1360.  That is the case here, as the claim unambiguously recites adhesive patches which vary, or differ, in width between two points, i.e. leading and trailing edges along the web.  However, should the Court determine a construction is needed, NCR's alternative construction is firmly rooted in the intrinsic record.

10



According to the specification, "adhesive patches 44 preferably vary in lateral width between the leading and trailing edges thereof, and along the running axis 36 of the web."  J.A. at Tab 3, col. 6:64-66. "[E]ach patch 44 preferably diverges in width aft from the leading edge thereof along the running axis, and also converges in width aft to the trailing edge along the running axis."  J.A. at Tab 3, col. 6:66 – 7:2.  This configuration is depicted in Figure 4 of the '264 patent, reproduced herein (labels and indicators added). It is plainly obvious that the phrase means that the patches vary in width between the beginning point of the patch and the end point of the patch and no construction is needed.

DRI's proposed construction would exclude this preferred embodiment, as that construction requires that the leading and trailing edges be of different widths relative to each other.  A construction that excludes a preferred embodiment is "rarely, if ever, correct." *Vitronics*, 90 F.3d at 1583.  The preferred embodiment in Figure 4 shows that the patches diverge and then converge in width between the leading and trailing edges, but neither edge is "wider than the other" as DRI proposes.

11

### h.      "index marks" (JCCC No. 11)

The term "index marks" has a specific meaning to one of skill in the art of the '264 patent such that a construction will be helpful for the jury to understand its meaning.  *See Phillips*, 415 F.3d at 1313 (claims have their ordinary meaning from the perspective of one of skill in the art). NCR's proposed construction provides an easily understood definition that is consistent with the intrinsic record.  The specification states that index marks "may have any conventional configuration such as the short black marks illustrated, and are suitably detected by an optical sensor 30 in an exemplary optical form." J.A. at Tab 3, col. 3:56-59.  Those marks consist of "[a]ny type of index mark and sensor known in the prior art," including "gaps or holes through the web detectable from either side." J.A. at Tab 3, col. 3:60-67. NCR's proposed construction conveys the ordinary meaning of the term as one of skill in the art would understand it based on the intrinsic record, and is more helpful to a lay juror without such expertise.

### i.      "the adhesive layer is variably patterned" (JCCC No. 12)

"Variably patterned" adhesive is described in depth in the specification of the '184 patent, and NCR's proposed construction clarifies the meaning of the term as supported by the intrinsic record.  DRI, however, merely limits the term to one disclosed embodiment and imports an unsupported limitation into the claim.

The '184 patent teaches that "adhesive may be patterned such that the location(s) where the adhesive comes into contact with the cutter may vary with each cut" which reduces adhesive build-up on the cutter.  J.A. at Tab 5, col. 3:58-60, col. 4:31-33.  This may be accomplished by "varying the pattern and/or any repeat of its pattern along the running axis of the web of media, and/or via varying the location of the cut(s)." J.A. at Tab 5, col. 3:61-63.   Importantly, the intrinsic record identifies reducing build-up in three, distinct ways: (1) varying the pattern, (2) varying the repeat of the pattern, and (3) varying the location of the cut.  J.A. at Tab 5, col. 3:61-

12

63.   NCR's proposed construction makes clear that the term "variably patterned" refers to the first way of reducing build-up, i.e. by having patterns of adhesives that will vary the location of contact between the adhesive and cutting mechanism.

DRI's proposed construction ignores the plain language and instead tries to adopt language from the second way, i.e. using a variable repeat length.  But the intrinsic record makes clear that this way of reducing build-up is separate and distinct from varying the pattern.  By taking such a wrong and facially flawed position, DRI's construction naturally runs into problems.  First, DRI's construction reads out embodiments in the claims. For example, Figure 1H depicts a "wide web of patterned adhesive media having a multitude of different adhesive patterns," which appears to support DRI's construction. J.A. at Tab 5, col. 7:8-9. However, Figure 1A also shows a wide web with the same adhesive pattern repeated across its width, while Figures 1B-1G show various narrow webs with a single adhesive pattern.  DRI's proposed construction excludes the embodiments of 1A and 1B-1G (and modifications thereof) without any intrinsic support for doing so.

Second, DRI seeks to limit the claim term to "variable repeat length" patterns.  However, the specification is clear that repeat length does not vary on a single particular patterned substrate as recited in claim 1.  Figure 1C, for instance, "illustrates various variations in the repeat length of an adhesive pattern." J.A. at Tab 5, col. 4:59-60.  Those repeat lengths are "selected" based on factors such as expected receipt length or the apparatus used to manufacture label media. *See* J.A. at Tab 5, col. 4:59 – 5:20. Repeat length may be varied from one patterned substrate to another, but not "variable" as DRI contends. Thus, DRI's construction is wrong.

**j.      "vary locations of contact" and "variably located lateral cuts" terms (JCCC Nos. 13-14)**

The crux of the dispute between the parties here is the meaning of the terms "vary locations of contact" and "variably located lateral cuts."  However, DRI refuses to parse those terms out for construction and only offers manufactured constructions that lack any support in the specification. Worse still, DRI's proposed constructions are internally inconsistent.

The '184 patent teaches that a problem solved by the claimed invention is "repeatedly cutting through the same location of a patterned adhesive" which may cause "localized/heavy adhesive buildup." J.A. at Tab 5, col. 5:2-4. The solution comes from varying one or more of the adhesive pattern, repeat length, and cut location. Figure 1B below is an example:



J.A. at Tab 5, Figure 1B. According to the specification, cuts made at points A, B, and C contact adhesive at 4, 9, and 5 different transverse points of contact on the substrate, respectively. J.A. at Tab 5, col. 4:7-15.  These cuts are made at different locations on the web relative to the repeat length of the adhesive pattern (in the case of Figure 1B, a repeat length of 202 millimeters).  The varied locations of contact "spread the adhesive contact across as much of the cutter as possible (e.g., over time) to minimize deposition in localized regions." J.A. at Tab 5, col. 4:2-4.

DRI's proposed constructions directly conflict with the intrinsic record.  First, DRI's proposal requires the cutting blade to pass through areas with ***and*** without adhesive ***on every cut***. However, the specification expressly states "sensing of an adhesive pattern may be performed to

14

cut through a clear or near-clear (or other desired region)…to periodically and/or systematically…clean the entire cutter width," J.A. at Tab 5, col. 6:43-48, and that "a cut-wise 'gap' in the pattern may be sensed…and a cut made therein." J.A. at Tab 5, col. 6:34-36. Cuts that never contact adhesive are thus expressly taught.  Despite this clear teaching, DRI advocates for a construction that would contradict the disclosure in the patent by requiring that every cut contact areas with adhesive and without adhesive.

Second, DRI's construction requires that *every portion* of the cutting blade which cuts an adhesive-free portion of the substrate *will* contact adhesive on a subsequent cut. This incredibly detailed requirement finds no support in the intrinsic record and, in fact, contradicts it.  For example, the embodiments of Figures 1B-1H all show that the adhesive pattern does not cover the entire width of the label, that is, portions of the cutting blade which cut at the margins will *never* contact adhesive because no adhesive ever appears at the margin of the pattern. Third, DRI proposes that variably located cuts "occur randomly."  But this purported limitation is also directly contradicted by the intrinsic record.  Cuts occur based on "transactions/receipt details" or "printer control logic." J.A. at Tab 5, col. 3:64-66.  Requiring random lateral cuts would frustrate the purpose of the claimed invention in POS printers because label length would no longer be a function of the information to be displayed on the receipt label, and thus NCR's proposed constructions should be adopted over DRI's.

k.     **"adhesive free lanes" term (JCCC No. 15)**

Neither a person of ordinary skill in the art nor a lay juror need any assistance understanding the meaning of an "adhesive free lane." The presumption towards the plain and ordinary meaning of this term should apply.  Furthermore, DRI's proposed construction merely paraphrases the claim language while inserting a limitation ("wide web") and substituting "or"

for "and/or" in an unsubtle attempt to narrow the claim scope. As discussed in Section III.i, the

intrinsic record discloses several embodiments beyond a "wide web" and there is no support for

a narrow reading excluding those embodiments.  Further, nothing in the intrinsic record justifies

DRI's attempt to rewrite the plain language of the claim from "and/or" to "or".

l.       **"elongated diamond shape" terms[7] (JCCC No. 16)**

An "elongated diamond shape" in the context of the '184 and '190 patents carries no

special significance beyond the plain and ordinary meaning of the term to a person of ordinary

skill in the art.  DRI attempts to impose a construction based on one embodiment from the

specification, but the proposed construction excludes other embodiments expressly referred to as

variations on the elongated diamond shape. The left four patterns in Figure 1H are "variations of

diamond shaped adhesive," J.A. at Tab 5, col. 7:20-21, yet none of those patterns contain

discrete adhesive patches (as DRI's proposed construction requires), but rather bands of adhesive

in elongated diamond shapes. DRI's proposed construction contradicts the intrinsic record.

m.      **"repeat length" & "repeat distance" (JCCC Nos. 17, 21)**

The '184 patent contains multiple references describing the repeat length for areas with

adhesive. Those references consistently refer to repeat length as the distance along the web in

which the adhesive pattern is repeated. *See, e.g.*, J.A. at Tab 5, col. 4:16-30; 4:59 – 5:20.

Furthermore, "repeat lengths may be limited depending on the apparatus used to manufacture

label media." J.A. at Tab 5, col. 5:15-16. The '190 patent expressly recites how the term "repeat

distance," as used in the claims, is determined. "[T]he repeat distance can also be a machine

configuration parameter, a profile for a customer based on largest known size for a receipt on a

cut label, a parameter based on end use (including printer) requirements, and the like." J.A. at

---

[7] The '184 and '190 patents share the same specification, and all citations for these terms will be
made to the '184 specification for ease of reference.

Tab 7, col. 9:14-19. Based on one or more of these and/or similar factors, the repeat distance is used to provide the length along the web in which the adhesive pattern is repeated.

Nowhere in the intrinsic record is a repeat length or distance limited by a "repeated unit"—the term is never even mentioned. If DRI suggests that a repeat length is defined by a repeating element in an adhesive pattern, such a proposed construction ignores embodiments, such as those depicted in Figures 1G and 1H, which comprise a single adhesive shape. Under DRI's proposed construction, the repeat length for those embodiments could be less than a centimeter, which contradicts the express teaching that a "repeat length may be limited to the circumference of the cylinder used to apply the adhesive to the web." J.A. at Tab 5, col. 5:18-20.

**n.      "custom" term (JCCC No. 18)**

Custom cuts at custom lengths are nothing more than cuts made at different, specified locations to produce labels of different, specified lengths. The '184 patent teaches that Figure 1B depicts "three cuts [that] would result in three, varied/custom length linerless labels." *See supra* Section III.j; J.A. at Tab 5, col. 3:46-37. Furthermore, cut locations and label lengths will vary "as a consequence of the varied length of material that may be required for a given use (e.g., variation of media length with transactions/receipt details)." J.A. at Tab 5, col. 3:64-66. NCR's proposed construction provides clarification as to the use of the term "custom" as it appears in the intrinsic record.  "Custom" denotes something that is specially made, developed, or created. In this context, custom cuts signify that the cuts can occur at specially designated places and that such cuts will vary in length to accommodate the length of material for a given use such as the amount of detail printed on a label.

DRI's construction attempts to introduce no less than three limitations (continuous adhesive, a lack of adhesive-free spaces, and a lack of index marks), each of which contradict the

intrinsic evidence.  First, Figures 1D-1G show discrete adhesive patterns, rather than continuous ones.  Second, every disclosed embodiment in the '184 patent contains adhesive-free spaces. Third, the specification expressly teaches "cutting…may be performed using the patterned adhesive as a sense marks [*sic*]." J.A. at Tab 5, col. 7:55-57. DRI's proposed construction, lacking any basis in the intrinsic record, should be rejected in favor of NCR's construction.

**o.** **"the front portion displaying information for a transaction" (JCCC No. 19)**

A receipt label "displaying information for a transaction" is entirely within the ability of a lay juror to understand; the plain and ordinary meaning of the term is more than sufficient. However, DRI improperly seeks to limit the term to labels with information that "has been printed," i.e. the printing has already occurred.  This construction contradicts the claim language that immediately follows, however: "…displaying information for a transaction ***when the ink is activated by the thermal printer***." J.A. at Tab 5, claim 14 (emphasis added). As the claim expressly recites, the front portion is ***capable*** of displaying transaction information and does so ***when activated*** by the thermal printer. DRI's proposed construction attempts to limit the claim to labels that have been printed rather than labels capable of being printed.

**p.** **"pattern for adhesive material" / "adhesive pattern" (JCCC No. 20)**

The adhesive patterns claimed in the '190 patent have several unique features that one of skill in the art would recognize based on the disclosure in the specification. The particular patterns disclosed in the '190 patent are each configured to have a plurality of areas perpendicular to the running axis of the web with and without adhesive.  This configuration functions in a manner that may "reduce and/or vary the contact," and/or "approximately uniformly distribute any contact" between the POS printer components and the adhesive materials. J.A. at Tab 7, col. 3:1-6. The configurations are "selected" to perform those functions,

*see* J.A. at Tab 7, col. 1:40-50, and their structures permit applications of adhesive across more than half of the back surface of the label media and custom cut labels of varying lengths.

In the context of this invention and these claims, a person of ordinary skill would understand the term "pattern" in these claims to mean patterns that contain these features given the teachings of the associated benefits of the invention (*e.g.*, less frequent printer downtime, reduced adhesive build-up, etc.). DRI's suggestion to use plain and ordinary meaning here would not capture the meaning and understanding given the term by a complete reading of the specification. Presumably, a lay juror might interpret the term to encompass any adhesive pattern. Here, the patentee acted as its own lexicographer when it stated "[a]s illustrated in this and other embodiments, problems associated with adhesive buildup on a cutter of a thermal printer can be minimized by ***patterning the adhesive in a certain manner***." J.A. at Tab 7, col. 3:63-66 (emphasis added).  In the context of the intrinsic record as described above, the pattern must provide a plurality of transverse areas with and without adhesive.  Accordingly, a clear construction of "adhesive pattern" and "pattern for adhesive" is required.

> q.      **"providing the pattern…" terms (JCCC No. 22-23)**

Neither of these terms require construction, as the plain and ordinary meaning of the claim language is abundantly clear.  However, DRI again seeks to impose limitations that have no support in the intrinsic record. The substitution of "electronically communicating" for "providing" improperly limits the claimed method to only electronic communication and ignores the fact that the adhesive pattern may be "preconfigured into the machine that executes the labeling process (e.g. via a banded gravure cylinder)," J.A. at Tab 7, col. 9:4-6. A banded gravure cylinder is simply an engraved cylinder which requires no electronic communication to provide a pattern to a printing press or coater. Thus, the patent teaches that patterns may be

provided in any number of ways, including by providing a cylinder to the printing press. Furthermore, DRI's attempt to limit the process to a single printing press or coater ignores the transition term "comprising" in the preamble of claim 1, which does not foreclose one or more printing presses and/or coaters performing the recited steps. *See KCJ Corp.*, 223 F.3d at 1356.

### r. "reducing" and "evenly distributing" terms (JCCC No. 24-25)

DRI's proposed construction for these terms is identical to its proposed construction for term 13, *supra*. These proposed constructions should be rejected for the sole basis of failing to account for ***any*** of the differences in the language between these three claim terms.

First, DRI's proposed constructions should be rejected for at least the reasons stated in Section III.j, *supra*. Second, the intrinsic record supports NCR's constructions. The areas without adhesive "assist in cleaning/reducing any previously deposited adhesive" from the cutting blade. J.A. at Tab 7, col. 4:37-39. Also, the "pattern and or cutting location through the media should spread the adhesive contact across as much of the cutter as possible (e.g. over time) to minimize deposition." J.A. at Tab 7, col. 4:9-14. The '190 patent also teaches "the patterned adhesive may be configured on the second portion of the media in such a manner so as to uniformly/approximately uniformly distribute any contact occurring between a cutting mechanism and the adhesive material over a length/width of the cutting mechanism over the course of continued use." J.A. at Tab 7, col. 3:4-8. NCR's constructions recognize that every cutting blade part and every cut need not contact adhesive over the continued use of the printer.

## IV. Conclusion.

For the foregoing reasons, NCR respectfully requests that the Court adopt NCR's proposed constructions.

Respectfully submitted,

/s/ David M. Fry
                                                                    _____

OF COUNSEL:                          John W. Shaw (No. 3362)
Matias Ferrario                      David M. Fry (No. 5486)
Andrew W. Rinehart                   SHAW KELLER LLP
KILPATRICK TOWNSEND & STOCKTON LLP   300 Delaware Avenue, Suite 1120
1001 West Fourth Street              Wilmington, DE 19801
Winston-Salem, NC 27101             (302) 298-0700
(336) 607-7300                       jshaw@shawkeller.com
                                     dfry@shawkeller.com
Christina E. Fahmy                   *Attorneys for Plaintiff NCR Corporation*
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street NW
Washington, D.C. 20005
(202) 508-5800

Dated: May 14, 2015