```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4    NCR CORPORATION,              )        Civil Action
                                    )
 5                 Plaintiff,       )
                                    )
 6          v.                      )
                                    )
 7    DOCUMOTION RESEARCH, INC.,    )
                                    )
 8                 Defendant.       )        No. 14-395-GMS

 9                         -  -  -
                        Wilmington, Delaware
10                   Thursday, October 1, 2015
                             9:30 a.m.
11                        Markman Hearing
                             -  -  -
12
      BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
13

14    APPEARANCES:

15            JEFFREY T. CASTELLANO, ESQ.
              Shaw Keller LLP
16                   -and-
              MATIAS FERRARIO, ESQ.,
17            ANDREW W. RINEHART, ESQ., and
              DANIEL R. TAYLOR, JR., ESQ.
18            Kilpatrick Townsend & Stockton LLP
              (Winston-Salem, NC)
19
                             Counsel for Plaintiff
20
              PHILIP A. ROVNER, ESQ., and
21            ALAN SILVERSTEIN, ESQ.
              Potter Anderson & Corroon LLP
22                   -and-
              LESTER J. SAVIT, ESQ.
23            One LLP
              (Newport Beach, CA)
24
                             Counsel for Defendant
25
```

| :38:22 | 1 | THE COURT:  Good morning.  Please, take your |
| :38:24 | 2 | seats, counsel.  Apologize for the delay. |
| :38:27 | 3 | (Counsel respond "Good morning.") |
| :38:28 | 4 | THE COURT:  Let's have introductions, beginning |
| :38:30 | 5 | with plaintiff, please. |
| :38:34 | 6 | MR. CASTELLANO:  Good morning, Your Honor.  Jeff |
| :38:38 | 7 | Castellano with Shaw Keller for plaintiff NCR Corporation. |
| :38:41 | 8 | I am joined by Matias Ferrario, Daniel Taylor, and Andrew |
| :38:51 | 9 | Rinehart of Kilpatrick Townsend & Stockton.  We are also |
| :38:56 | 10 | joined by Chris Murphy, law VP for NCR Corporation. |
| :39:02 | 11 | (Counsel respond "Good morning.") |
| :39:03 | 12 | MR. ROVNER:  Going morning, Your Honor.  Phil |
| :39:05 | 13 | Rovner from Potter Anderson & Corroon, on behalf of the |
| :39:08 | 14 | defendant Documotion.  With me today from One LLP is Lester |
| :39:14 | 15 | Savit, my colleague Alan Silverstein, and Documotion's CEO |
| :39:19 | 16 | Joel VanBroom. |
| :39:20 | 17 | THE COURT:  Good morning, counsel. |
| :39:23 | 18 | (Counsel respond "Good morning.") |
| :39:23 | 19 | THE COURT:  How much time have we allotted for |
| :39:23 | 20 | this? |
| :39:26 | 21 | MR. SAVIT:  Three hours. |
| :39:27 | 22 | MR. FERRARIO:  Three hours, Your Honor. |
| :39:29 | 23 | THE COURT:  Have you discussed how you would |
| :39:30 | 24 | like to proceed? |
| :39:31 | 25 | MR. FERRARIO:  Yes, we have discussed the order |

| | | |
|---|---|---|
| :39:32 | 1 | and going term by term. |
| :39:34 | 2 | THE COURT:  Tell me what you have in mind. |
| :39:36 | 3 | MR. FERRARIO:  We thought we would start with |
| :39:38 | 4 | the '811 patent and address the terms in the order as they |
| :39:42 | 5 | were briefed. |
| :39:42 | 6 | THE COURT:  You are going to go through the |
| :39:44 | 7 | entire patent and defense respond and you reply, term by |
| :39:48 | 8 | term? |
| :39:48 | 9 | MR. FERRARIO:  Term by term. |
| :39:51 | 10 | THE COURT:  Is that acceptable? |
| :39:52 | 11 | MR. SAVIT:  Yes, Your Honor.  It would be in the |
| :39:55 | 12 | order of the joint claim construction statement and our |
| :39:58 | 13 | briefs then followed that order as well.  Those are numbered |
| :40:01 | 14 | 1 through 25.  Obviously, we will be spending more time on |
| :40:04 | 15 | some than others. |
| :40:05 | 16 | THE COURT:  I don't recall, it's been a while |
| :40:09 | 17 | since I read your briefs, quite frankly.  Let's keep in mind |
| :40:12 | 18 | that this is claim construction.  It is not summary |
| :40:16 | 19 | judgment.  I am not going to be doing matters that have to |
| :40:20 | 20 | do potentially with summary judgment issues.  It's pure |
| :40:27 | 21 | claim construction.  I am not going to be considering a lot |
| :40:31 | 22 | of -- any extrinsic evidence, unless you convince me there |
| :40:33 | 23 | is a need to help me do my job to consider intrinsic |
| :40:37 | 24 | evidence. |
| :40:39 | 25 | I give you that guidance so you don't waste your |

| | | |
|---|---|---|
| :40:42 | 1 | time and mine in your presentations.  Okay? |
| :40:47 | 2 | MR. FERRARIO:  Thank you, Your Honor. |
| :40:52 | 3 | Your Honor, I have a PowerPoint presentation. |
| :40:54 | 4 | THE COURT:  Please, pass that up to Mr. Buckson. |
| :41:16 | 5 | MR. FERRARIO:  Your Honor, if you would like, we |
| :41:18 | 6 | did prepare about three slides on some of the background, |
| :41:23 | 7 | just to take a step back, if that would be helpful. |
| :41:26 | 8 | THE COURT:  Sure. |
| :41:27 | 9 | MR. FERRARIO:  Very quickly, the technology here |
| :41:29 | 10 | and the issue relates to what's called linerless labels. |
| :41:34 | 11 | Those are simply receipt paper.  It is thermal receipt |
| :41:39 | 12 | paper, meaning it is printed using heat.  This is an example |
| :41:44 | 13 | of a printer that one would use.  The figure on the right is |
| :41:46 | 14 | what a roll of that paper looks like.  It is also known as a |
| :41:50 | 15 | narrow web.  And the distinction there simply is the machine |
| :41:55 | 16 | on the right -- these things come in huge rolls.  They are |
| :41:58 | 17 | also known as wide webs.  They are put into the machines. |
| :42:01 | 18 | And they go through a line where they are coated with |
| :42:05 | 19 | certain materials.  When they come out the other side, |
| :42:08 | 20 | another machine will do a slitting procedure, which will |
| :42:12 | 21 | slit the wide web into a narrow web, which is ultimately the |
| :42:18 | 22 | roll that's seen here. |
| :42:21 | 23 | It's linerless, because, as you know, on the |
| :42:24 | 24 | side here, the back side, there is adhesive.  You can sort |
| :42:30 | 25 | of see those in these little patches here. |

:42:33    1              THE COURT:  I see.

:42:34    2              MR. FERRARIO:  That adhesive patch is contacting

:42:38    3    this front surface.  That's the print surface.  So there is

:42:41    4    what's known as a release layer there.  It is just a coating

:42:44    5    to make this not stick to that surface.

:42:48    6              It is really as simple as that.

:42:50    7              On this back side you also see some index marks.

:42:54    8    Those are optional.  Those can be used by the printer to

:42:57    9    read and sense with respect to the paper.

:43:01   10              This is the side again where the thermal ink is

:43:03   11    printed.

:43:06   12              These narrow webs, these labeled rolls, they go

:43:09   13    into these printers and they contact lots of different

:43:12   14    components, rollers, a flat roller that helps feed the paper

:43:17   15    along, as well as a cutter that's used obviously to cut the

:43:21   16    receipts.  And then here is a top view that you will see.

:43:26   17              Here we show you this so that you can see the

:43:29   18    roller would be here, and the path upon which it is fed is

:43:33   19    also known as the longitudinal access, or axis, and this is

:43:37   20    the transverse axis here.

:43:39   21              You will hear some of these terms today, and I

:43:41   22    thought it would be useful to do that.

:43:44   23              Any questions?

:43:45   24              THE COURT:  No, sir.

:43:46   25              MR. FERRARIO:  With that, I will hand it over to

:43:48   1    Mr. Taylor.

:43:49   2                   THE COURT:  Mr. Taylor.

:43:50   3                   MR. TAYLOR:  Good morning, Your Honor.

:43:52   4                   THE COURT:  Good morning.

:43:53   5                   MR. TAYLOR:  I hope I can work this technology.

:43:56   6              May it please the Court, I would like to hand up

:44:02   7    three copies of the '811 patent.

:44:05   8                   THE COURT:  I think we have the patent, but we

:44:10   9    will take additional copies.

:44:14   10                   MR. TAYLOR:  There are four claims in that

:44:15   11   patent, Your Honor, that are at issue, Claims 1, 2, 22 and

:44:20   12   23.  The claim construction hearing will involve three of

:44:25   13   those claims, Claims 1, 2 and 22.

:44:32   14              There are five terms that need to be construed,

:44:35   15   Your Honor, that have been presented for construction.  We

:44:39   16   have agreed to address them one by one.  I will start with

:44:43   17   the first term, which is "single column."

:44:47   18              I will sort of advise the Court that I really

:44:51   19   don't think I am going to have much to say if anything on

:44:54   20   the remaining four, because I think it will be very clear to

:44:57   21   Your Honor when we get there.

:44:59   22              So I want to talk about the first one.

:45:07   23              '811 patent, "single column."  The term single

:45:10   24   column appears in two claims, Claims 1 and 22.  And it

:45:14   25   reads, "a plurality of discrete adhesive patches aligned and

:45:20    1    spaced apart longitudinally in a single column along a

:45:23    2    running axis of said web."

:45:25    3            That's Claim 1.

:45:26    4            Claim 22:  "a plurality of noncontiguous

:45:30    5    adhesive patches aligned in and spaced longitudinally apart

:45:33    6    along a single column."

:45:35    7            We propose that the proper construction is the

:45:38    8    plain and ordinary meaning.  DRI's proposed construction

:45:43    9    calls for "two or more patches of adhesive aligned and

:45:46   10    spaced apart in only one column," that is the argument, Your

:45:49   11    Honor, only one column, "and not having another column of

:45:53   12    adhesive patches."

:45:55   13            Obviously, not having another column of adhesive

:45:57   14    patches follows their position of only one column.

:46:00   15            The issue for Your Honor on this term, if you

:46:04   16    will, is whether "comprising a single column" precludes more

:46:08   17    than one column of adhesive patches.  Does single equal one

:46:14   18    and only one?  And we propose that the answer is no.  The

:46:20   19    claim language, the specification, and particularly the

:46:23   20    prosecution history do not redefine single as one and only

:46:27   21    one.

:46:30   22            Again, the single column language, a printing

:46:34   23    label comprising said back surface including a plurality of

:46:37   24    discrete adhesive patches aligned and spaced apart

:46:39   25    longitudinally in a single column, that's Claim 1.

| | |
|---|---|
| :46:44 | 1 |
| :46:48 | 2 |
| :46:50 | 3 |
| :46:53 | 4 |
| :46:55 | 5 |
| :46:58 | 6 |
| :47:03 | 7 |
| :47:06 | 8 |
| :47:16 | 9 |
| :47:20 | 10 |
| :47:25 | 11 |
| :47:28 | 12 |
| :47:31 | 13 |
| :47:34 | 14 |
| :47:37 | 15 |
| :47:38 | 16 |
| :47:39 | 17 |
| :47:45 | 18 |
| :47:50 | 19 |
| :47:56 | 20 |
| :47:59 | 21 |
| :48:03 | 22 |
| :48:04 | 23 |
| :48:08 | 24 |
| :48:10 | 25 |

Claim 22:  A label roll comprising said back
surface including a plurality of noncontiguous adhesive
patches aligned and spaced longitudinally apart along a
single column.

This is the claim specification, Your Honor.  It
talks about a small adhesive patch, but nowhere is the word
single or is the word one in the specifications.

Now, DRI in the joint appendix, I guess it was,
provided some language for what single meant.  I have
highlighted, or boxed, if you will, the two definitions.
They provided all four, but these are the two that they
argued.  Interestingly enough, the other two actually we
respectfully suggest --

THE COURT:  These are dictionary definitions?

MR. TAYLOR:  Yes, sir.

THE COURT:  That is perfectly fine.  I don't
want to overstate my point on extrinsic evidence.  I am not
interested in hearing from experts, considering expert
declarations, testimony, unless I am convinced that it's
necessary for me to understand the technology and therefore
do my job.

I am fine with this.

MR. TAYLOR:  We understand.  This is really, we
think, pointing out how their argument supports our
position.

:48:11    1         THE COURT:  I just wanted to inject that,

:48:14    2    because of my earlier comment.

:48:16    3         MR. TAYLOR:  If Your Honor will read with me,

:48:23    4    "Individual, taken in isolation (every single person

:48:29    5    present.)"

:48:31    6         Basically, it is saying has the same attribute,

:48:34    7    every single person present has the same attribute,

:48:36    8    consisting of a separate, unique whole.  Again, every single

:48:40    9    one has the same attribute.

:48:42    10        So single in that instance means same, not one.

:48:48    11        Now, this is the claim as it was issued.  And

:48:57    12   the underlined words are the words that were added after a

:49:00    13   tussle, if you will, with the patent examiner.  I want to

:49:03    14   explain that tussle to you and how these words got here.

:49:07    15        The words that were added were "noncontiguous

:49:10    16   and spaced longitudinally apart along a single column of

:49:16    17   adhesive extending along said running."

:49:18    18        There were three pieces of prior art that the

:49:20    19   patent examiner brought to our attention and argued made

:49:23    20   this invention, if you will, not patentable.  They are

:49:26    21   Mertens, Smith and Slagsvol.  What they showed was, in our

:49:33    22   terms, two long columns of contiguous adhesive running along

:49:40    23   the axis.  And the patent examiner, in looking at that,

:49:45    24   said, hey, you can't patent this thing because what I see is

:49:51    25   adhesive patches, a plurality of patches, in other words,

:49:55    1    the strip on the top and the strip on the bottom, aligned in

:49:59    2    a column, as I showed you over on the right.  That's what

:50:02    3    the patent examiner said he saw.

:50:04    4            We didn't agree with that.  But you have to move

:50:09    5    forward.  So we added "noncontiguous," "spaced

:50:13    6    longitudinally apart," "single," "of adhesive extending

:50:18    7    along said running axis."  Basically what we did was said

:50:22    8    discrete, noncontiguous, spaced laterally, in a single or

:50:26    9    same column.

:50:29   10            THE COURT:  You mean spaced longitudinally.

:50:31   11            MR. TAYLOR:  Yes, sir.

:50:39   12            Their whole argument is essentially that single

:50:43   13    means one and only one.  Our argument is essentially that

:50:47   14    single means its ordinary meaning, which includes the same.

:50:51   15            Now, it is interesting, this doesn't often

:50:55   16    happen, but occasionally, occasionally it helps you a little

:51:00   17    bit.  In connection with another patent, another patent that

:51:03   18    we are going to argue today, the '264 patent, they in fact

:51:07   19    use the word single to mean same.

:51:14   20            If you will look at how they raise -- I will try

:51:19   21    to do it this way, Your Honor, if I could.  In their

:51:22   22    brief -- I guess this is extrinsic evidence, so I hope I am

:51:26   23    not crossing the line -- in the brief they defined the first

:51:31   24    term of the '264 patent -- again, it is a different

:51:34   25    patent --

:51:35  1           THE COURT:  You mean their opening brief?

:51:37  2          MR. TAYLOR:  Yes, sir, their opening brief.

:51:39  3           THE COURT:  What page?

:51:40  4          MR. TAYLOR:  It starts on the bottom of Page 7.

:51:43  5  The important part is right at the top of Page 8, in the

:51:47  6  box.

:51:47  7           THE COURT:  I am there.

:51:49  8          MR. TAYLOR:  They say, first they say,

:51:52  9  Indefiniteness, then they say, alternatively, "the adhesive

:51:56  10  patches within a single aligned column."

:51:59  11        We called them out on it, because the patent, in

:52:03  12  fact, clearly says you can have one or more columns.  They

:52:06  13  responded in their final brief, their responsive brief, on

:52:12  14  Page 8, again, right after the '264, that essentially said

:52:19  15  NCR mischaracterized DRI's proposed claim construction to

:52:25  16  limit the claim scope to a single aligned column and patches

:52:29  17  in that column.  And they go on to say, Rather, DRI's

:52:32  18  proposed construction requires the presence of at least one

:52:35  19  column of differently sized patches and the same column

:52:40  20  containing different size adhesive free zones with those

:52:45  21  patches.

:52:45  22        Your Honor, we believe -- of course, there are

:52:48  23  three things that Your Honor looks at to inform your

:52:50  24  decision.  One, you look at the claims.  We believe it is an

:52:53  25  open claim, comprising.  And the word is single.  We see

| | | |
|---|---|---|
| :52:57 | 1 | nothing in the specification that limits that.  There is |
| :53:00 | 2 | nothing that says "one."  The word is a column several times |
| :53:04 | 3 | in there. |
| :53:04 | 4 | Third, if you look at the prosecution history -- |
| :53:06 | 5 | of course, it would be their burden to show by clear and |
| :53:09 | 6 | convincing evidence there was something in the prosecution |
| :53:11 | 7 | history that changed either the claim or the specification. |
| :53:14 | 8 | But we argue not only is there not anything in the |
| :53:18 | 9 | prosecution history that changes the claim or the |
| :53:23 | 10 | specifications, it actually reinforces our position that |
| :53:25 | 11 | single means same. |
| :53:27 | 12 | That is all I have on that one, Your Honor. |
| :53:31 | 13 | THE COURT:  Okay.  Thank you, Mr. Taylor. |
| :53:37 | 14 | MR. SAVIT:  Your Honor, may I bring up the slide |
| :53:40 | 15 | set? |
| :53:40 | 16 | THE COURT:  Sure, Mr. Savit.  Yes. |
| :54:06 | 17 | MR. SAVIT:  Thank you, Your Honor. |
| :54:20 | 18 | Your Honor, my voice woke up a little raspy |
| :54:24 | 19 | today. |
| :54:24 | 20 | THE COURT:  I hear that. |
| :54:26 | 21 | MR. SAVIT:  I will try to stay close to the |
| :54:28 | 22 | microphone. |
| :54:29 | 23 | THE COURT:  I am picking you up fine. |
| :54:32 | 24 | MR. SAVIT:  Thank you. |
| :54:33 | 25 | Your Honor, I first want to set a context for |

:54:36   1    the four patents and how they relate to each other.  And it

:54:39   2    turns out this first issue, the way that it has been framed

:54:43   3    by Mr. Taylor, I think it is important for you to understand

:54:46   4    the relationship between those four patents.

:54:53   5           So I am sorry, the print is quite small

:54:56   6    obviously on the copy you have.  This will be a little more

:54:59   7    readable.

:55:01   8           The information that I am trying to show here is

:55:03   9    a timeline for the four patents that are being asserted by

:55:08   10   NRC and how they relate to each other.  What we have up here

:55:11   11   is color-coded as to not just the filing date, also the date

:55:16   12   of publication of the applications and the issue date of the

:55:20   13   four patents, that I would like to walk you through.

:55:27   14          The first patent we already started to discuss

:55:30   15   is the '811 patent.  That was filed in 2004.  The second

:55:33   16   patent, the '264 patent, was filed as a new application.

:55:38   17   Now, normally, Your Honor -- I know you handle a lot of

:55:40   18   patent cases -- when you have patents that are related in

:55:44   19   subject matter, then they are generally filed as either a

:55:49   20   continuation or a divisional or even a continuation-in-part.

:55:52   21   This was actually filed as a completely separate

:55:55   22   application.  It doesn't trace back its history or claim

:55:59   23   priority to the '811 patent that was filed earlier that same

:56:04   24   year.

:56:05   25          So they were filed close in time, but not in the

:56:09   1   same family, technically.

:56:11   2           Third, Your Honor, is the '184 patent.  It was

:56:15   3   filed five years later, again, a new application not filed

:56:20   4   as a continuation, a continuation-in-part, or a divisional.

:56:25   5   It is not related in family to the earlier two patents.

:56:29   6           Now, due to the passage of time, the publication

:56:33   7   of those earlier applications and the failure of this

:56:36   8   application to claim priority to the earlier applications,

:56:41   9   those earlier applications are now prior art to the '184

:56:46   10  patent.  And then the '184 patent then was the source of the

:56:51   11  '190 patent application, which was filed as a divisional.

:56:55   12  The '184 is directed to this label stock, what we are

:56:59   13  calling label media.  And the '190 is directed to the method

:57:03   14  of manufacture.  Those two applications, that is, the '184

:57:07   15  and the '190, have the same disclosure.

:57:11   16          So the conclusion is there are, among these four

:57:17   17  patents, there are three separate disclosures.

:57:21   18          Again, I circled the earlier two to emphasize

:57:27   19  here that those earlier two are prior art to the later two.

:57:30   20  Once we get later in the morning to the later patents, you

:57:33   21  will see that that patent is directed in an entirely

:57:40   22  different direction, those later two patents.

:57:42   23          Let me direct my remarks -- I have some general

:57:45   24  remarks that relate to the '811 patent, then I will address

:57:49   25  the Claim Dispute No. 1.

:57:53    1          Again, some of this Mr. Taylor and Mr. Ferrario

:57:57    2     already discussed.  This is a roll of labels.  We have no

:58:02    3     dispute on that general topic.  I would like to point out,

:58:06    4     Your Honor, that the way that we show these labels, in other

:58:09    5     words, our interest today is in what we call the back side

:58:13    6     of the label.  You have to understand that these labels, the

:58:19    7     primary function is t be a label.  It is the other side, it

:58:24    8     is the printed side.  So when these printers are made, they

:58:27    9     are not specifically made for labels that have glue on them.

:58:30   10     They are made typically for the receipt that you get when

:58:33   11     you go, say, to a fast-food restaurant.  No glue on the

:58:36   12     back.  It prints out.  Nobody is interested in what is on

:58:39   13     the back of the label.  It just picks up -- you probably

:58:42   14     never even look at the back of the label.  That is the way

:58:44   15     the printers are made to deliver the label, so that you can

:58:46   16     see the printed side visually when it comes out.

:58:50   17          This is kind of reversed.  The reason that that

:58:52   18     is important -- I will get to that in a minute.  Let me

:58:55   19     finish the architecture here.  So the front side of the

:58:58   20     label here is the part that then gets rolled onto the

:59:01   21     adhesive part.  And that has a thermal coating.  That's

:59:05   22     where the print is made when this roll goes through the

:59:11   23     printer and is made into a label.  This is the back side of

:59:15   24     the labels.

:59:17   25          What is shown in the '811 patent is a single

:59:20    1    column of adhesive patches along one edge.  I think the

:59:23    2    common person who sees this is going to reflect on that and

:59:27    3    go out and say, that reminds me of a post-it.  Indeed, just

:59:32    4    like a post-it, you have an adhesive-free area on the other

:59:35    5    side, which is for hand grasping.  In other words, you want

:59:38    6    to be able to hold on to grab it, pull it off, and not have

:59:45    7    the adhesive stuck on your finger.  That's why there is this

:59:50    8    adhesive-free area.

:59:54    9            Particularly important, Your Honor, if you can

:59:55   10    visualize for a moment what happens in the back of a

:59:58   11    fast-food restaurant, let's say you go to a fast-food

:00:01   12    restaurant, you order a hamburger.  You don't want pickles

:00:04   13    on it.  I don't like pickles.  Okay.  You don't want

:00:08   14    pickles.  You tell the cashier that you don't want pickles.

:00:12   15    That gets put onto the receipt.  Then that gets printed out

:00:15   16    in the back where the person has the job of making that

:00:18   17    special order.

:00:20   18            That comes out in the printer.  That person who

:00:23   19    is then the worker has got plastic gloves on for sanitation

:00:27   20    reasons.  And they are going to reach up and take that label

:00:31   21    that has just been printed that tells them what they should

:00:35   22    be making, hamburger, no pickles.  They then put that onto

:00:39   23    the wrapper so that they can see, while they are building

:00:42   24    the hamburger, they can see what what goes in the hamburger,

:00:46   25    what doesn't go in the hamburger.  In this case, pickles

:00:49   1    don't go in it.  And then it's wrapped in a way that the

:00:51   2    visual side with the print then is seen by the workers up

:00:55   3    front, who can then make sure the right hamburger goes to

:00:58   4    the right customer.

:01:01   5          Now, one of the things Mr. Taylor said that I

:01:07   6    think might give you a misimpression, let me address it

:01:10   7    right now, which is, the back side of the label, again, when

:01:17   8    the worker takes it, the printer doesn't show the part with

:01:20   9    the glue on it.  So they are not able to see where the glue

:01:23   10   is and where the glue isn't.  So they are not able to grasp

:01:26   11   it.

:01:27   12         Another thing that is misleading is, in these

:01:31   13   drawings, we outline the shapes of the adhesive.  In

:01:37   14   reality, the adhesive is a very thin coat of transparent

:01:43   15   adhesive.  So you can't see it.  Even if you were to have

:01:49   16   the label come out with the glue side showing to the worker,

:01:54   17   they would still have a difficult time if they didn't know

:01:57   18   where the glue was and where the glue wasn't avoiding the

:02:00   19   location of the glue and avoiding therefore it getting stuck

:02:04   20   onto the plastic glove and you try to pull it off with the

:02:08   21   other plastic glove.

:02:09   22         That is very undesirable.

:02:11   23         Your Honor, let me address disputed Claim 1.

:02:15   24         We don't really have a -- we have already gone

:02:19   25   through this.  I do want to point out, really, the lengthy

| :02:24 | 1 | verbiage here that we submitted for claim construction, it |
| :02:28 | 2 | really just sets the context.  But we are really interested |
| :02:31 | 3 | in the phrase "a single column."  Again, maybe the |
| :02:35 | 4 | difference from what you just heard from Mr. Taylor was, he |
| :02:38 | 5 | was just focusing on "single" because he wants single to |
| :02:40 | 6 | mean same.  We are focusing on three words, which is "a |
| :02:43 | 7 | single column." |
| :02:47 | 8 | Now, let me get into the guts of this. |
| :02:52 | 9 | They had a dictionary definition.  Here is our |
| :02:54 | 10 | dictionary definition, which in Webster's Dictionary, I |
| :02:57 | 11 | obviously can't say I checked every dictionary, but the more |
| :03:00 | 12 | common definition rather than same or isolated is one and |
| :03:04 | 13 | only one, or not having or including, only one. |
| :03:09 | 14 | The classic example is, my best friend is |
| :03:12 | 15 | single.  Okay.  Not a couple.  That's one, that's not two. |
| :03:17 | 16 | Right?  Somebody is dating, you no longer refer to them as a |
| :03:23 | 17 | single.  You don't refer to them as two singles.  You have a |
| :03:26 | 18 | wedding.  You have a table.  That's a singles table. |
| :03:29 | 19 | Everybody there is a single, perhaps.  And, in fact, once |
| :03:34 | 20 | people connect, you no longer put them at the singles table. |
| :03:43 | 21 | Your Honor, Mr. Taylor now said -- it just so |
| :03:46 | 22 | happens my slide deck is going to address exactly what he |
| :03:50 | 23 | said -- he said, the patent doesn't use the word single. |
| :03:53 | 24 | Actually, he said the specification -- he was very careful. |
| :03:56 | 25 | Obviously, the claims that were written by NCR use the word |

:04:00  1  single.  So there was a disclosure of single.  And now I

:04:05  2  will show you where that disclosure is found.

:04:08  3  It's found in all the figures.  There are eight

:04:11  4  figures in the '811 patent.  Every single one of them, all

:04:16  5  eight opportunities to show more than one column, every

:04:20  6  single one of them had one and only one column.  That's

:04:24  7  their disclosure for single.  That's what they are using to

:04:27  8  support the word single as it appears in their claim that

:04:31  9  they added during prosecution.

:04:37  10  Here too shows a single column of adhesive.

:04:40  11  Here I want to point out that this is now showing a single

:04:43  12  label after it has come out of the printer and it has been

:04:46  13  cut.  That's why you just see one patch in this particular

:04:51  14  figure.  But when all those patches exist all along, it is a

:04:57  15  column.  It is initiated as a column.

:04:59  16  Again, this is a view.  It shows a single column

:05:02  17  of adhesive, Figure 3.  Figure 4, single column of adhesive.

:05:05  18  Figure 5, single column of adhesive.  Figure 6, single

:05:09  19  column of adhesive.  7, single column of adhesive.  Figure

:05:14  20  8, again, single column of adhesive.

:05:17  21  So that is looking, again, staying within the

:05:21  22  intrinsic evidence, the specification discloses only one way

:05:28  23  of doing this.  And that's a single column, not as one and

:05:33  24  only one.

:05:36  25  Your Honor, let's go to the prosecution history.

| | |
|---|---|
| :05:41 | 1 |
| :05:45 | 2 |
| :05:50 | 3 |
| :05:53 | 4 |
| :05:57 | 5 |
| :06:00 | 6 |
| :06:05 | 7 |
| :06:09 | 8 |
| :06:12 | 9 |
| :06:15 | 10 |
| :06:20 | 11 |
| :06:22 | 12 |
| :06:26 | 13 |
| :06:30 | 14 |
| :06:35 | 15 |
| :06:38 | 16 |
| :06:43 | 17 |
| :06:48 | 18 |
| :06:52 | 19 |
| :06:53 | 20 |
| :06:59 | 21 |
| :07:03 | 22 |
| :07:08 | 23 |
| :07:12 | 24 |
| :07:16 | 25 |

NCR added single to the claims.  If you look, and we cite the appendix page number in our briefs -- at the original set of claims, you are not going to see the word single or single column in that original set of claims. The word single, therefore, to the extent it exists in the claims -- and it does exist as a single column in all the asserted claims in this case -- was added during prosecution.  And as you know, Your Honor, that in itself, whether it is argued for patentability or not, that in itself has some very significant ramifications.

If, in fact, they did not add the word single and they just said a column, then perhaps they might have some weight to their argument about the open-ended nature of the word comprising or the word including.  In other words, they are arguing that because the word comprising or including is the lead-in, the preamble, then therefore, it's an open-ended claim and therefore an additional element can be added without departing from the scope of the claim.

We have no dispute with that general proposition.  I don't think anybody could.  However, of course, there are circumstances in which you then need to during prosecution then have a limiting terminology.  This is one of those occasions.  The question is, the word single was added.  If it just said a column you could say, yes, all you need was a column.  There is a column there.  The word

:07:19    1    single was added specifically to exclude prior art that had

:07:24    2    multiple columns.  So the word single is added.  It was

:07:28    3    intended to exclude prior art that had multiple columns, end

:07:35    4    of story.

:07:38    5            We are here to determine the meaning of the word

:07:40    6    single.  That was the meaning attributed to the word by NCR.

:07:44    7    They are now trying to do a revisionist history, a

:07:48    8    revisionist prosecution history, if you will.

:07:53    9            Now, that is not the end of it.  They did

:07:56   10    actually argue -- so we have single added to the claims to

:08:01   11    get around the prior art, three pieces of the prior art.

:08:05   12    Then they added argument, specifically, about the number of

:08:10   13    columns.  During the prosecution, they are addressing Claim

:08:20   14    31.  Of course, the application claims are numbered

:08:22   15    differently from the eventual patent claims.

:08:28   16            Claim 31, here it recites a "single column of

:08:32   17    the adhesive patches 38 along only one edge of the web; and

:08:38   18    the Figure 2 embodiment of Slagsvol," which is the prior art

:08:42   19    being addressed, "clearly shows two continuous adhesive

:08:45   20    strips, 2b and c.

:08:49   21            The word strips comes out of Slagsvol.  That is

:08:52   22    why it is used here in this argument.  Two does not

:08:55   23    anticipate one.  In other words, the limitation added of

:09:00   24    single column is then distinct from Slagsvol, which has two

:09:06   25    columns.

| | | |
|---|---|---|
| :09:07 | 1 | What Mr. Taylor showed you very quickly, |
| :09:11 | 2 | Slagsvol, let me show you again. |
| :09:14 | 3 | Slagsvol has two adhesive strips.  To the |
| :09:18 | 4 | examiner, strips were the columns.  So in other words, what |
| :09:21 | 5 | is being argued here -- maybe they were arguing |
| :09:24 | 6 | simultaneously that their columns, that is, NCR's columns, |
| :09:29 | 7 | are not continuous.  But in addition to that, if that's what |
| :09:33 | 8 | they were arguing, they were saying two does not equal one. |
| :09:38 | 9 | In other words, we have limited our claim.  We, NCR, have |
| :09:41 | 10 | limited our claim to single, meaning one and only one, to |
| :09:44 | 11 | distinguish this prior art, which has two.  This is really |
| :09:47 | 12 | as simple as that. |
| :09:49 | 13 | I rarely see something this clear in a |
| :09:51 | 14 | prosecution history. |
| :09:53 | 15 | Okay.  Two, another argument made by NCR.  It is |
| :09:59 | 16 | quite clear that Smith, another piece of prior art, |
| :10:02 | 17 | expressly illustrates, expressly discloses, and, indeed, |
| :10:06 | 18 | expressly recites in Claim 1 a linerless label in which two |
| :10:10 | 19 | strips of adhesive are disposed along the opposite edges and |
| :10:16 | 20 | are essential to the performance of the labels. |
| :10:18 | 21 | Again, NCR added "single" to get over Smith, |
| :10:24 | 22 | prior art.  And then they argued Smith is distinct, |
| :10:28 | 23 | different than and doesn't anticipate because it has two |
| :10:32 | 24 | strips or columns. |
| :10:35 | 25 | Let's take a look at Smith. |

:10:37    1         Well, indeed, Smith shows two adhesive strips.

:10:42    2    It is very clear, that is what was being distinguished.

:10:47    3         Okay.  Three, Your Honor, a third argument made

:10:51    4    in the prosecution history, now addressing the Mertens prior

:10:56    5    art, here, the examiner rejected based on Mertens.  And NCR

:11:02    6    says to the Patent Office, "Figures 5 and 7 of Mertens

:11:05    7    applied by the examiner have two bands."  They are not

:11:08    8    talking -- here they are not talking about continuous.  They

:11:10    9    are not talking about that same or isolated.  They are not

:11:14   10    talking about anything.  They are just distinguishing

:11:17   11    Mertens based on the fact that it has two and not one

:11:20   12    column.  Just to confirm that, here is Mertens' two adhesive

:11:26   13    bands 94.

:11:29   14         So, Your Honor, let me just check my notes.

:11:35   15    There are some other things that Mr. Taylor said that are

:11:38   16    not necessarily in my slide show.

:11:42   17         I will say that, again, we cited a case in our

:11:48   18    brief, in our briefs, stating that comprising is not this

:11:53   19    end all and be all.  They call it -- it's not a weasel word.

:11:58   20    In other words, that doesn't open up to multiple elements

:12:03   21    features that have been limited.  And this is the case here.

:12:10   22         Now, finally, I am glad that I addressed the

:12:12   23    history of the four patents, because Mr. Taylor, what he was

:12:15   24    saying, it's his Slide No. 24, is somewhat deceptive, Your

:12:22   25    Honor, because he is now talking about the next patent,

:12:26    1    which is the '264 patent.  So he is quoting back my brief,

:12:33    2    Documotion's brief, saying our position isn't -- if you look

:12:41    3    at his Slide 4, that quote there about my brief Page 8, you

:12:51    4    see that, Your Honor, that is -- we haven't even gotten to

:12:55    5    that issue yet.  That is the next patent.  A different claim

:12:58    6    term, and a different patent entirely.

:13:01    7             And, in fact, I will own up, in that patent our

:13:05    8    position is that claim itself is not limited to a single

:13:08    9    element.  Of course, it doesn't have the words "single

:13:11    10   column" in it.  It doesn't have any of these issues.

:13:14    11            So I will also tell you, Your Honor, I don't

:13:16    12   like to use the word deceptive.  I am talking about in a

:13:22    13   courtroom my opposing counsel.  But this is quite deceptive.

:13:25    14   And I do have to alert you that when I am talking there, on

:13:29    15   Page 8 on my brief, I am talking about the '264 patent.  I

:13:32    16   am not talking about this patent.  I am not talking about

:13:35    17   these Claims 1 and 22.  And I am not talking about the

:13:38    18   phrase "a single column."

:13:39    19            Thank you, Your Honor.

:13:40    20            THE COURT:  Thank you, Mr. Savit.

:13:42    21            Mr. Taylor.

:13:43    22            MR. TAYLOR:  Very briefly, Your Honor.

:13:58    23            I am from North Carolina.  Maybe we do things

:14:02    24   differently in North Carolina.  But I heard "deceptive"

:14:05    25   about three times.  I heard "misleading" a couple of times.

| | |
|---|---|
| :14:10 | 1 |
| :14:14 | 2 |
| :14:17 | 3 |
| :14:21 | 4 |
| :14:25 | 5 |
| :14:36 | 6 |
| :14:39 | 7 |
| :14:42 | 8 |
| :14:46 | 9 |
| :14:49 | 10 |
| :14:49 | 11 |
| :14:52 | 12 |
| :14:54 | 13 |
| :15:01 | 14 |
| :15:05 | 15 |
| :15:10 | 16 |
| :15:15 | 17 |
| :15:20 | 18 |
| :15:23 | 19 |
| :15:25 | 20 |
| :15:30 | 21 |
| :15:32 | 22 |
| :15:37 | 23 |
| :15:41 | 24 |
| :15:42 | 25 |

I heard "gave a misimpression" a couple of times.

I stand by everything that I spoke to this Court about and what it showed.

About four points I want to make.  I will make the first one with the patent.

Mr. Savit is correct that there are eight figures.  They are not the be all and end all.  We are not limited to only those eight figures.  But only eight figures that he showed you, representing to you that they are on the patent.

He added words that are not on the eight figures.  I won't characterize that, other than to ask Your Honor to look at the patent.

With regards to the reference in the '264 patent, which he ended with, in fact, he used in his own brief the word single to mean same.  That is all we were referring to.  He used single to mean same, which is what we believe it should mean.

With regards to Claim 33 that he showed, first of all, that claim is not an issue in dispute.  If you read the prosecution history, you will see that it's a different claim in a different context.  In that context, two does not mean one or one does not anticipate two.  But it's an entirely different context.

As Your Honor knows, in all of these cases,

| | |
|---|---|
| :15:44 | 1 |
| :15:46 | 2 |
| :15:50 | 3 |
| :15:51 | 4 |
| :15:59 | 5 |
| :16:06 | 6 |
| :16:13 | 7 |
| :16:16 | 8 |
| :16:20 | 9 |
| :16:23 | 10 |
| :16:25 | 11 |
| :16:26 | 12 |
| :16:30 | 13 |
| :16:33 | 14 |
| :16:38 | 15 |
| :16:43 | 16 |
| :16:46 | 17 |
| :16:53 | 18 |
| :16:55 | 19 |
| :16:56 | 20 |
| :16:59 | 21 |
| :17:01 | 22 |
| :17:04 | 23 |
| :17:08 | 24 |
| :17:12 | 25 |

there are about three things that are important:  context, context, and context.  Just like real estate.  It's that simple.

Finally, if I can go back, these were the words that were added, "noncontiguous," "spaced longitudinally apart," "single column adhesive."  This is why.  This is why they were added, because the patent examiner saw those two bands as a plurality of patches that were aligned in a column.  It's the same issue in all three of the prior art.  You can talk about them separately, but it's really the same.

The patent examiner saw two bands of adhesive, which he said were a plurality of patches and they were aligned in a column.  So we added that language, which gave you this, essentially, discrete, noncontiguous patches spaced longitudinally apart in a single or same column.  Just like every single person here is wearing a tie.  They are like ties in this room, Your Honor.

That's all I have.

THE COURT:  All right.  Thank you, Mr. Taylor.

Let's move on to the next term.

MR. TAYLOR:  Yes, sir.  In an attempt to maybe expedite this, I really don't have anything with regards to the next five terms, other than it's in our briefs.  I would like to respond briefly, because I think in each instance

:17:17   1   Documotion is attempting to read into the patent limitations

:17:20   2   that do not exist.

:17:21   3            THE COURT:  That is music to my ears, Mr.

:17:24   4   Taylor.  Let's hear from Mr. Savit.

:17:25   5            MR. SAVIT:  Your Honor, I do have some comments

:17:27   6   on Terms 2 and 3.  But I will do them together.  And I will

:17:32   7   try and be brief, although there is some explaining that

:17:36   8   needs to be done.

:17:39   9            One last point about --

:17:41   10           THE COURT:  I am done with that.

:17:42   11           MR. SAVIT:  Okay.

:17:43   12           THE COURT:  Plaintiff gets the last word in my

:17:45   13   courtroom.

:17:46   14           MR. SAVIT:  Thank you, Your Honor.

:18:03   15           So, Your Honor, as I said, I have grouped Terms

:18:07   16   2 and 3 together.  They go together because they use the

:18:11   17   phrases "in minor area" and "remaining major area."

:18:20   18           Our construction is the column of adhesive is

:18:23   19   located in an area that is less than one side of the

:18:26   20   longitudinal center of the web's back surface.  And the

:18:30   21   web's back surface has an area that is more than one-half of

:18:34   22   the back surface opposite of the longitudinal centerline

:18:37   23   from the minor area.

:18:41   24           So, again, in Claim 1, the adhesive patches are

:18:47   25   claimed as being in an area described as minor.  There is an

:18:53      1    area major, obviously, which needs to be larger than the

:18:58      2    minor area.  That is described as being the remainder,

:19:01      3    remaining area, what's left over.  That area does not have

:19:05      4    adhesive.  Again, that traces back to this idea that you

:19:08      5    want this area free from grasping hands that have gloves on

:19:12      6    them.  The major area allows for the hand grasping.

:19:18      7              Your Honor, the '811 specification discloses --

:19:22      8    I am using Figure 8 as an example here -- any of the figures

:19:27      9    1 through 8 could be used for this purpose.  These adhesive

:19:32     10    patches are in a minor area.

:19:34     11              Now, it doesn't show great on this screen, Your

:19:38     12    Honor.

:19:38     13              Just to address a point that Mr. Taylor said

:19:41     14    about adding things to the slides, I made an effort to make

:19:45     15    sure everything I added to a slide that wasn't in the

:19:48     16    original figures is in red, so that there would be no

:19:52     17    confusion, with the exception, as I recall now, Your Honor,

:19:55     18    there were some cropped views that I needed to add figure

:20:01     19    numbers or citations.  Those I did not put in red just

:20:04     20    because I didn't want to have those to be distracting.

:20:07     21              Other than that, I made a very big effort to

:20:09     22    make sure that everything that I have is clearly denoted in

:20:13     23    red, and that would not be in the original patent.

:20:18     24              THE COURT:  It is clear what is outlined in red

:20:20     25    in the actual slide deck that I have in front of me.

:20:23    1           MR. SAVIT:  Now, Your Honor, the patches, as

:20:27    2   shown here, that dotted line I have added, that's the minor

:20:32    3   area.  The major area is what's left over.  That's described

:20:37    4   as being devoid of adhesive.  What is also shown here is a

:20:43    5   longitudinal centerline, which is also called in the patent

:20:46    6   a running axis.

:20:55    7           Here, Your Honor, what we see is the area is, if

:21:02    8   you add up those areas, they have to be a hundred percent.

:21:06    9   So the areas in which you could have the patches are going

:21:10   10   to be in an area that's less than 50 percent and the area

:21:15   11   that is devoid of it is going to be more than 50 percent.

:21:19   12   Because you have this running centerline or axis disclosed

:21:23   13   in the patent, then necessarily you can use that as a guide

:21:26   14   as to where the patches, the area that the patches would be

:21:29   15   present.

:21:31   16           Again, if you look at the figures, Figure 1

:21:34   17   shows this major area, which is to the one side of the

:21:40   18   centerline, devoid of adhesive.  Figure 2, same thing.

:21:44   19   Figure 3, same thing.  Figure 4, there is the centerline.

:21:49   20   Your Honor, no adhesive on that side of the longitudinal

:21:53   21   centerline.  Again, major area, more than 51 percent,

:22:00   22   bridging over from the centerline, no adhesive.

:22:02   23           Figure 6, same thing.  Figure 7, same.  Figure

:22:06   24   8, same.

:22:07   25           So what we have here again, just to do the

:22:13    1    **mathematics, an adhesive-free area for hand grasping is the**

:22:16    2    **area that's 51 percent.  The remaining area where the**

:22:21    3    **columns are not, columns of adhesive are not, on that side,**

:22:26    4    **the opposite side of the longitudinal centerline, clearly**

:22:29    5    **disclosed in the patent.  And as I point out here, the**

:22:34    6    **longitudinal running axis denoted as 32.**

:22:38    7    **Thank you, Your Honor.**

:22:39    8    **THE COURT:  Thank you, Mr. Savit.**

:22:42    9    **Mr. Taylor.**

:22:43    10    **MR. TAYLOR:  Yes, Your Honor.  I was just**

:22:44    11    **drawing something here.**

:22:46    12    **First of all, this is the construction, Your**

:23:19    13    **Honor, that they are arguing for:  The column of adhesive is**

:23:24    14    **located in an area that is less than one side of the**

:23:27    15    **longitudinal centerline of the web's back surface.**

:23:30    16    **They are injecting a positional limitation, if**

:23:34    17    **you will.**

:23:35    18    **THE COURT:  You mean longitudinal.**

:23:37    19    **MR. TAYLOR:  Well, yes, longitudinal, I guess,**

:23:40    20    **get my axis right.  Longitudinal.**

:23:43    21    **What is interesting about that is, here is an**

:23:46    22    **example, if you forget for a moment about the argument about**

:23:52    23    **single columns, so we will just say there is just, we will**

:23:56    24    **show an example with one single column, although I could**

:23:59    25    **show you an example of multiple single columns, you clearly**

| | | |
|---|---|---|
| :24:03 | 1 | could have a plurality of discrete patches that crosses -- |
| :24:07 | 2 | THE COURT:  You can use the Elmo if you would |
| :24:09 | 3 | like.  Just lift it up. |
| :24:11 | 4 | MR. TAYLOR:  Let me figure out how to do that. |
| :24:13 | 5 | THE COURT:  You need to lift that up. |
| :24:17 | 6 | MR. TAYLOR:  You can see, that would be one |
| :24:52 | 7 | column.  And there can be part of the adhesive that would |
| :24:55 | 8 | cross over the centerline and still be consistent with the |
| :24:58 | 9 | way the claim is written.  And, of course, if you had two |
| :25:02 | 10 | columns, and nothing in that alignment, nothing that was |
| :25:09 | 11 | issued in the adhesive in there, takes way from the ability |
| :25:12 | 12 | of the fast-food employee grabbing the free space that we |
| :25:19 | 13 | will talk about later, the cantilevered space.  It is just, |
| :25:23 | 14 | whatever is fixed, he can grab. |
| :25:26 | 15 | So their proposed construction, Your Honor, is |
| :25:30 | 16 | one that violates the rules, because it's limiting a term by |
| :25:35 | 17 | information that's not in the claim, and it doesn't work. |
| :25:39 | 18 | That's the argument. |
| :25:39 | 19 | THE COURT:  Okay.  Let's move on to the next |
| :25:44 | 20 | term. |
| :25:58 | 21 | MR. TAYLOR:  I don't have anything to say about |
| :26:01 | 22 | "major" until my friend finishes.  I rest on the brief. |
| :26:08 | 23 | MR. SAVIT:  You passed on everything up until |
| :26:10 | 24 | the '264 patent. |
| :26:11 | 25 | MR. TAYLOR:  Yes, sir. |

:26:12    1    MR. SAVIT:  Your Honor, I am happy with the way

:26:14    2    we briefed that.  We can move to the '264 patent.

:26:17    3    THE COURT:  Let's move to the '264 patent.

:26:28    4    MR. FERRARIO:  Your Honor, there are a number of

:26:47    5    terms in the '264 patent that have been briefed, although I

:26:52    6    would like to focus on the first two terms, which claim

:26:57    7    different patches, different sized patches, and then

:27:03    8    different sized adhesive free spaces.

:27:08    9    THE COURT:  Okay.

:27:08    10   MR. FERRARIO:  Let me get through this here.

:27:16    11   So the first one is in the joint claim

:27:19    12   construction statement No. 8.  It states, "An identically

:27:23    13   repeating series of differently sized adhesive patches."

:27:26    14   Then in joint claim construction No. 9, there is

:27:33    15   differently sized adhesive three zones.

:27:36    16   So the dispute really boils down to where these

:27:45    17   different size patches have to be.  It's really their

:27:49    18   location, because the parties at least agree that different

:27:52    19   means different and different sizes means different sizes.

:27:55    20   There is no dispute there.  The question is whether,

:27:59    21   according to DRI, whether those different sized patches have

:28:03    22   to be in the same column.

:28:06    23   So you have heard a little bit about this

:28:08    24   before, because their proposal was that different size

:28:12    25   patches have to be in a single column.  There was actually

:28:15     1     some confusion at first.  We said, single, you mean only

:28:18     2     one?  Because Figure 8 shows two columns.  Because, they

:28:23     3     said, No, no, no.  We meant by single they have to be in the

:28:26     4     same column.  You have to have a patch of one size in one

:28:29     5     column and you have to have a patch of another size in that

:28:32     6     same column.

:28:34     7           For us, it really boils down to where are you

:28:37     8     getting that limitation of the claim, because the claim says

:28:40     9     different sized patches in a column, which is one or more

:28:43    10     columns.

:28:45    11           I think you will see a theme here today, this is

:28:48    12     that, it is my understanding of DRI's interpretation of

:28:51    13     claim construction jurisprudence, that is that if you don't

:28:55    14     show it in the figure, it is not part of the claim.  So in

:28:58    15     other words, they require a figure for every variation of

:29:02    16     what the claim is, which is missed --

:29:07    17           THE COURT:  Let's clear that up.  That's not an

:29:09    18     unreasonable position.

:29:12    19           Is that your view, Mr. Savit?

:29:14    20           MR. SAVIT:  No, Your Honor.  But in this case,

:29:17    21     with respect to single, that was --

:29:20    22           THE COURT:  Just as to his comment about his

:29:22    23     perception, counsel's interpretation of how you view the

:29:28    24     canons of construction.

:29:30    25           MR. SAVIT:  No, as far as the disclosure, with

|         |    |                                                                    |
|---------|----|--------------------------------------------------------------------|
| :29:33  | 1  | respect to the '811 patent, since there was no word single         |
| :29:37  | 2  | used in the specification --                                       |
| :29:38  | 3  | THE COURT:  His comments about the figure.                         |
| :29:39  | 4  | MR. SAVIT:  In the figures, in the '811, yes,                      |
| :29:42  | 5  | all those figures have just one column.  That doesn't mean         |
| :29:44  | 6  | it's limited to one column.  Yes, I would agree with that.         |
| :29:47  | 7  | When you add the word single to the claim, and that's all          |
| :29:50  | 8  | you disclosed, I would say yes, that it is.                        |
| :29:53  | 9  | THE COURT:  I am just trying to understand,                        |
| :29:55  | 10 | counsel, what your positions are in terms of the law that I        |
| :29:59  | 11 | am to apply.                                                       |
| :30:01  | 12 | Go ahead, counsel.                                                 |
| :30:02  | 13 | MR. FERRARIO:  So at least that's our view.  I                     |
| :30:05  | 14 | think that crystallizes here when you look at what was             |
| :30:08  | 15 | disclosed in the patent and what they say about where these        |
| :30:11  | 16 | different sized strips should be.  Let me point out Figure         |
| :30:17  | 17 | 5, that is the focus for that.  Then you have, according to        |
| :30:19  | 18 | them, the patches in the same column, the different sized          |
| :30:23  | 19 | shapes in the same column.  In Figure 8, which they identify       |
| :30:26  | 20 | in their brief and they criticize and they say, well, this        |
| :30:29  | 21 | shows two columns, but it doesn't show different sized            |
| :30:34  | 22 | patches in between two columns.  I am not entirely sure.  I        |
| :30:40  | 23 | think, yeah, looking at this, just eyeballing it, I can say,       |
| :30:43  | 24 | they don't appear to be overly differently sized here.  But       |
| :30:48  | 25 | what this does show, that when you back up and you read the        |

| | | |
|---|---|---|
| :30:51 | 1 | patent and you say what is going on here, what is the |
| :30:54 | 2 | teaching, it shows, and it teaches, you have multiple |
| :30:57 | 3 | columns, and you need different sizes, patches, to achieve a |
| :31:02 | 4 | benefit. |
| :31:03 | 5 | So there is nothing in the specification that |
| :31:05 | 6 | says that those different sized patches have to be in the |
| :31:08 | 7 | same column.  And that's the limitation that they are trying |
| :31:11 | 8 | to add.  So that works the same with differently sized |
| :31:17 | 9 | adhesive free spaces, which is the space between the |
| :31:21 | 10 | patches. |
| :31:22 | 11 | The patent teaches pretty clearly that, it is |
| :31:27 | 12 | pretty broad, I think, in the description of the |
| :31:31 | 13 | functionality, is that the number, the size, and the spacing |
| :31:34 | 14 | of these patches, and the corresponding adhesive free zones, |
| :31:39 | 15 | are controlled in large part by the configuration of the |
| :31:43 | 16 | intended printer.  And as we discussed earlier, the |
| :31:47 | 17 | printer -- |
| :31:50 | 18 | THE COURT:  Let me ask this:  Is it your |
| :31:52 | 19 | position that differently, in terms of patent scope, that |
| :31:55 | 20 | differently sized patches are in different columns? |
| :31:58 | 21 | MR. FERRARIO:  Can be. |
| :31:59 | 22 | THE COURT:  Rather, can be. |
| :32:00 | 23 | MR. FERRARIO:  Yes. |
| :32:01 | 24 | THE COURT:  In different columns. |
| :32:02 | 25 | MR. FERRARIO:  That's right. |

| | | |
|---|---|---|
| :32:03 | 1 | THE COURT:  Okay.  Go ahead. |
| :32:04 | 2 | MR. FERRARIO:  And the differently sized |
| :32:07 | 3 | adhesive free zones can be between those different columns |
| :32:10 | 4 | as well. |
| :32:11 | 5 | The teaching here is simply that.  The patent |
| :32:15 | 6 | taught that they are on these printer components that can |
| :32:18 | 7 | interfere with or touch the adhesive patches.  So one of |
| :32:22 | 8 | skill in the art would know that you can design your pattern |
| :32:27 | 9 | such that you can have patches avoiding these areas.  That |
| :32:33 | 10 | includes patches that might avoid components in a particular |
| :32:38 | 11 | column.  And that includes components of the printer where |
| :32:41 | 12 | if you have multiple columns you have to have different |
| :32:43 | 13 | sizes in between those as well. |
| :32:46 | 14 | Thank you. |
| :32:47 | 15 | THE COURT:  Thank you, counsel. |
| :32:51 | 16 | I guess I do have a curiosity for both of you. |
| :33:32 | 17 | This has nothing to do with claim construction.  Given the |
| :33:35 | 18 | advance of technology in our world today, I don't want to |
| :33:39 | 19 | upset any of the executives in here, but how much longer is |
| :33:43 | 20 | this technology going to be relevant to the way we consume |
| :33:49 | 21 | in the world?  You used the example, Mr. Savit, of fast-food |
| :33:55 | 22 | workers and the way they take their instructions and how it |
| :33:58 | 23 | works back there, as they are building a burger or whatever. |
| :34:02 | 24 | I just wonder how much longer paper or anything that would |
| :34:08 | 25 | vaguely resemble a piece of paper is going to be in use. |

:34:11    1    Just a curiosity.

:34:14    2                MR. SAVIT:  Your Honor, I have another client

:34:15    3    who actually is involved in how you get wireless connection

:34:21    4    to your airplane.  And it's sort of connected here, which is

:34:27    5    why you have weightings in an airplane when every single

:34:30    6    person in there has at least a phone, some have a phone, a

:34:34    7    computer and a tablet, and it adds a lot of weight.

:34:36    8                You will see in the next generation what is

:34:38    9    going to happen is it will just connect up.  There will no

:34:43   10    screens.  Everybody will have their own screen.  In retail,

:34:47   11    that is what will happen in fast-food restaurants, you will

:34:49   12    come in, you will get your receipt from the phone.

:34:52   13                THE COURT:  I am always offered anymore, Do you

:34:58   14    want your receipt by e-mail?

:34:59   15                I will leave it there.  I don't want to upset

:35:03   16    that.

:35:04   17                MR. MURPHY:  You did not upset us, Your Honor.

:35:07   18    That receipt you received, that is NCR technology.

:35:11   19                THE COURT:  All right.

:35:15   20                MR. SAVIT:  We are talking about the '264

:35:17   21    patent.  As a general introduction, we are talking about a

:35:21   22    level of labels that are going through the printer.

:35:26   23                The direction of the labels through the printer

:35:28   24    is now very important.  And what you see here is, there is

:35:33   25    actually an arrow marked as No. 36, let's see if I can put

| | | |
|---|---|---|
| :35:37 | 1 | my laser pointer to work, right there.  36, that arrow, is |
| :35:43 | 2 | to designate that this web, which is the paper coming off |
| :35:47 | 3 | the roll, that's the direction of the paper through the |
| :35:52 | 4 | printer.  It does not go this way.  It doesn't go this way |
| :35:55 | 5 | (indicating).  I will tell you right now why that is |
| :35:59 | 6 | important.  That's called the running axis.  The label runs |
| :36:03 | 7 | this way through the printer. |
| :36:05 | 8 | Your Honor, the whole point of this differently |
| :36:08 | 9 | sized adhesive patches and the differently sized adhesive |
| :36:15 | 10 | free zones between the adhesive patches is in order to |
| :36:20 | 11 | create spaces at nonuniform positions along this direction. |
| :36:29 | 12 | I will point back at 36 -- this direction, which is the |
| :36:34 | 13 | direction on this column, through the printer, so that those |
| :36:39 | 14 | spaces align perfectly with the printer component. |
| :36:44 | 15 | If you can imagine comparing printer paper to |
| :36:48 | 16 | printers, it's almost like Mohammed and the Mountain. |
| :36:53 | 17 | Obviously, it is easier to take Mohammed to the mountain |
| :36:55 | 18 | than bring the mountain to Mohammed.  It is easier to make |
| :36:58 | 19 | the paper fit the printer than it is to change the printer, |
| :37:04 | 20 | especially since these printers are made primarily for |
| :37:08 | 21 | non-glue receipts, where you don't have these issues. |
| :37:13 | 22 | So printers are not made to have components that |
| :37:17 | 23 | are going to match up with where the spaces are in the glue |
| :37:21 | 24 | patches, so that's why you want to design the glue patches |
| :37:25 | 25 | in a way with differently sized adhesive and differently |

:37:29      1    sized zones without adhesive between them so that they will

:37:32      2    match up with where the printer components are.

:37:36      3              Here are the printer components that are shown

:37:39      4    in this figure of the patent.  And you will note, then,

:37:44      5    exactly as I said, the printer components line up exactly

:37:49      6    with the spaces.

:37:53      7              Now, let me flash ahead here.  We have already

:38:03      8    gone through this.  Our position, indeed, is that this

:38:09      9    language, "aligned in a column along said web," there is two

:38:12     10    things that are important in that.  One is that they are

:38:16     11    aligned in a column, not a row.  That means they are aligned

:38:20     12    in a column, along the web, along meaning longitudinally, as

:38:26     13    disclosed in the patent.  Long being basically a derivative

:38:30     14    of longitudinal.  And that all of these patches are in the

:38:37     15    same column.

:38:39     16              Again, that is the same column, because

:38:44     17    otherwise there would be no point to it.  The whole point is

:38:47     18    you want to space the spaces between the adhesive at regular

:38:51     19    points that match up again with the printer components.

:38:56     20              So, the questions are, does aligned in a column

:38:59     21    along the web modify both the differently sized patches and

:39:03     22    the differently sized free zones?  The answer is, yes.  And

:39:07     23    I don't know that we have a dispute about that.  I think

:39:10     24    maybe we have agreement on that.

:39:11     25              Does the column have to be in the direction of

:39:13  1   the longitudinal axis of the web?

:39:16  2                Answer:  Yes.

:39:17  3                I believe that's maybe where we have our

:39:20  4   dispute.

:39:21  5                Again, differently sized adhesive patches, free

:39:24  6   zones between the patches, aligned perfectly.

:39:28  7                Now, let me, in register with the printer

:39:36  8   components, I already made that point.

:39:39  9                NCR has what I called red-herring arguments that

:39:42  10  relate to Figures 5 through 8.  Mr. Ferrario just pointed to

:39:48  11  Figure 8 and said that shows two columns.  Therefore, that

:39:53  12  means their claim that says aligned in a column along the

:39:56  13  web, that means you can't have two columns.  Again, with

:40:00  14  respect to this patent and this claim, we don't dispute that

:40:04  15  you could have within the scope of the claim multiple

:40:06  16  columns.  All we are saying is that the patches and the

:40:11  17  adhesive-free spaces have to be in the same column and that

:40:15  18  column has to be aligned along the dimension of the web.

:40:20  19                So construing alignment along the web to be in

:40:26  20  this direction, side to side, which is what they are arguing

:40:29  21  that that claim should be expanded to allow that

:40:35  22  orientation, it makes no sense, because in that case, you

:40:37  23  are not going to be able to register this in the particular

:40:41  24  spots where the printer components are, because the label

:40:45  25  doesn't move this way (indicating) through the printer.  It

:40:49    1   moves this way through the printer.  These components are

:40:52    2   rollers.  And in every printer that's what the orientation

:40:55    3   is going to be.

:40:58    4          Figures 1 --

:40:59    5          THE COURT:  When you say "this way," it moves

:41:01    6   east and west as opposed to north and south.

:41:04    7          MR. SAVIT:  Yes, in this particular figure, yes.

:41:07    8          Now, Your Honor, Figures 1 through 4 actually

:41:12    9   relate to this concept, this idea of differently sized

:41:17   10   patches and putting them in spots to register with the

:41:20   11   printer component.  If you will notice, when you go

:41:22   12   through -- and I am prepared to go through that now --

:41:26   13   Figure 1, that shows, if you look carefully, you will see

:41:33   14   No. 44 there, on Figure 1 and Figure 2, again, these are the

:41:40   15   differently sized patches and differently sized spaces.  You

:41:44   16   can clearly see that in Figure 2.  Figure 3, same thing,

:41:48   17   shows the printer, this is an elevational view looking down

:41:53   18   on the printer -- actually, I guess you would say looking up

:41:56   19   from the bottom of the printer.  They are saying, the blue

:42:00   20   patches traveling over the printer components.

:42:02   21         Here are the rollers, the printer components.

:42:05   22   Here are the patches.  Here is the arrow, direction No. 36.

:42:09   23   Here is the figure that we already spent a lot of time

:42:12   24   focusing on.

:42:14   25         Now Figures 5 through 8, it relates to specific

:42:16    1    shapes of patches, an entirely different idea.  You will see

:42:19    2    in Figure 5, you don't see printers, you don't see printer

:42:25    3    components.  You see, yes, this one, Figure 5 actually shows

:42:28    4    a single column.  It does show different size patches.  But

:42:33    5    they are not evenly spaced.

:42:35    6          Figure 6, single column.  Now you go to Figure

:42:41    7    7, single column.  You have different, what's being shown

:42:46    8    there are different shapes.  And what's significant here is

:42:50    9    these shapes, the teardrop shape here.  The moon crescent

:42:53    10    here.  And that's what's being disclosed.  And actually we

:42:57    11    have disputes about the meaning of some of those terms as

:43:00    12    well.

:43:01    13          Then you get to Figure 8, it shows two columns.

:43:03    14    Guess what?  Those are evenly spaced and evenly sized

:43:07    15    patches.  So there is no disclosure in this patent of

:43:10    16    differently sized patches and differently sized spaces in

:43:15    17    this direction.  They are using Figure 8 to demonstrate that

:43:19    18    point.  But that's not shown in Figure 8.  They are saying

:43:23    19    Figure 8 says you can have multiple columns, but Figure 8

:43:26    20    doesn't show different sized patches and different sized

:43:30    21    adhesive free zones in this direction.

:43:34    22          Again, compared to Figure 4, printer components,

:43:39    23    on to a direction, different sized patches, different sized

:43:45    24    spaces, aligned with the components.

:43:47    25          Here, same size patches, same size spaces.

:43:52    1          Thank you, Your Honor.  That is all I have on

:43:54    2    that.

:43:54    3          THE COURT:  Thank you, Mr. Savit.

:43:56    4          Mr. Ferrario.

:43:56    5          MR. FERRARIO:  I just want to briefly address

:44:04    6    this new idea that Figures 1 through 4 and Figures 5 through

:44:10    7    8 relate to different things.

:44:14    8          Figure 7 has different sized shapes.  But there

:44:19    9    is also different spacing here as well.  And again, we will

:44:24   10    concede that there isn't a figure that shows every single

:44:28   11    variation of what the patent teaches and what is claimed.

:44:33   12    But we would maintain that it's not necessary to draw every

:44:39   13    single variation.  What's important is to teach.  And what

:44:43   14    the patent teaches is to use different size shapes and that

:44:48   15    those different size shapes, you can use multiple columns.

:44:52   16    That is what is taught.  That is what is claimed.

:44:55   17          There is nothing in the specification that would

:44:58   18    limit the different size shapes to the same column.

:45:02   19          So with that, I would like to, unless there is

:45:05   20    any questions...

:45:07   21          THE COURT:  No, sir.

:45:08   22          MR. FERRARIO:  I would like to move to the "vary

:45:11   23    in width."

:45:27   24          Here, again, we are talking about the

:45:30   25    differently sized shapes of the adhesive patches, and they

:45:35    1    vary in width between leading and trailing edges.  I think

:45:37    2    this should be a relatively simple issue.  To me, it's just

:45:41    3    a straightforward reading of the claim.  The dispute between

:45:45    4    the parties is what varies.

:45:50    5         We say the patch width varies between the

:45:56    6    lateral edge and the leading edge.  DRI's position is that

:46:00    7    the edges vary in width.  How they get that is not entirely

:46:06    8    clear to me, when the language says very clearly the patch

:46:12    9    width varies between two edges.  The "vary in width" refers

:46:18   10    to the width of the patch between two points or two lines,

:46:24   11    not that the two lines vary in width.  That's just the plain

:46:29   12    reading, the correct grammatical reading of that term.

:46:34   13         What happens when you test DRI's construction

:46:38   14    against the disclosed embodiment is that it fails.  It fails

:46:42   15    because Figure 4 of the patent, which the specification

:46:47   16    specifically describes as an example of patterns and that

:46:54   17    have trailing lead edges with a shape that varies in width,

:46:58   18    would not fall under the scope of the claim under DRI's

:47:03   19    construction.

:47:04   20         So here is a mockup, with again, I guess, to be

:47:08   21    clear, we have added identifiers to the shape.  It's a

:47:14   22    blowup of Figure 4 that has two different shapes, patches.

:47:19   23    It's got a circle and it's got what we can call a capsule

:47:24   24    and -- in fact, it has sort of three different shapes.  They

:47:26   25    are all labeled the same, 44.  Those are all the shapes, 44.

| | | |
|---|---|---|
| :47:30 | 1 | So there is no distinction made between the circle and the |
| :47:33 | 2 | capsule in the specification. |
| :47:36 | 3 | What is clear is it has a leading edge, that is |
| :47:39 | 4 | sort of the first edge that is encountered, we called it the |
| :47:42 | 5 | left edge here.  Then you have got a trailing edge, which is |
| :47:45 | 6 | the end of the shape on the right side. |
| :47:48 | 7 | The question is, what happens between those two |
| :47:52 | 8 | edges.  And what happens is the shape varies in width. |
| :47:56 | 9 | This is what the specification teaches.  This is |
| :47:59 | 10 | not something that we are pulling out here.  It basically |
| :48:03 | 11 | identifies patches 44, those are both the circle and |
| :48:10 | 12 | capsule, as to varying in lateral width between two edges. |
| :48:15 | 13 | I don't think it can be any simpler than that. |
| :48:18 | 14 | THE COURT:  Okay.  Mr. Savit. |
| :48:21 | 15 | MR. SAVIT:  Your Honor, our construction is each |
| :48:39 | 16 | adhesive patch has a leading edge that is different from the |
| :48:42 | 17 | shape and/or size of the trailing edge of the adhesive patch |
| :48:45 | 18 | such that one edge is wider than the other edge. |
| :48:50 | 19 | Now, first off, there is a dispute here, I |
| :48:57 | 20 | think, as to what edge is.  If you look at the patent -- and |
| :49:00 | 21 | I don't have the slide, but it is cited in our brief -- they |
| :49:03 | 22 | talk about an edge being convex, being curved.  They don't |
| :49:10 | 23 | talk about an edge being a point.  So an edge is something |
| :49:14 | 24 | more than a point. |
| :49:15 | 25 | And let's take Figure 5, for example, but it |

:49:20    1    could have been any of these figures, 5 through 8, that show

:49:24    2    a leading edge.  I have marked in red here where the leading

:49:28    3    edges are.  I don't think there is any question about that.

:49:32    4    You can see, there is an arrow here, arrow of direction

:49:36    5    here, so I think it's reasonable to conclude these are the

:49:39    6    leading edges.  They are marked in red here, here, here and

:49:43    7    here.  Then the trailing edges here, here, here and here.

:49:53    8    Clearly, Figure 5, what is shown here is a leading edge that

:49:59    9    varies in width from the width of the trailing edge.  That's

:50:03   10    what this claim means.

:50:06   11           Now, you will see something similar in Figure 7

:50:13   12    that I didn't mark in red.  I don't think it's necessary,

:50:15   13    once you get the general idea.  You have got a pointed front

:50:19   14    edge and you have got a curved trailing edge.  Figure 8,

:50:22   15    same thing, teardrop, where you have a different width in

:50:27   16    your leading edge from your trailing edge.  That's what the

:50:30   17    claim is referring to.

:50:33   18           Now, what Mr. Ferrario was referring to here was

:50:41   19    saying Figure 4 is demonstrating this claim.  Again, I ran

:50:48   20    through that when I was up here previously.  Figures 1

:50:51   21    through 4 are directed to an entirely different subject

:50:54   22    matter, which is different size patches and different size

:50:58   23    spaces without adhesive between the patches.  Then you get

:51:01   24    to Figures 5 through 8, and, in fact, you go back here, and

:51:06   25    you see, yes, that's not demonstrating that.  That's

:51:09    1    demonstrating this different idea of edges that have a

:51:14    2    different width in the trailing portion as compared to the

:51:18    3    leading portion.

:51:21    4              Your Honor, as Mr. Ferrario pointed out, it's

:51:25    5    quite arbitrary where he was saying what's wider and what's

:51:30    6    narrower.  In fact, if you apply that here, these leading

:51:35    7    edges are the same width as the trailing edges, we would say

:51:39    8    that Figures 1 through 4 were not intended to be

:51:42    9    demonstrating the subject matter.  I am not saying there is

:51:45   10    nothing in this patent.  In fact, half of the figures, 5

:51:48   11    through 8, demonstrate this subject matter of this claim.

:51:53   12    So you can't use Figure 4 as an example of what should be

:51:56   13    covered by this claim.

:51:58   14              In any event, even if you were to use Figure 4,

:52:00   15    you would conclude the leading edge and the trailing edge,

:52:05   16    not only are they the same sides, but between the leading

:52:08   17    and the trailing edges, there is no difference in width.

:52:11   18    They are absolutely the same width as you go from the

:52:13   19    leading edge to the trailing edge.  Clearly, even under

:52:16   20    their definition, Figure 4 wouldn't be covered.

:52:19   21              Thank you, Your Honor.

:52:20   22              THE COURT:  Thank you.

:52:21   23              MR. FERRARIO:  So again, Your Honor, I will just

:52:28   24    very briefly address this notion that Figures 1 through 4

:52:32   25    are one thing and Figures 5 through 8 are another thing.  I

| | |
|---|---|
| :52:38 | 1 |
| :52:42 | 2 |
| :52:45 | 3 |
| :52:50 | 4 |
| :52:54 | 5 |
| :52:56 | 6 |
| :52:59 | 7 |
| :53:02 | 8 |
| :53:07 | 9 |
| :53:11 | 10 |
| :53:14 | 11 |
| :53:18 | 12 |
| :53:23 | 13 |
| :53:27 | 14 |
| :53:32 | 15 |
| :53:36 | 16 |
| :53:39 | 17 |
| :53:41 | 18 |
| :53:46 | 19 |
| :53:49 | 20 |
| :53:54 | 21 |
| :53:57 | 22 |
| :53:59 | 23 |
| :54:01 | 24 |
| :54:24 | 25 |

think we cite this in our brief.  But in the specification,
the patent applicant clearly discussed how the leading and
trailing edges of adhesive patches 44 are illustrated in
Figure 4, how they are arcuate, not linear, for both
performance and in fashioning advantages, both performance
and manufacturing advantages.  Those performance and
manufacturing advantages are described, include how varying
the width of the patch can lead to performance advantages.

So I think it's clearly discussed.  We also
think, Your Honor, all you have to do is just read the
language of the claim.  It says, it varies in width between
two inches.  So it can't be that the trailing edge and the
leading edge vary in width.  My understanding of DRI's
proposed construction, when I read it, it says, it has a
leading edge that is a different shape and size of the
trailing edge such that one is wider than the other.  So
under DRI's construction, what they are saying, the language
of the claim means that the edges vary in width.  What about
the word between?  What does that mean in the language?

So I don't mean to belabor the point, but I
think it's there, it's pretty evident.

The next term is index marks.

THE COURT:  Pardon me a second.

(Pause.)

MR. FERRARIO:  The next term is index marks,

| | | |
|---|---|---|
| :54:27 | 1 | Your Honor.  The dispute here simply is that DRI proposes |
| :54:30 | 2 | plain and ordinary meaning.  We would be okay with that, |
| :54:35 | 3 | although we have seen where we think they are going to argue |
| :54:38 | 4 | that it's only ink marks that can serve as index marks.  We |
| :54:42 | 5 | don't think that's correct, because the patent specification |
| :54:45 | 6 | clearly shows that these index marks can be any type known |
| :54:51 | 7 | in the art, in the prior art -- |
| :54:53 | 8 | THE COURT:  Any kind of physical indicator? |
| :54:56 | 9 | MR. FERRARIO:  That's right.  Including the gap |
| :54:58 | 10 | or hole.  That was what was intended by our discussion. |
| :55:00 | 11 | That's it. |
| :55:01 | 12 | THE COURT:  Okay. |
| :55:02 | 13 | MR. SAVIT:  Your Honor, I will accept that. |
| :55:05 | 14 | There are just two ways of index marks shown on there, which |
| :55:08 | 15 | are the black marks and then there are apertures or holes. |
| :55:13 | 16 | Our dispute with their construction is, it has this intent |
| :55:16 | 17 | element in it.  That says -- that's intended -- |
| :55:20 | 18 | THE COURT:  "A physical indicator which may be |
| :55:21 | 19 | detected by a sensor"? |
| :55:24 | 20 | MR. SAVIT:  That's some sensor that didn't exist |
| :55:27 | 21 | in the prior art.  You are talking about, it becomes very |
| :55:30 | 22 | speculative, and really they have this intent aspect to it. |
| :55:34 | 23 | THE COURT:  "Physical indicator which may be |
| :55:35 | 24 | detected"? |
| :55:36 | 25 | MR. FERRARIO:  Something like that would be |

:55:38    1    acceptable, Your Honor.  I think it's gaps -- it's holes as

:55:43    2    well.  It can detect the adhesive, absence of adhesive and

:55:44    3    adhesive.  And it can tell that there is a gap there.

:55:47    4                    THE COURT:  Mr. Savit?

:55:48    5                    MR. SAVIT:  That's what we dispute, Your Honor.

:55:50    6    That is what we dispute, is they are trying to say that the

:55:53    7    gaps between the patches, that can be an index mark.  Now,

:55:59    8    as you point out, the technology is changing so fast, yes,

:56:02    9    maybe you could get developed in the future many things, I

:56:06   10    don't know, an optical reader, certainly not something that

:56:09   11    is contemplated in the patent, that could then see where the

:56:11   12    glue is and you could just cut there.

:56:13   13                    You are saying even though you have no black

:56:15   14    mark, even though you have no aperture, you have nothing

:56:18   15    other than the gaps between the patches, that the gaps

:56:21   16    themselves are the index mark.  That's where they are going

:56:24   17    with this.  And that's why we object to their construction.

:56:27   18                    MR. FERRARIO:  The gap is expressly disclosed in

:56:30   19    this patent there.  And it's further described in Column 8.

:56:33   20                    THE COURT:  When you say "there," Mr. Ferrario?

:56:35   21                    MR. FERRARIO:  I am sorry.  So it may be in the

:56:38   22    form of a gap, this gap refers to a gap between the

:56:41   23    adhesive.

:56:41   24                    THE COURT:  Is that from the spec?

:56:43   25                    MR. FERRARIO:  That is from the specification.

:56:47  1    It's also again in Column 8.

:56:51  2                    THE COURT:  What column is that up there?  Is

:56:54  3    that 11?

:56:58  4                    MR. FERRARIO:  I will tell you in just a second,

:57:01  5    Your Honor.

:57:10  6                    MR. SAVIT:  Your Honor, I actually have that.

:57:13  7                    MR. RINEHART:  Your Honor, what was just on the

:57:15  8    screen, that is Column 3, approximately 54 through the

:57:19  9    bottom of Column 3.

:57:21  10                   MR. FERRARIO:  We have it in the record.

:57:23  11   Further in Column 8, there is Lines 59 through 64.  Those

:57:28  12   sensing gaps are disclosed in the patent.

:57:32  13                   THE COURT:  Sorry, Mr. Savit.  Go ahead.  My

:57:34  14   fault.

:57:35  15                   MR. SAVIT:  Your Honor, I want to point out here

:57:38  16   that it says may be in the form of gaps or holes through the

:57:42  17   web.  What that means is gaps through the web or holes

:57:46  18   through the web.  There is no disclosure of saying don't put

:57:48  19   a black mark, don't put a hole in the web, and we will just

:57:52  20   go ahead and see that the gaps between the adhesive pass as

:57:56  21   an index mark.  It is completely opposite to the idea of

:57:59  22   putting a specific mark so that you know where the gap is.

:58:02  23   That would be basically saying the absence of an index mark

:58:04  24   is an index mark.

:58:06  25                   And I have, let me point out, I have both

:58:12    1    disclosures of what they call in the patent index marks.

:58:19    2            Right here, Figure 4, the index marks, this is

:58:24    3    42, these little black marks, there is no dispute that those

:58:28    4    are index marks.  The patent also discloses these little

:58:31    5    circular items, these oblong items, also marked as 42.

:58:35    6    Those are also called index marks in the patent

:58:39    7    specification.

:58:40    8            There is no other disclosure of saying that,

:58:45    9    hey, by the way, don't put anything there and that's your

:58:47   10    index mark.  You see these gaps, they are basically saying,

:58:50   11    these gaps here between this, all we can do is make an

:58:54   12    optical reader that will note where the adhesive is and

:58:58   13    where the adhesive isn't and there will be the absence of an

:59:02   14    index mark, that will be an index mark, too.  That is their

:59:05   15    position.

:59:06   16            Now, look, Your Honor, we are talking --

:59:09   17            THE COURT:  You suggest that broadens the scope

:59:11   18    of the claim.

:59:12   19            MR. SAVIT:  It is basically saying the absence

:59:14   20    of an index mark is an index mark, by virtue of let's focus

:59:18   21    now on what the optics of the printer can do.

:59:22   22            Your Honor, we are just talking about literal

:59:24   23    infringement, just the literal language of the words index

:59:28   24    mark.  We are not talking about doctrine of equivalents, all

:59:31   25    those things.  We are not getting to that.  They are really

| | | |
|---|---|---|
| :59:33 | 1 | talking about the doctrine of equivalents, where they can |
| :59:35 | 2 | say, look, you don't have an index mark, but you are |
| :59:38 | 3 | intending this to be used in a way with a printer that has |
| :59:41 | 4 | an optical reader that can operate without an index mark. |
| :59:44 | 5 | That's an argument for another day.  But the literal |
| :59:47 | 6 | language of index mark in this patent, there has got to be |
| :59:51 | 7 | something there.  It can't be the absence of something being |
| :59:54 | 8 | an index mark. |
| :59:55 | 9 | THE COURT:  Thank you, Mr. Savit. |
| :59:56 | 10 | Mr. Ferrario, any response to that? |
| :59:58 | 11 | MR. FERRARIO:  Yes, Your Honor.  All we would |
| :00:00 | 12 | point to is what is disclosed in the specification.  And we |
| :00:03 | 13 | have that in our briefing.  It has been read into the |
| :00:08 | 14 | record.  I will include in that the full -- and I will just |
| :00:11 | 15 | point out this Column 8 language, because again, Mr. Savit |
| :00:16 | 16 | showed you two figures and said that's all it can be, well, |
| :00:19 | 17 | it can only be an ink mark or a hole. |
| :00:23 | 18 | THE COURT:  Forget the figures for a moment. |
| :00:25 | 19 | Let's look at the spec and the claim, the claim, the spec. |
| :00:29 | 20 | MR. FERRARIO:  The claim requires index marks. |
| :00:32 | 21 | And the specification here, in just another area, says that |
| :00:38 | 22 | the index mark which may be a simple aperture or gap through |
| :00:43 | 23 | the web that is optically detected in any conventional |
| :00:46 | 24 | manner. |
| :00:47 | 25 | THE COURT:  Where are you reading from? |

| | |
|---|---|
| :00:48 | 1 |
| :00:53 | 2 |
| :01:00 | 3 |
| :01:02 | 4 |
| :01:06 | 5 |
| :01:09 | 6 |
| :01:12 | 7 |
| :01:15 | 8 |
| :01:19 | 9 |
| :01:24 | 10 |
| :01:28 | 11 |
| :01:29 | 12 |
| :01:31 | 13 |
| :01:35 | 14 |
| :01:37 | 15 |
| :01:38 | 16 |
| :01:40 | 17 |
| :01:44 | 18 |
| :01:47 | 19 |
| :01:50 | 20 |
| :01:54 | 21 |
| :01:59 | 22 |
| :02:02 | 23 |
| :02:08 | 24 |
| :02:12 | 25 |

1          **MR. FERRARIO:  Sorry, Your Honor.  Line 59.**

2  **Column 8, line 59.**

3          **"As indicated above, various forms of index**

4  **marks maybe used for optical or magnetic or in any other**

5  **conventional form of detection."**

6          **The point here is when we saw plain and ordinary**

7  **meaning proposed by DRI, we said, well, what do you mean by**

8  **that?  And it was clear to us that they were going to try**

9  **to, at first we thought to limit it just to ink marks.  Now**

10  **I am hearing, we will give you ink marks and gaps, but**

11  **that's it.**

12          **We are trying to find the language that would**

13  **appropriately capture what's here in Column 8.  We think we**

14  **have done that in our proposed constructions, and that's**

15  **what our support is.**

16          **THE COURT:  I will give you the last word, Mr.**

17  **Ferrario.  I do want Mr. Savit to respond to that citation.**

18          **MR. SAVIT:  So, Your Honor, my client just**

19  **pointed out to me, actually, this is the very column, which**

20  **is Column 8, Lines 59 through 61, and it uses the word gap.**

21  **Remember earlier, Mr. Ferrario was saying gap and holes**

22  **through the web, was trying to say that gap is referring to**

23  **a gap between the patches.  And right here, this language**

24  **uses again the word gap, and it clearly here says gap**

25  **through the web.**

:02:12   1   When they use the word gap in the specification,

:02:15   2   they are not talking about gap between the adhesive patches.

:02:17   3   They are talking about a hole through the web that passes

:02:21   4   through.  There is something there, an index mark, which is

:02:24   5   a black mark, or some physical item.

:02:28   6   Again, I don't think you can make up for a

:02:30   7   physical item and say, yes, you have got a physical item by

:02:33   8   its absence, because the technology has now allowed that.

:02:37   9   THE COURT:  All right.  Thank you, Mr. Savit.

:02:38  10   Mr. Ferrario, there is a very focused point to

:02:44  11   which you need to respond.  He has made for the second time

:02:48  12   now this argument that what you are suggesting, what NCR is

:02:52  13   suggesting is the absence can't mean the presence,

:02:58  14   essentially is what he is saying.  There has got to be

:03:01  15   something there and not a hole in the web.

:03:07  16   You would suggest, Mr. Savit -- this is not

:03:10  17   always going to be with me call and response -- Mr. Savit,

:03:15  18   you are saying there has to be a physical mark.

:03:18  19   MR. SAVIT:  Something physical, Your Honor.  We

:03:22  20   would acknowledge that there is a hole, that is clearly

:03:25  21   disclosed.

:03:25  22   THE COURT:  Something physical can be a hole.

:03:27  23   It can be a gap.  As long as it is capable of detection.

:03:30  24   Right?

:03:31  25   MR. SAVIT:  It would be capable of detection,

| | | |
|---|---|---|
| :03:34 | 1 | but not because you now have a newfangled optical reader |
| :03:38 | 2 | that can determine that there is nothing between the |
| :03:42 | 3 | patches.  In other words, that there is an area of |
| :03:45 | 4 | adhesive -- |
| :03:48 | 5 | THE COURT:  Because in the specification we do |
| :03:50 | 6 | see discussion of optical or magnetic.  "As indicated above, |
| :03:57 | 7 | various forms of index marks may be used for optical or |
| :04:00 | 8 | magnetic" -- index marks, it's got to be a mark. |
| :04:07 | 9 | MR. SAVIT:  It's got to be a mark.  If you are |
| :04:10 | 10 | going to consider a hole a mark, yes, it's got to be |
| :04:13 | 11 | something physical.  We can't interpret index marks which is |
| :04:15 | 12 | called out as a specific feature in the claim to be the |
| :04:18 | 13 | absence of -- |
| :04:19 | 14 | THE COURT:  That could be ink, black ink.  It |
| :04:21 | 15 | can be some kind of mark. |
| :04:23 | 16 | MR. SAVIT:  Yes.  Maybe you could put a magnetic |
| :04:25 | 17 | mark there; you could put something else.  But it can't be |
| :04:29 | 18 | the fact that there is no glue there, just the absence of |
| :04:32 | 19 | glue. |
| :04:32 | 20 | MR. FERRARIO:  That is the part for me where I |
| :04:34 | 21 | am kind of missing why the absence of glue couldn't be a |
| :04:37 | 22 | mark.  You could put a magnetic mark there which is not |
| :04:40 | 23 | something you can see but you can read.  And what if you |
| :04:44 | 24 | have a pattern of adhesive that had a hole in it like that |
| :04:48 | 25 | that could be optically sensed.  That is a mark.  Absence of |

| | | |
|---|---|---|
| :04:52 | 1 | adhesive there would be a mark. |
| :04:54 | 2 | I think earlier you may have heard that you |
| :04:56 | 3 | couldn't see the adhesive on these papers.  But you actually |
| :05:00 | 4 | can see it if you got one of these rolls, and sometimes you |
| :05:03 | 5 | kind of have to hold it under red light.  But you can see |
| :05:07 | 6 | it.  It can be optically sensed. |
| :05:09 | 7 | THE COURT:  Let's take a stretch break. |
| :05:11 | 8 | (Recess taken.) |
| :18:04 | 9 | THE COURT:  Before we continue, I would ask you |
| :18:08 | 10 | to address cantilevered, what is required, cantilevered. |
| :18:13 | 11 | MR. TAYLOR:  Your Honor, let me pull that up. |
| :18:32 | 12 | No. 6.  My apologies. |
| :18:38 | 13 | THE COURT:  That said labels extend transversely |
| :18:42 | 14 | across said web and cantilevered. |
| :18:45 | 15 | MR. TAYLOR:  I guess, being an engineer, |
| :18:48 | 16 | undergraduate training, I sort of have an idea of what that |
| :18:53 | 17 | is. |
| :18:53 | 18 | THE COURT:  My law clerk is a scientist.  I am |
| :18:55 | 19 | not. |
| :18:56 | 20 | MR. TAYLOR:  I would suggest this is |
| :18:57 | 21 | cantilevered. |
| :18:59 | 22 | THE COURT:  You are saying something hanging |
| :19:01 | 23 | over the edge of the conference table. |
| :19:03 | 24 | MR. TAYLOR:  Yes, sir. |
| :19:04 | 25 | THE COURT:  Piece of paper. |

:19:05      1           MR. TAYLOR:   The typical sort of example of

:19:08      2    cantilever is a flagpole sticking off the building.   But it

:19:12      3    doesn't just have to have one point.   It can have multiple

:19:17      4    points, as, for example, a patio sticking off an apartment

:19:21      5    building.   It's just this (indicating).

:19:23      6           The reference earlier was made to a post-it

:19:26      7    note.   You know how a post-it note is stuck and the other

:19:30      8    part of the note is free.   That part would be -- I have one

:19:33      9    over here, just by way of example.

:19:37     10           THE COURT:   He has a post-it note.

:19:39     11           MR. TAYLOR:   Same thing.

:19:40     12           THE COURT:   So now, the sticky part is sticking

:19:44     13    on the podium and the nonsticky part is hanging off.   That

:19:48     14    is cantilevered.

:19:49     15           MR. TAYLOR:   Yes, sir.

:19:51     16           THE COURT:   Mr. Savit, did you want to add

:19:53     17    anything to that?

:19:54     18           MR. SAVIT:   No, Your Honor.   Our point would be

:19:56     19    that is a very odd claim.   You could take the same stickie

:20:00     20    note, and you could put it down here.   That's not

:20:03     21    cantilevered.   Or you could take the note, put it here.

:20:07     22    That would be cantilevered.   How do you know what this note

:20:10     23    is until you know how it's applied?   That's the problem I

:20:14     24    have with that claim.

:20:16     25           MR. TAYLOR:   I disagree with that, Your Honor.

| | | |
|---|---|---|
| :20:18 | 1 | THE COURT:  Let's read the rest of the claim |
| :20:20 | 2 | just for a second, and I will get you to talk about it. |
| :20:24 | 3 | With regard to your context, context, context, Mr. Taylor, |
| :20:27 | 4 | within the context of the claim that's used, said labels |
| :20:31 | 5 | extend transversely across said web and cantilever from said |
| :20:35 | 6 | adhesive column to permit hand grasping of said adhesive |
| :20:38 | 7 | free and major area.  Go ahead. |
| :20:42 | 8 | MR. TAYLOR:  It's stuck here.  It's not stuck |
| :20:46 | 9 | here.  That's cantilevered. |
| :20:48 | 10 | THE COURT:  Can you see this, Mr. Savit? |
| :20:50 | 11 | MR. TAYLOR:  Stuck here, not stuck here.  That's |
| :20:54 | 12 | cantilevered. |
| :20:56 | 13 | MR. SAVIT:  That's not the way I understand. |
| :20:58 | 14 | Cantilevered, I need to know how this is being used before I |
| :21:02 | 15 | know whether this is cantilevered or not cantilevered. |
| :21:05 | 16 | THE COURT:  Let me ask you this:  You say you |
| :21:06 | 17 | need to know how it's being used.  Does the claim not tell |
| :21:09 | 18 | you -- and you can say no, it doesn't, Judge -- but it says |
| :21:13 | 19 | to permit hand grasping of said adhesive-free major area. |
| :21:18 | 20 | Isn't that how it's being used?  It's being applied in a way |
| :21:21 | 21 | to permit hand grasping. |
| :21:23 | 22 | MR. SAVIT:  Sure.  If in fact you are going to |
| :21:26 | 23 | say you have no adhesive over here, that permits hand |
| :21:29 | 24 | grasping.  But it says cantilevered.  It says physically |
| :21:33 | 25 | cantilevered.  That's what the claim says.  All I know is |

:21:37    1    what the claim says.  It could have just said it permits

:21:39    2    hand grasping or there is no adhesive there and it permits

:21:43    3    hand grasping, as some of the claims to.  But to say it's

:21:47    4    cantilevered to permit hand grasping, as some of the claims

:21:51    5    do, it means it's applied this way and I can grasp it out

:21:54    6    here.  If it is like this, I can't grab it.

:21:56    7            THE COURT:  Flush to the table, as opposed to

:21:59    8    hanging over the edge.

:22:00    9            Mr. Taylor, you can respond in a moment.  I

:22:03   10    apologize for the unorthodox argument.  But as an engineer,

:22:09   11    a person of skill would understand cantilevered to mean your

:22:14   12    point, Mr. Savit, that it's hanging over the edge of

:22:18   13    something.

:22:18   14            MR. SAVIT:  I took that right out of the

:22:20   15    dictionary.  I don't think it's -- necessarily of ordinary

:22:23   16    skill --

:22:24   17            THE COURT:  It is not ordinary skill.

:22:25   18            MR. SAVIT:  We have no indication anywhere that

:22:27   19    there is a special meaning that an ordinarily skilled

:22:30   20    person --

:22:31   21            THE COURT:  Hence, what you really want to argue

:22:34   22    is this is indefinite.  But I understand and you understand

:22:37   23    you don't get to do that today.

:22:40   24            MR. TAYLOR:  This is the hamburger wrapped,

:22:42   25    beautiful hamburger wrapped.  This is the tag that says it

:22:45    1    has no pickles.

:22:47    2            This free part is cantilevered, because it

:22:50    3    allows the person to put it down and allows it to read.

:23:04    4            Maybe we can use another word.  But I think

:23:07    5    cantilevered is an appropriate word.

:23:09    6            THE COURT:  How about the labels extend from the

:23:10    7    adhesive patches across the web such that the adhesive-free

:23:14    8    major area may be grasped by hand.

:23:17    9            MR. TAYLOR:  This --

:23:18   10            THE COURT:  I am just offering an alternative

:23:20   11    instruction.

:23:21   12            MR. TAYLOR:  I think that is basically saying

:23:23   13    the same thing.

:23:23   14            THE COURT:  It seems to me a jury would well

:23:26   15    understand that, as opposed to the way the claim is actually

:23:29   16    written.  But I don't want to improperly expand the claim

:23:33   17    scope, either.

:23:38   18            Mr. Savit?

:23:38   19            MR. SAVIT:  That language has to give some

:23:41   20    meaning.  Just ignoring the meaning to make sense out of it,

:23:45   21    it seems to me that is not an option for claim construction.

:23:48   22            THE COURT:  Okay.

:23:49   23            Mr. Taylor, anything else on that?

:23:51   24            MR. TAYLOR:  Again, I believe the part that is

:23:54   25    not affixed is cantilevered.

| | | |
|---|---|---|
| :23:56 | 1 | THE COURT:  All right.  Let's move ahead, Mr. |
| :23:58 | 2 | Ferrario, if you were going to take the next portion. |
| :24:09 | 3 | MR. FERRARIO:  Your Honor, we are now on to the |
| :24:18 | 4 | '184 patent.  This patent is entitled Linerless Labels.  The |
| :24:25 | 5 | patent again discloses a number of new configurations and |
| :24:30 | 6 | patterns. |
| :24:30 | 7 | The first claim at issue is this term "the |
| :24:34 | 8 | adhesive layer is variably patterned."  And the question is |
| :24:41 | 9 | what the parties believe "variably patterned" means.  We |
| :24:44 | 10 | thought plain and ordinary meaning initially.  But the |
| :24:48 | 11 | claims and disclosures and description in the specification |
| :24:51 | 12 | that tell you what the plain and ordinary pattern is, DRI |
| :24:55 | 13 | proposed that it was indefinite and then proposed an |
| :24:58 | 14 | alternative construction. |
| :24:59 | 15 | Our construction in response there is simply |
| :25:00 | 16 | that it's patterned such that the cutting blade surface may |
| :25:04 | 17 | come into contact with adhesive at different locations over |
| :25:07 | 18 | time as the cutting blade makes repetitive cuts. |
| :25:11 | 19 | Now, where do we find support for that |
| :25:14 | 20 | definition?  We find that in the specification, where it |
| :25:18 | 21 | say, very clearly, that the adhesive patches may be |
| :25:22 | 22 | patterned such that the location where the adhesive comes |
| :25:25 | 23 | into contact with the cutter may vary with each cut. |
| :25:29 | 24 | You can do that in three different ways.  You |
| :25:32 | 25 | can vary the pattern.  You can vary the repeat of the |

:25:36  1  pattern, that is, in what fashion does it repeat over time

:25:40  2  along the web.  And you can also vary the location of the

:25:43  3  cut.  And that's why they use index marks or you do custom

:25:47  4  cuts or what have you.

:25:49  5          So here, what's being claimed is one of those

:25:53  6  ways of doing that.  That is varying the pattern.  Varying

:25:58  7  the pattern really means not using a consistent shape, a

:26:05  8  uniform shape for the pattern or the shape of the adhesive.

:26:08  9          And there are lots of different disclosures here

:26:13  10  or pictures of what a variable pattern looks like, and they

:26:19  11  are specifically called out in the patent and they are

:26:20  12  described in the patent.  And here you have some examples of

:26:23  13  them.

:26:25  14          When we look at DRI's construction, we ask

:26:29  15  ourselves, is this something we could live with or what

:26:32  16  would we propose in response?

:26:35  17          We have a couple problems with them.  I will run

:26:38  18  through them briefly.

:26:39  19          DRI's construction first starts off by saying

:26:41  20  this has to be a wide web.  So I think you will recall

:26:45  21  earlier, when we talked about the wide web it is that big

:26:47  22  roll that goes into the line is later slit and becomes the

:26:53  23  one that goes in the printer.  Wide web, narrow web.  We

:26:56  24  said, where does the claim say wide web?

:27:00  25          Well, it doesn't.  The claim says "a label

:27:03    1    media."  And the specification says that label media is wide

:27:13    2    and narrow webs.  And it goes and it shows you different

:27:16    3    pictures of the wide web.  This is an example of what a wide

:27:21    4    web might look like.

:27:23    5            So you have a pattern.  Then you might slit.

:27:26    6    You see the little arrows.  You would slit, and then that

:27:30    7    would become the narrow web.  Well, it says, Figures 1A

:27:35    8    through H are diagrams of label media.  The claim is to

:27:41    9    label media.  Label media includes wide web, and here, when

:27:46    10   you look at Figure 1B, narrow web.

:27:50    11           So there is nothing about the claim, and in fact

:27:53    12   wide web would just limit for no reason at all.  There is

:27:57    13   nothing in the specification, there is no reason why label

:28:01    14   media is limited to wide web.

:28:04    15           Moving on from that requirement, then DRI says,

:28:08    16   okay, not only does it have to be a wide web but it also has

:28:12    17   to have a couple other requirements.  This is what DRI is

:28:15    18   telling us varying the pattern means.  It says you can have

:28:18    19   two things, essentially.  One is, if you are going to put it

:28:21    20   on a web, you can have -- I am sorry, multiple patterns on

:28:28    21   the web.

:28:30    22           Multiple patterns on the web.  Let me show you

:28:33    23   what I think they mean by multiple patterns here, because

:28:36    24   what this is is not a multiple pattern.

:28:41    25           What they mean by multiple patterns on a web is,

:28:54    1    in this figure, this is Figure 1H, these arrows again refer

:28:59    2    to areas where the wide web can be slit, and this would be

:29:04    3    one example of having multiple patterns.  You have this

:29:08    4    pattern.  This is different than this.  This is different.

:29:10    5    This is different than this.  At the end of the day, when

:29:13    6    you slit it up, you would have, what is it, six rolls, all

:29:17    7    with different patterns on them.  A wide web with multiple

:29:21    8    patterns.  DRI says varying the pattern means this to begin

:29:25    9    with.

:29:26   10        Now, okay.  We don't disagree that that is an

:29:30   11    example of varying the pattern.  But it's not the only

:29:33   12    example of varying the pattern.

:29:35   13        The specification was broader than that, first

:29:38   14    because it wasn't limited to wide webs.  And here is an

:29:41   15    example of a web that has a single pattern, has the same

:29:47   16    pattern on it.

:29:50   17        So how can the claim be limited where there is

:29:56   18    the description in the specification and a figure that shows

:30:00   19    a single pattern on a web that is repeated.  So this

:30:03   20    requirement that has to have multiple patterns on the web is

:30:06   21    wrong.  We think it's wrong.

:30:09   22        Now, DRI then says, okay, well, if you don't

:30:13   23    have multiple patterns on the wide web, the alternative,

:30:16   24    that is, if you are going to use a single pattern on the

:30:19   25    web, then it has to have variable repeats or variable

| | | |
|---|---|---|
| :30:24 | 1 | repeating lengths. |
| :30:25 | 2 | This is a claim term that we have issue with and |
| :30:28 | 3 | dispute a little bit later, and you will hear about that. |
| :30:31 | 4 | But just, basically, it is what it sounds like, what a |
| :30:38 | 5 | variable repeat line does, that is, how often does it repeat |
| :30:39 | 6 | the pattern? |
| :30:40 | 7 | Why do we think this is wrong?  We think this is |
| :30:43 | 8 | wrong for a number of reasons.  The easiest way I think is |
| :30:45 | 9 | to use an example. |
| :30:47 | 10 | This is Claim 1 of the '184 patent.  From Claim |
| :30:52 | 11 | 1 depends Claim 4.  Claim 4 claims an elongated diamond |
| :30:58 | 12 | shape.  The elongated diamond shape is described and shown |
| :31:02 | 13 | in Figure 1B of the patent.  So we know that an elongated |
| :31:07 | 14 | diamond shape is a variable pattern, pursuant to the rules |
| :31:11 | 15 | of dependent claims and independent claims and dependent |
| :31:14 | 16 | claims depending from independent claims, this pattern is a |
| :31:18 | 17 | variable pattern. |
| :31:20 | 18 | Does it fit DRI's rule of a single pattern that |
| :31:23 | 19 | has a variable repeat length?  The answer is, no.  It |
| :31:26 | 20 | doesn't.  It has a repeat length of 202 millimeters, and it |
| :31:33 | 21 | goes from this junction to this junction, and then it will |
| :31:38 | 22 | repeat down here, 202 millimeters later. |
| :31:42 | 23 | So we have examples of disclosures in the |
| :31:48 | 24 | specification that fall within the scope of the claim but |
| :31:53 | 25 | will not fit DRI's proposed construction of requires a wide |

:31:58   1   web and either multiple patterns or a single pattern with a

:32:03   2   variable repeat length.

:32:06   3          We think our construction is correct.

:32:07   4          THE COURT:  Let me ask you this:  Does your

:32:10   5   claim construction proposal read out the variably

:32:21   6   limitation?

:32:23   7          MR. FERRARIO:  We don't think so, because -- and

:32:26   8   this was sort of -- no, we don't think don't think so,

:32:29   9   because we think it's patterned.  And I hope I can answer

:32:32   10   this.  If I don't, please let me know.

:32:34   11          Our proposed construction, it says, patterned so

:32:37   12   that the cutting blade may come into contact with adhesive

:32:40   13   at different locations over time.

:32:43   14          We think that you can only have that happen if

:32:47   15   the pattern varies.

:32:50   16          THE COURT:  You are saying it is inherent.

:32:53   17          MR. FERRARIO:  It is.  I wonder if I can show

:32:55   18   you in an example, which may be a little easier, as to what

:33:00   19   we mean by that.

:33:14   20          So not with respect to numbers or columns or

:33:18   21   anything like that, I am talking about shapes here.  And I

:33:21   22   am very poor at drawing, so I apologize.

:33:23   23          In this example, there is a pattern.  But it

:33:26   24   doesn't vary.  So as you make cuts -- I am trying to do this

:33:29   25   with my right hand, I am left handed -- over time, you will

| | | |
|---|---|---|
| :33:33 | 1 | see that the contact will occur at the same position each |
| :33:39 | 2 | time over time.  The cutting blade mechanism will always |
| :33:43 | 3 | contact adhesive between here and here, and between here and |
| :33:47 | 4 | here and here and here. |
| :33:49 | 5 | If you switch over to a pattern that varies, |
| :33:53 | 6 | what you see is, you know, the cutting blade mechanism will |
| :33:57 | 7 | not contact here.  And then when it cuts through here, it |
| :34:02 | 8 | has a different contact profile.  And so for that, that's |
| :34:06 | 9 | varying the pattern. |
| :34:07 | 10 | THE COURT:  Okay.  Thank you, Mr. Ferrario. |
| :34:10 | 11 | Mr. Savit. |
| :34:10 | 12 | MR. SAVIT:  Your Honor, I have some general |
| :34:15 | 13 | remarks first, and then I will focus on this term in |
| :34:18 | 14 | particular. |
| :34:30 | 15 | So, Your Honor, I am going to use Figure 1B as |
| :34:34 | 16 | sort of the archetypal drawing here that applies to all the |
| :34:39 | 17 | terms or most of the terms we will be discussing with |
| :34:41 | 18 | respect to this patent. |
| :34:43 | 19 | The adhesive pattern in these figures is shown |
| :34:46 | 20 | in black.  There is the repeat length that's clearly called |
| :34:51 | 21 | out in the specification.  Here is this example of 202 |
| :34:55 | 22 | millimeters. |
| :34:57 | 23 | Then we have got three exemplar cuts within that |
| :35:00 | 24 | one repeat length.  And Cut A hits four areas of adhesive. |
| :35:09 | 25 | Cut B hits nine different areas of adhesive.  Cut C hits |

| | | |
|---|---|---|
| :35:14 | 1 | five different areas of adhesive. |
| :35:19 | 2 | Now, if you look at this Figure 1H, we have |
| :35:25 | 3 | multiple patterns on the same lined web.  This brings me to |
| :35:30 | 4 | that point of agreement with the other side, because they |
| :35:33 | 5 | were trying to say we had a dispute that I was arguing, my |
| :35:36 | 6 | client was arguing that the claim was limited to the wide |
| :35:40 | 7 | web.  And that's not true. |
| :35:43 | 8 | The claim reads label media.  Our point was, in |
| :35:47 | 9 | our brief, that it was broad enough to include the wide web. |
| :35:51 | 10 | That word, that phrase "label media" is also broad enough to |
| :35:54 | 11 | include the narrow. |
| :35:56 | 12 | The narrowing in the claim occurs later, |
| :35:58 | 13 | including the phrase variably patterned. |
| :36:03 | 14 | Let's talk about that. |
| :36:06 | 15 | We say that it's indefinite.  What's referred to |
| :36:09 | 16 | here is a wide web of media containing multiple different |
| :36:12 | 17 | patterns, or a single pattern that -- that could exist on |
| :36:16 | 18 | the narrow web that has a variable repeat length. |
| :36:22 | 19 | So Claim 1, as pointed out, is directed to label |
| :36:25 | 20 | media.  In the illustration Figure 1A shows a pattern that |
| :36:31 | 21 | can be provided on multiple portions of a wide web, for |
| :36:36 | 22 | example, later slitting into a final narrow width product as |
| :36:39 | 23 | illustrated in 1B. |
| :36:40 | 24 | I am going to show you 1A and 1B.  This is a |
| :36:43 | 25 | quote right out of the patent. |

:36:45    1          There is 1A, which shows this pattern with

:36:50    2     elongated diamonds, five of those, as they would exist in

:36:54    3     this wide web as it comes off the manufacturing roll.  As

:36:59    4     you can imagine, the rolls of paper are wide and they are

:37:02    5     all processed at the same time.  Then after the processing

:37:07    6     is done, for example, the adhesive is put onto the back

:37:12    7     side, then it comes off, then you put it on a different

:37:15    8     machine.  That is called a slitter.  That then slits, in

:37:18    9     this case, it would be these five patterns, into the

:37:21    10    narrower rolls, which are narrow enough to get into the

:37:24    11    individual printers.  That's just the efficient way to do

:37:26    12    it.

:37:26    13          Now, these arrows actually are disclosed as

:37:32    14    showing the areas where you would slit the wide web to get

:37:37    15    five rolls of the narrow web or the narrow rolls, that would

:37:42    16    then fit in the printer.

:37:44    17          Okay, now the patent says, as depicted in Figure

:37:47    18    1A, the patterned adhesive may be coated on a relatively

:37:50    19    wide web, a log of label media.

:37:53    20          We don't seem to have a dispute about that.

:37:56    21          Claim 1, though, says, the adhesive layer, now

:37:59    22    it's talking about the layer as it would spread out on the

:38:03    23    substrate.  As it would spread out on the label media.  That

:38:06    24    whole layer is variably patterned.

:38:11    25          One thing Mr. Ferrario did not mention is, you

:38:13    1    look at some of the other claims, like Claim 14, and it

:38:17    2    doesn't talk about variably patterned.  It talks about

:38:22    3    repeating pattern.  I looked at this, the first time I --

:38:25    4    probably the first ten times I looked at this patent and I

:38:27    5    kept shaking my head, variably patterned, that sounds

:38:30    6    impossible.  Is it a pattern not variable?  Isn't that why

:38:34    7    it is a pattern, because it repeats over and over again?

:38:36    8    And that went on.  And I realized that in fact this is what

:38:40    9    we are talking about.  It is the adhesive layer that then

:38:44   10    contains variable patents, different patents.

:38:49   11            As I looked into this, I thought that is exactly

:38:52   12    what they are talking about, and certainly that is at the

:38:54   13    end of the day how the examiner viewed it, how members of

:38:57   14    the public had viewed it.  Again, you look at what's 1H,

:39:03   15    which is what that figure is, this is how they talk about

:39:06   16    it.  As shown in Figure 1H, various -- I don't think it is a

:39:11   17    huge stretch to get from various to variable -- various

:39:14   18    adhesive patterns may be produced utilizing, having similar

:39:18   19    or different overall elemental shapes.

:39:21   20            For example, the left four patterns all include

:39:23   21    variations of diamond-shaped adhesive.  Likewise, the right

:39:27   22    two patterns both include variations of circular-shaped

:39:31   23    adhesive.

:39:33   24            So there we go.  The right four, left four are

:39:37   25    variations of the pattern.  The right two are, again, other

| | | |
|---|---|---|
| :39:41 | 1 | variations. |
| :39:43 | 2 | Okay.  Now, this is actually how this is |
| :39:47 | 3 | described.  The wide web of patterned adhesive media having |
| :39:51 | 4 | a multitude of different adhesive patterns, Column 7, Lines |
| :39:56 | 5 | 8 and 9 of the patent.  Just look at the patent.  It matches |
| :39:59 | 6 | up perfectly with the claim language variably patterned. |
| :40:06 | 7 | Now, we do not need to discuss the Network |
| :40:10 | 8 | Signatures case. |
| :40:11 | 9 | One other point I want to make is that both of |
| :40:16 | 10 | us agree that 1H is within the scope of this claim. |
| :40:24 | 11 | However, 1C is also an example.  In the briefs -- I don't |
| :40:30 | 12 | have a slide -- in the briefs, it has a varying repeat |
| :40:33 | 13 | length.  And we are not wedded to that position.  If you |
| :40:36 | 14 | were to decide that 1C is not included within the scope of |
| :40:39 | 15 | the claim, we would be fine with that as well. |
| :40:46 | 16 | As far as Claim 4, Mr. Ferrario was mentioning |
| :40:49 | 17 | saying reference to variable pattern comprising elongated |
| :40:57 | 18 | diamond shapes, well, yes, we agree, you could do a variably |
| :41:02 | 19 | patterned embodiment and include elongated diamond shapes. |
| :41:08 | 20 | Of course, you would have to have other shapes as well.  It |
| :41:10 | 21 | wouldn't be limited.  Just like they say about the word |
| :41:12 | 22 | comprising.  They have an agreement.  Comprising is open |
| :41:15 | 23 | ended.  They are just saying, when you make this variably |
| :41:18 | 24 | patterned, Claim 4 says one of the patterns within the |
| :41:22 | 25 | multiple patterns would include elongated diamond shapes. |

| | | |
|---|---|---|
| :41:25 | 1 | That's all. |
| :41:26 | 2 | Our position is, it's consistent with Claim 4 -- |
| :41:29 | 3 | it's not inconsistent at all with Claim 4 because of the |
| :41:33 | 4 | word comprising. |
| :41:33 | 5 | THE COURT:  Okay. |
| :41:35 | 6 | MR. SAVIT:  Thank you, Your Honor. |
| :41:37 | 7 | MR. FERRARIO:  Just one brief response to that. |
| :41:43 | 8 | With respect to the description of Figure 1H |
| :41:46 | 9 | that had the different patterns, it was described as a |
| :41:49 | 10 | multitude of different patterns.  That's the way the |
| :41:52 | 11 | specification describes it.  Those words aren't used in the |
| :41:57 | 12 | claim anywhere.  It doesn't say a wide web comprising or |
| :42:02 | 13 | containing a multitude of different patterns.  It says a |
| :42:05 | 14 | label media variably patterned.  The variably patterned |
| :42:08 | 15 | refers to the benefits of not having to cut through or |
| :42:13 | 16 | coming into contact at different points over time. |
| :42:15 | 17 | THE COURT:  Okay. |
| :42:17 | 18 | MR. FERRARIO:  The next term, Your Honor, is |
| :42:21 | 19 | "areas with and without adhesive." |
| :42:25 | 20 | As part of the broader phrase here that says, |
| :42:28 | 21 | "to include areas with and without adhesive to vary |
| :42:30 | 22 | locations of contact between the adhesive layer and a |
| :42:33 | 23 | cutting mechanism making variably located lateral cuts |
| :42:36 | 24 | across width of the substrate." |
| :42:40 | 25 | I think we were at a situation again here where |

:42:42   1    we thought more or less plain and ordinary meaning.  But in

:42:45   2    response to contention and the claim was indefinite, we

:42:50   3    clarified, just a couple points here, that these areas

:42:57   4    include different transverse points between the adhesive

:43:01   5    layer.  And that was about all we did there to clarify the

:43:07   6    language.

:43:10   7            DRI's proposed construction, like the previous

:43:12   8    one, has a number of the requirements that, when we look at

:43:15   9    them and we work through them, in view of the disclosures of

:43:19   10   the patents, we are not sure where they come from and how

:43:22   11   they get there.

:43:28   12           The briefing is interesting, because up to a

:43:31   13   certain point I think we are in agreement on some of the

:43:33   14   briefing, because we get to the point where we say what is

:43:35   15   vary locations of contact?  And we both talk about how the

:43:39   16   different points in the cutting mechanism will come into

:43:41   17   contact with adhesive at different points.  I think we agree

:43:44   18   with that.  And DRI, of course, can point out if there is

:43:47   19   any disagreement there.

:43:49   20           Then the question is, well, variably located

:43:51   21   lateral cuts, what does that mean?  That just means you are

:43:54   22   cutting at different points.  Okay, we are in agreement

:43:56   23   there.

:43:58   24           What we point out is that the patent very

:44:04   25   clearly talks about buildup of adhesive and how to avoid

:44:08   1    that by varying the pattern, by doing these things and by

:44:10   2    having areas with and without adhesive.

:44:14   3         That is the solution.

:44:16   4         DRI gets to a point where it says, well, it then

:44:19   5    follows from that that you have to have these two

:44:24   6    requirements.  And these two requirements are that you have

:44:28   7    to have some adhesive and adhesive-free areas at every

:44:32   8    width-wise cut and, and, it's conjunctive, that each portion

:44:38   9    of the cutting mechanism will contact an adhesive-free area

:44:43  10    when the prior cut didn't contact adhesive, and did contact

:44:50  11    adhesive, and vice versa, is the way we understand it.

:44:52  12         Here is why this is wrong.

:44:55  13         The first requirement, the adhesive and adhesive

:44:57  14    free at every cut, that's just wrong.  First, the

:45:01  15    specification discloses that you can have a cut-wise gap.

:45:05  16    So that means that there would be cuts where you are not

:45:09  17    cutting through adhesive and adhesive at every cut.

:45:14  18         Second, even the figures support that, because

:45:16  19    there are some embodiments where the adhesive pattern, you

:45:20  20    can draw a line and you can see there will be areas where

:45:22  21    there be a cut and you won't hit adhesive and an

:45:26  22    adhesive-free area at every cut.

:45:27  23         That requirement is improper.

:45:30  24         Next.  The next requirement is that each part of

:45:35  25    the blade will contact adhesive when the previous part of

:45:38   1    the blade did not.  That is our understanding of what they

:45:41   2    are proposing and what they are saying the requirement is.

:45:43   3    We can show you why this is wrong as well.

:45:45   4              First of all, there is no such disclosure or

:45:48   5    part of the specification that would teach you why that is

:45:51   6    the case.  But secondly, looking at the figures, you can see

:45:56   7    that if you made the first cut here, and you made a second

:45:59   8    cut here, both the cutting edges would contact adhesive in

:46:05   9    the exact same area.  And it would not contact adhesive in

:46:08  10    the exact same area.

:46:10  11              For this reason this requirement is wrong.  Here

:46:11  12    again, you can see it in the NCR-labeled version of the

:46:17  13    stickie.  If you cut here, and then you were to cut here --

:46:21  14    again, it's not to suggest necessarily that you were to cut

:46:24  15    this close.  But as these are repeating patterns, they go

:46:27  16    down or up as the case may be, you could see cutting here

:46:31  17    and then cutting at a later time here.  And at points, for

:46:35  18    example, here and here, you would have adhesive contact here

:46:39  19    and here and adhesive contact that would be the same.

:46:42  20              So the statement that each part of the blade

:46:45  21    will contact adhesive when a previous part of the blade did

:46:49  22    not is incorrect, and it's inconsistent with the teachings

:46:52  23    of the patent.

:46:54  24              Thank you.

:46:56  25              THE COURT:  Thank you.

:46:58    1          MR. SAVIT:  Your Honor, our construction is "at

:47:14    2    least some adhesive and some adhesive-free areas at every

:47:17    3    width-wise cut at a cutting mechanism and each portion of

:47:24    4    the cutting mechanism that contacts an adhesive-free area

:47:26    5    will contact adhesive when the locations of the cutting

:47:29    6    mechanism" -- it is very relative to the running axis of a

:47:32    7    substrate.

:47:35    8          Let's look at the Claim 1 language because it

:47:39    9    really means to set context here.  One of the things or

:47:42   10    several things are quite confusing about this claim, but one

:47:45   11    of the things is, what the heck is the cutting mechanism

:47:49   12    that you are talking about?  All of a sudden you are reading

:47:51   13    that claim and you now introduce the cutting mechanism.

:47:53   14    That is something that, obviously, not something that is in

:47:57   15    the roll of paper.  That's not in the label media.  That is

:48:00   16    some independent device, presumably in the printer.  But it

:48:04   17    doesn't even say that.

:48:06   18          Okay.  We are not going to talking

:48:09   19    indefiniteness.  Let's look at that, what could this

:48:11   20    possibly mean?  Again, we go back to this Figure 1B, Cut A

:48:18   21    hits four areas of adhesive.  Cut B hits nines different

:48:24   22    areas of adhesive.  Cut C hits five different areas of

:48:27   23    adhesive.

:48:28   24          The problem with the phrase, Your Honor, as I

:48:29   25    point out in my brief, in the responsive brief, is that the

:48:33   1   words vary and locations are each used twice, mean entirely

:48:39   2   different things.

:48:40   3          What I have done in the responsive brief is to

:48:44   4   tease this language apart so that we now separate the first

:48:49   5   uses of vary and location from the second uses, and then,

:48:53   6   once we understand those differences, then when we put back

:48:57   7   the meanings together with the overall gist of what this

:49:00   8   patent is, that leads directly to what we propose for the

:49:04   9   construction.

:49:08   10          There is really three portions.  First, the

:49:12   11   pattern includes areas with adhesive and areas without

:49:15   12   adhesive.  Now, here is a point I want to introduce.  It

:49:20   13   might not mean something to you right away.  But when we

:49:23   14   come back to it, which is, it's the pattern that we are

:49:26   15   talking about.  We are not talking about -- obviously, we

:49:29   16   could have areas between patterns where we have gaps.  We

:49:32   17   can have areas, longitudinal areas between patterns where we

:49:37   18   have multiple patterns on a single wide web or label media

:49:40   19   or even a narrow web.  That's not what we are talking about.

:49:43   20          We are talking about what happens within the

:49:45   21   four corners, if you will, of the pattern itself.  That

:49:48   22   pattern as a starting point has to be recognizable as having

:49:52   23   both areas with adhesive and areas without adhesive.

:49:57   24          Two.  The locations of contact between the

:50:00   25   adhesive layer and a cutting mechanism.  That is that the

| | |
|---|---|
| :50:04 | 1 |
| :50:10 | 2 |
| :50:13 | 3 |
| :50:17 | 4 |
| :50:17 | 5 |
| :50:23 | 6 |
| :50:25 | 7 |
| :50:27 | 8 |
| :50:30 | 9 |
| :50:33 | 10 |
| :50:34 | 11 |
| :50:38 | 12 |
| :50:41 | 13 |
| :50:44 | 14 |
| :50:48 | 15 |
| :50:51 | 16 |
| :50:54 | 17 |
| :50:57 | 18 |
| :51:00 | 19 |
| :51:03 | 20 |
| :51:06 | 21 |
| :51:07 | 22 |
| :51:11 | 23 |
| :51:14 | 24 |
| :51:19 | 25 |

pattern varies with the locations of contact between the

adhesive layer and the cutting mechanism.

Three.  When the cutting mechanism makes the

various --

THE COURT:  I see the words no dispute.  It's an

illusion.

Go ahead, counsel, I am sorry.

MR. SAVIT:  When the cutting mechanism makes

variably located lateral cuts across the width of the

substrate.

So let's now break this down.  I don't think

there is a dispute about this.  My only point of even

putting it up there was to -- I did get to say "no

dispute" -- is just to say that, no, we are really talking

about the area within the pattern.  That's the area we are

talking about.  We have now defined that.  That has to

include both areas with and without adhesive.

Now, I have put a red box around the pattern,

and that pattern has the black areas which have adhesive and

the white areas which do not have adhesive.  Fine, we

understand that.

Two.  The locations of the pattern varies the

locations of contact between the adhesive layer and this

cutting mechanism, presumably in a printer.  And locations

here means positions on the cutting blade.  And vary here

:51:23   1   means varying the positions on the blade, positions on the

:51:28   2   blade over time.

:51:31   3            So let's look at the figure.

:51:36   4            Here, in other words, if you look at Cut 1, you

:51:40   5   will see, which I have put a box around it and identified

:51:43   6   with an arrow, those red arrows coming down from above are

:51:47   7   now showing what's now being experienced by this cutting

:51:52   8   mechanism.

:51:53   9            So you will see that it's alternating black and

:51:56  10   white, so that's alternating areas of adhesive and areas

:52:00  11   without adhesive.

:52:02  12            Then you go to Cut 2, and you similarly -- so

:52:12  13   Cut 2, and you similarly now have that line drawn at B for

:52:17  14   Cut 2.  That is showing again -- is experienced by the

:52:20  15   cutting mechanism.  Again, it's this alternating adhesive

:52:23  16   and adhesive-free areas.  Those are different areas of the

:52:28  17   cutting mechanism, which is exactly what this patent is

:52:30  18   talking about.  It's talking about spreading the adhesive

:52:35  19   across the pattern as it's experienced by the blade.

:52:39  20            Okay.  Cut C -- it is C.  It is covered up by my

:52:45  21   arrow.  Cut 3, again, shows that line, that east-west line,

:52:51  22   which then shows, again, different areas that are the

:52:56  23   positions of the adhesive.

:53:00  24            So you put red arrows here, this is where the

:53:04  25   adhesive is for Cut 1.  For example, an adhesive where the

:53:08    1    adhesive is for Cut 3.  You will note that the areas that

:53:11    2    don't experience adhesive on the cutting mechanism, like in

:53:17    3    Cut 1, in Cut 3, now those areas now experience the

:53:22    4    adhesive.  That's how you accomplish spreading the adhesive

:53:25    5    across the cutting mechanism where the pattern is.

:53:31    6            Now, let's go to Phrase 3 now, which is when

:53:37    7    your cutting mechanism makes variably located lateral cuts

:53:40    8    across the width of the substrate.

:53:42    9            Here the location is the position on the

:53:44   10    substrate along the running axis.  And that varies with the

:53:48   11    movement of the cutting mechanism along the running axis.

:53:54   12            So location and vary mean different things used

:53:57   13    in this context.  Let's look at that change.

:53:59   14            Here, when you move from Cut 1 to Cut 2, which I

:54:04   15    am trying to indicate with that curved arrow, then you are

:54:07   16    now having areas of the cutting mechanism that didn't

:54:11   17    experience adhesive now in Cut 1.  In Cut 2, they now

:54:17   18    experience contact with adhesive.

:54:21   19            Similarly, now when you move from Cut 2 to Cut

:54:25   20    3, you now have different areas that had previously not

:54:29   21    experienced contact with adhesive now are contacting the

:54:33   22    black areas there, which are where the adhesive is.  That's

:54:38   23    what's being demonstrated.

:54:40   24            When you go to the patent, you may be wondering,

:54:42   25    what is all this about?  So you have to set context for

:54:47  1   this.   It's too confusing to understand it without

:54:50  2   understanding the context.   The context, the goal of the

:54:54  3   pattern is, here is a quote out of the patent, to "spread

:54:57  4   the adhesive contact across as much of the cutter as

:55:00  5   possible, that is, over time, to minimize deposition in

:55:05  6   localized regions."

:55:10  7         First, this is how we formulate:   adding in the

:55:15  8   goal to deconstructing the actual claim language.   First,

:55:19  9   "The pattern provides contact with both adhesive and

:55:22  10  adhesive-free areas with each cut (within the pattern)."

:55:28  11        That is implicit.   That is not actually in the

:55:30  12  claim construction.   But I have added that to the slide

:55:32  13  because that is implicit in what we are talking about.   We

:55:34  14  are not talking about what happens outside the pattern.   We

:55:37  15  are saying, if you are going to determine infringement, you

:55:39  16  have got to have a pattern.   You have got to have an example

:55:42  17  of a pattern that operates the right way.

:55:44  18        Okay.   Now, second, "each portion of the cutting

:55:50  19  mechanism contacts the adhesive-free area within the

:55:52  20  pattern."   Again, we are not talking about areas outside the

:55:56  21  pattern that don't have adhesive.   And they will contact

:55:58  22  adhesive when the location of the cutting mechanism is

:56:01  23  changed relative to the running axis of the substrate.

:56:06  24        Now, the examples that Mr. Ferrario gave

:56:13  25  actually are -- I believe he gave those examples where he is

:56:17    1    saying you can cut through the pattern, some of the

:56:20    2    disclosure, some of the figures, you can cut through that

:56:23    3    and you can find a space within the pattern where you didn't

:56:25    4    hit any adhesive at all.

:56:28    5              First of all, there is no reason that every

:56:30    6    figure has to be covered by every claim.  Putting that

:56:33    7    aside, the fact that you cut through the pattern, in that

:56:38    8    case it's the polka dots, and you don't, in some cuts don't

:56:43    9    intersect any adhesive, that doesn't mean that that pattern

:56:47    10   would fall outside our definition, because in later cuts, if

:56:51    11   you look at those polka dot patents, you will, in fact,

:56:54    12   cover every inch, every millimeter of that cutting mechanism

:57:01    13   within the pattern, within the boundaries of the pattern.

:57:04    14             So in other words, you have that pattern of

:57:07    15   adhesive, polka dots.  And you can just draw a border around

:57:12    16   it and say that's a pattern over time, which, remember, that

:57:15    17   was a quote right out of the patent, was over time, for Line

:57:23    18   2 through 5, over time you get multiple cuts, then you will

:57:28    19   in fact hit every part of that cutting mechanism within that

:57:33    20   pattern.  Whether you have one cut or ten cuts, where you

:57:37    21   don't cut any adhesive, it doesn't matter.  That's certainly

:57:41    22   not -- that is consistent with our claim construction.  In

:57:46    23   fact, that would be included.

:57:49    24             Now, if you were to adjust those polka dots and

:57:52    25   actually have them arrayed in simple columns and rows, you

| | | |
|---|---|---|
| :57:57 | 1 | would have gaps between them, and that wouldn't be true |
| :58:00 | 2 | because you would have areas within the pattern, lanes |
| :58:05 | 3 | without adhesive, that would never contact the adhesive. |
| :58:10 | 4 | That's why we have that limitation in the claim, |
| :58:14 | 5 | because clearly, you have got to have some movement across, |
| :58:19 | 6 | width-wise across within the pattern.  So in other words, |
| :58:23 | 7 | you can't just say, oh, there are polka dots and we didn't |
| :58:26 | 8 | cut through.  So what?  We have to say, no, no, no.  Within |
| :58:29 | 9 | the pattern over time, we are not just talking about two |
| :58:32 | 10 | cuts, you know, every cut, later cut, that is not our claim |
| :58:36 | 11 | construction, it isn't saying the next cut.  We are just |
| :58:40 | 12 | saying over time, once you do a multitude, a plurality, many |
| :58:47 | 13 | cuts, yes, you will intersect, the cutting mechanism will |
| :58:51 | 14 | intersect the cutting blade within that pattern. |
| :58:57 | 15 | Thank you, Your Honor. |
| :58:58 | 16 | THE COURT:  Thank you, Mr. Savit. |
| :59:02 | 17 | MR. FERRARIO:  So their construction doesn't say |
| :59:06 | 18 | that.  It doesn't say that over time.  It says every time. |
| :59:10 | 19 | That's a very different thing. |
| :59:13 | 20 | Furthermore, even accepting their modification |
| :59:17 | 21 | here of their construction, it's still wrong.  If you take a |
| :59:26 | 22 | look at one of the patterns here, the one, this one here in |
| :59:33 | 23 | the middle, okay, if you are cutting across you do have |
| :59:37 | 24 | horizontal areas within that pattern that will not contact |
| :59:42 | 25 | adhesive over time, even under their modifying. |

:59:46      1              So their original one is wrong and doesn't work

:59:49      2      and even their modified construction isn't correct.

:59:52      3              THE COURT:  Okay.

:00:05      4              MR. FERRARIO:  Your Honor, the next issue is

:00:08      5      very simple.  I will be brief.  It relates to variably

:00:12      6      located lateral cuts.  All we are saying is they are lateral

:00:16      7      cuts that occur at different locations relative to a repeat

:00:19      8      length.  DRI's proposal, which is pretty similar, though,

:00:22      9      inserts the term "randomly."  We dispute that the cuts are

:00:26      10     random.  The cuts, in fact, as the specification teaches,

:00:30      11     are made purposefully.  They are made purposefully according

:00:36      12     to what's being printed on the label.  If you have a short

:00:40      13     label, you print a short one.  If you have a lot, you print

:00:43      14     a little bit longer.  And that is not a random cut.  That is

:00:48      15     one that occurs at different locations relative to the

:00:53      16     repeat length.

:00:57      17             That is all we have to say on that.

:01:00      18             MR. SAVIT:  Your Honor, the difference between

:01:03      19     our random language and their language is, in fact, that

:01:09      20     what they want to expand the scope of this claim to include

:01:13      21     is where you have -- remember those prior patents, where you

:01:18      22     have gaps and index marks.  And when you have gaps and index

:01:22      23     marks, you have to cut at the gap.  That's what the index

:01:26      24     marks tell the printer, you can cut here safely without

:01:29      25     intersecting or contacting the adhesive.

:01:33    1          So if you can imagine that roll coming through

:01:36    2    the printer, then the -- obviously, you are primarily

:01:40    3    concerned with printing the information on top.  Let's say

:01:42    4    it's a receipt.  Some receipts are long.  Some receipts are

:01:45    5    short.

:01:46    6          What happens is, when you get to the end of the

:01:49    7    printing length, then if you have the index marks in gaps,

:01:57    8    the printer then has to continue to unfurl the paper till

:02:02    9    you get to the index mark and then cut.

:02:06   10          So you can have different sized labels, you can

:02:12   11    vary the length of the label with that configuration where

:02:17   12    you have gaps and index marks, because you could have a

:02:20   13    label that just goes from one index mark to the next index

:02:24   14    mark, or you can have a label that's twice as long as that

:02:28   15    that goes to the next index mark, which would be twice as

:02:31   16    big as the smallest label, or three times.  In other words,

:02:35   17    there would be integer numbers times that length of the

:02:40   18    pattern where the index marks is.

:02:42   19          That would be variably length, as they describe

:02:46   20    it.  But that's not what this patent is about.  This patent

:02:49   21    is about, because you are cutting through the -- you can cut

:02:52   22    through the adhesive, you can cut anywhere.  The advantage

:02:57   23    of that, Your Honor, is as follows.  You think about that

:03:01   24    paper unfurling through the printer.  It's printing that

:03:04   25    receipt.  It gets to the end of the receipt.  It cuts, it

:03:09     1   cuts at the end of the receipt where the end of the print

:03:12     2   is.  It doesn't have to go to the next index mark and gap.

:03:17     3   That's why we say random.  We don't mean it's random, it's

:03:20     4   going to cut through the print randomly wherever.  When we

:03:23     5   say random, we mean random with respect to the pattern.  It

:03:27     6   can cut anywhere along the pattern.  It doesn't have to wait

:03:29     7   for an index mark and a gap.  That's why our phrasing is

:03:34     8   better than their phrasing.  Their phrasing would open up

:03:37     9   really to undo any meaning of that term at all.

:03:41    10              Thank you.

:03:41    11              THE COURT:  Thank you, Mr. Savit.

:03:43    12              Mr. Ferrario, brief reply.

:03:46    13              MR. FERRARIO:  We think -- I don't really have

:03:53    14   much more to say on that, unless you have any questions.  I

:03:56    15   think it's pretty well described in our brief.

:03:59    16              The next term is vertical and horizontal free

:04:05    17   lanes, adhesive -- comprised of adhesive-free lanes.

:04:08    18   Vertically and horizontally.

:04:10    19              I think the big dispute here -- we think it is

:04:13    20   pretty clear what this means.  There are a number of figures

:04:15    21   in the specification, as well as a description that

:04:17    22   discloses this.  We think the big issue here is whether this

:04:23    23   should be limited to a web, the wide web in particular.

:04:28    24              Again, we note that the claim is directed to

:04:32    25   Label B, which includes both wide webs and narrow webs, and

| | |
|---|---|
| :04:37 | 1 |
| :04:42 | 2 |
| :04:48 | 3 |
| :04:52 | 4 |
| :04:56 | 5 |
| :05:02 | 6 |
| :05:05 | 7 |
| :05:08 | 8 |
| :05:22 | 9 |
| :05:27 | 10 |
| :05:33 | 11 |
| :05:37 | 12 |
| :05:44 | 13 |
| :05:48 | 14 |
| :05:52 | 15 |
| :05:53 | 16 |
| :05:56 | 17 |
| :06:00 | 18 |
| :06:05 | 19 |
| :06:09 | 20 |
| :06:13 | 21 |
| :06:16 | 22 |
| :06:20 | 23 |
| :06:22 | 24 |
| :06:24 | 25 |

1 there are a number of figures, 1A through 1H, that show this

2 label media.  That label media includes wide webs, includes

3 narrow webs, and it includes vertical adhesive-free areas

4 and it shows horizontal adhesive-free areas.

5 So limiting the term pursuant to Documotion's

6 proposed construction we think is inconsistent with the

7 specification.

8 MR. SAVIT:  Your Honor, briefly, what we are

9 asking for is a construction that just clarifies that the

10 adhesive-free lanes are the areas between the pattern.  They

11 are not the areas within the pattern.  And I would just

12 invite you to look at the patent, Column 3, Lines 27 through

13 34, talking about Figure 1A, which we can look at right

14 here.  That is the wide web, and those arrows are showing

15 the lanes.

16 And it says, the portion of the media that would

17 become the edges of a narrow slit label product as in, for

18 example, Figure 1B, following the relief arrows down the

19 length of the illustration of Figure 13, are free of

20 adhesive to create adhesive-free lanes for slitting the wide

21 web product of Figure 1A, and thereby mitigate buildup of

22 adhesive on the slitting mechanism, for example, a cutter

23 knife, and the like.

24 Here, remember, there is two things going on.

25 One is the manufacture of the label stock, the rolls, that

:06:30    1    comes out of the machine, the processing line, in this wide

:06:33    2    form.   Then that is slit into the narrow rolls.   If you just

:06:38    3    had glue that went across the whole width of it, then those

:06:42    4    slitters would then get gummed up with adhesive.

:06:46    5            What they then have disclosed was, okay, when

:06:48    6    you print this out, when you lay down the adhesive on the

:06:52    7    processing, and you are making multiple narrow rolls, you

:06:57    8    just include a lane between them so that when you slit it

:07:00    9    you don't get glue on the lanes.   That is shown not just in

:07:04   10    Figure 1A.   Same thing in Figure 1H, has those arrows,

:07:10   11    again, designating, actually, perforation lines, not really

:07:14   12    perforations, that would be the line of cutting, where you

:07:16   13    cut through to divide up the wide web into individual narrow

:07:20   14    rolls without getting your slitter all gummed up with glue.

:07:26   15            So that's all, again, our construction -- now, I

:07:29   16    just invite you to do a word search on this patent and look

:07:32   17    for adhesive-free lanes, and that's what you find out.

:07:35   18            I just want to again make the point to say these

:07:38   19    are adhesive-free areas between the patterns, not defining

:07:42   20    within the patterns, or not the adhesive-free areas within

:07:46   21    the patterns.

:07:47   22            Thank you.

:07:47   23            THE COURT:   Thank you, Mr. Savit.

:07:49   24            Mr. Ferrario.

:07:50   25            MR. FERRARIO:   So the big problem with that

| | | |
|---|---|---|
| :07:59 | 1 | construction is that, and as I have heard the argument here, |
| :08:04 | 2 | it was focused on the vertical lanes in a wide web, which |
| :08:10 | 3 | the claim does in fact discuss vertical lanes.  But the |
| :08:16 | 4 | claim also discusses horizontal lanes. |
| :08:20 | 5 | So if you look at the figure that Mr. Savit |
| :08:23 | 6 | showed you, they are the horizontal lanes in that figure. |
| :08:26 | 7 | And that's the one he is advocating for to limit this term. |
| :08:31 | 8 | Look at Figure 1E.  There are horizontal lanes |
| :08:34 | 9 | here.  So if you have got horizontal lanes in the wide web, |
| :08:38 | 10 | you are going to have horizontal lanes in the narrow web, |
| :08:41 | 11 | too, because they are so going to show up as gaps. |
| :08:43 | 12 | We don't think this term really needs |
| :08:46 | 13 | construction, Your Honor. |
| :08:47 | 14 | Next is elongated diamond shape.  So this shows |
| :08:52 | 15 | up in a couple of claims.  We think it's plain and ordinary |
| :08:57 | 16 | meaning.  And then there are just a few words here proposed |
| :09:00 | 17 | by DRI.  Those are that "The adhesive layer is made up of |
| :09:08 | 18 | diamond-shaped patches that have been stretched along the |
| :09:11 | 19 | top to bottom axis between the top and bottom points |
| :09:15 | 20 | relative to the side-to-side points, or stretched between |
| :09:18 | 21 | the side-to-side axis between the side points relative to |
| :09:21 | 22 | the top and bottom points." |
| :09:23 | 23 | I think there is a lot there.  But I think we |
| :09:25 | 24 | can really boil the dispute down to whether, one, do these |
| :09:29 | 25 | have to be patches?  No. |

| | | |
|---|---|---|
| :09:34 | 1 | So the one thing we would point out is there are |
| :09:37 | 2 | two claim terms here initially.  And the claim term does in |
| :09:42 | 3 | one patent say stretching vertically, which is an |
| :09:45 | 4 | orientation.  And then there is our proposed construction, |
| :09:48 | 5 | that just kind of reads that out of the claim.  I don't |
| :09:51 | 6 | think that was intentional.  I just want to point that out. |
| :09:54 | 7 | There is, in fact, in one claim a stretching vertically. |
| :09:57 | 8 | And in the other claim there isn't any orientation |
| :10:01 | 9 | component. |
| :10:02 | 10 | So really, the issue is patches, or elongated |
| :10:07 | 11 | diamond patches.  If you look at the briefing, what they are |
| :10:10 | 12 | basically saying, we all agree, Figure 1A shows an elongated |
| :10:15 | 13 | diamond shape.  That is the only place in the specification |
| :10:17 | 14 | that tells you where there is an elongated diamond. |
| :10:21 | 15 | Then they say, it follows that Figure 1H -- |
| :10:26 | 16 | Figure 1A, by the way is continuous -- I am sorry, they are |
| :10:29 | 17 | patches.  Figure 1A are patches. |
| :10:31 | 18 | Then they say, okay, then look at Figure 1H, |
| :10:34 | 19 | which are not patches, and those are not described as |
| :10:39 | 20 | elongated diamond shapes.  Those are diamond-shaped |
| :10:41 | 21 | adhesive.  They are different.  Different. |
| :10:43 | 22 | Now, what they skip is that when the patentee |
| :10:47 | 23 | was describing Figure 1A, it described the elongated diamond |
| :10:52 | 24 | shapes as a diamond adhesive pattern.  That's the generic |
| :10:56 | 25 | description that's in the specification.  And then Figure 1H |

| :11:00 | 1 | is described as a variation of the diamond adhesive pattern. |

So it's very clear that you can pull all of those together, that they were equated in the specification. Elongated diamond shape is a diamond-shaped pattern which is a variation, which -- Figure 1H are variations of diamond-shaped adhesive.

The reason that again is important is simply because Figure 1H shows diamond shaped, I should say variations of diamond-shaped patterns that are continuous and that are not patches.

That is all we think is wrong with the construction. It shouldn't be limited to patches.

THE COURT: Mr. Savit.

MR. SAVIT: Your Honor, I agree with what Mr. Ferrario was pointing out. And 1A, I just have one slide. If you go to the specification, and it was the part, I believe, that Mr. Ferrario pointed out, it does refer to these shapes as elongated diamond shapes. That, I would agree, is a variation of a diamond shape. There are other diamond shapes. So elongated diamond shape is a subset of diamond shapes.

So not all diamond shapes that are disclosed in here fall into that category of elongated diamond shapes. We know for a fact, when you look at the spec and you plug in and search for elongated diamond shape, this is what you

:12:40  1    come out with.

:12:41  2              That's what we have identified, or tried to

:12:45  3    describe in words, in our claim construction.

:12:49  4              That's all.

:12:49  5              THE COURT:  Okay.

:12:51  6              MR. FERRARIO:  I would say, no, that's not all

:12:56  7    they did, because they are relating to patches and 1H is

:12:59  8    continuous.

:13:03  9              Now we are on to repeat length.

:13:05  10             THE COURT:  Is there really a difference here

:13:08  11   between the parties?

:13:12  12             MR. FERRARIO:  When we see their construction,

:13:14  13   that it is limited to patches, yes, we think that is

:13:16  14   incorrect.

:13:16  15             THE COURT:  I am talking about repeat length.

:13:18  16             MR. FERRARIO:  I am sorry.  Shortest, "shortest"

:13:23  17   is the problem.  And repeat unit.  I will explain very

:13:26  18   briefly if you would like why that is.

:13:29  19             I think I have some slides on the specification

:13:32  20   and what it talks about the repeat length is.  But when it

:13:37  21   comes to the shortest, maybe some examples will show why

:13:41  22   shortest repeated unit is not the right way to measure it.

:13:43  23             That comes down to, here I have shown visually,

:13:47  24   in Example 1, this is a label that was part of the

:13:51  25   specification.  1 is, what's the repeated unit?  There is

:13:54    1    no -- that is not a term that is used in the specification.

:13:58    2    It's not used in the claim.  It's not used in the

:14:01    3    description.

:14:01    4              The question then would be, what's a repeated

:14:04    5    unit?  Is it the NCR?  Or is this three series of NCR, NCR,

:14:11    6    that becomes repeated?

:14:12    7              Automatically, their proposed construction, what

:14:14    8    is happening here?  If it is just the NCR, then I guess you

:14:17    9    are talking about an overlapping repeat length, which

:14:20   10    doesn't really make sense.  So it brings up a lot of

:14:24   11    questions.

:14:24   12              The other problem here is, imagine, if you will,

:14:27   13    in an example where you have each number corresponding to a

:14:30   14    different shape, and say that you have Shape 1-2-3 1-3-2.

:14:37   15    According to their definition, the shortest distance that

:14:42   16    the unit is repeated would be this distance on the left.

:14:46   17    But that's not the pattern.  The pattern is 1-2-3 1-3-2, and

:14:51   18    then it would repeat, 1-2-3 1-3-2.  This is the repeat

:14:55   19    length here.  Not this here.

:14:58   20              That's the problem with their definition.  It

:15:00   21    doesn't work.

:15:02   22              THE COURT:  All right.

:15:04   23              MR. SAVIT:  Your Honor, again, it needs some

:15:09   24    explanation as to what the difference is between our

:15:13   25    positions.  The dispute in our view is really the word

:15:16   1   shortest, not unit.  We are not wedded to the term unit.

:15:20   2            THE COURT:  That's what Mr. Ferrario said.  He

:15:23   3   said shortest.

:15:26   4            MR. SAVIT:  Is the point of dispute.  If you

:15:28   5   look at the briefing, they are taking issue with me.  And I

:15:31   6   think this argument, if I understand it correctly, is really

:15:33   7   taking issue with the idea of unit, which they are

:15:36   8   interpreting to mean shape.  In other words, the smallest or

:15:40   9   shortest repeating shape.  And, in fact, that is fine if you

:15:45   10  want to make all of the shortest portion of the pattern that

:15:49   11  is repeated, that is the idea, if he has a problem with

:15:52   12  unit.

:15:53   13           In that example that he gave, our definition of

:15:58   14  it's the shortest portion of the pattern that is repeated,

:16:01   15  it would have picked up that difference between 1-2-3 1-3-2,

:16:04   16  because that would be the shortest portion that would be

:16:08   17  repeated.  If I understand it correctly, that would just be

:16:11   18  repeated over and over again.

:16:13   19           So we don't really have a dispute -- we are just

:16:17   20  saying not every portion of a pattern that's repeated is the

:16:21   21  repeat length.  And here is, at the end of the day, our

:16:24   22  position.  Our position is there can only be one repeat

:16:27   23  length.  Now, by definition, a repeat length is repeated.

:16:32   24  So if you go out two repeat lengths -- I think I have that.

:16:39   25           THE COURT:  You wouldn't accept, as a

| | | |
|---|---|---|
| :16:42 | 1 | definition, the distance along the web that includes the |
| :16:46 | 2 | repeated unit in the pattern?  It has to be the shortest? |
| :16:51 | 3 | MR. SAVIT:  Yes, for the following reason. |
| :16:53 | 4 | If you go to their Figure 1B, they point out repeat length, |
| :16:56 | 5 | 202 millimeters in this example.  Now, in fact, they could |
| :17:02 | 6 | also argue within the scope of their definition to say, oh, |
| :17:05 | 7 | you know what?  Look, if you go from the top, very top of |
| :17:08 | 8 | this pattern to the very bottom, that, in fact, also is a |
| :17:13 | 9 | length that's repeated.  It's twice a long as the repeat |
| :17:19 | 10 | length as identified in the patent.  And it would be the |
| :17:22 | 11 | unique length, would be the repeat length, is clearly what |
| :17:27 | 12 | is being referred to as a unique number. |
| :17:29 | 13 | In other words, let's say the repeat length is |
| :17:32 | 14 | 202.  Well, that pattern also repeats every 404 millimeters, |
| :17:39 | 15 | it then repeats every 606, because those are integer |
| :17:47 | 16 | multiples of the repeat length. |
| :17:49 | 17 | That is why we need shortest to define a unique |
| :17:53 | 18 | number to be the repeat length.  The repeat length can't be |
| :18:00 | 19 | 202, it can't also be 404 and can't be 606. |
| :18:05 | 20 | As we cited in our brief and referred to in the |
| :18:07 | 21 | brief, we also explain that they claim, they actually refer |
| :18:10 | 22 | to the repeat length, there being some benefits by having |
| :18:12 | 23 | the cylinder which actually puts the adhesive onto the |
| :18:17 | 24 | substrate, having the circumference of that being one repeat |
| :18:21 | 25 | length, being the repeat length. |

:18:23     1          Obviously, they are talking about having it as

:18:27     2    long as possible, because when you have a cylinder,

:18:28     3    obviously whatever length you have of the cylinder is going

:18:32     4    to be repeated over and over again.  That's why we needed

:18:35     5    the modifier "shortest."

:18:39     6          THE COURT:  Let me ask, Mr. Savit, I may be

:18:42     7    missing something, where do you derive the term shortest,

:18:48     8    the adjective shortest?

:18:52     9          MR. SAVIT:  I wouldn't need that except --

:18:54    10          THE COURT:  What is the support for that?

:18:56    11          MR. SAVIT:  The support for that would be go to

:18:58    12    the specification, look at how Figure 1B is described.  Then

:19:01    13    look at the 202 millimeters.  That's what's called the

:19:04    14    repeat length.  Now, as I point out here, the right-hand

:19:09    15    side, to say, this length, from here to here (indicating),

:19:13    16    that also repeats.  But that's not identified in the patent

:19:17    17    as being the repeat length.  There is only going --

:19:23    18          THE COURT:  You derive the support for your

:19:25    19    contention and your argument from Figure 1B.

:19:28    20          MR. SAVIT:  Figure 1B, and also, I don't have a

:19:30    21    slide for this, but if you look at their explanation of

:19:33    22    repeat length and say --

:19:36    23          THE COURT:  Forget their explanation.  Where in

:19:37    24    the patent do you derive the term shortest?  What is the

:19:42    25    support for the inclusion of that word in your construction?

:19:47    1          MR. SAVIT:  That is the meaning that's implied

:19:49    2    when they say there is an advantage by having the repeat

:19:52    3    length be the same as the circumference of the printing

:19:57    4    cylinder.

:19:58    5          THE COURT:  Whoa.

:20:00    6          MR. SAVIT:  Because there are some advantages to

:20:02    7    stretching that out.

:20:03    8          THE COURT:  As one not skilled in the art, how

:20:06    9    would I ever get there?  How would I get to that point

:20:09   10    where, as you have just described for me, the starting point

:20:12   11    you have just given me?  Shouldn't I be able to read the

:20:15   12    patent -- and I am surely reading it from the viewpoint of

:20:18   13    one of skill in the art.  Is that your argument, one of

:20:22   14    skill in the art would read into this repeat length element

:20:28   15    the word shortest?

:20:30   16          MR. SAVIT:  Yes.

:20:31   17          THE COURT:  Based upon what you just said.

:20:33   18          MR. SAVIT:  Yes.

:20:34   19          THE COURT:  Would you repeat what you just said.

:20:35   20          MR. SAVIT:  Yes.

:20:36   21          THE COURT:  Tell me again.

:20:37   22          MR. SAVIT:  When you go in the patent --

:20:39   23    unfortunately, I don't have a slide here for this.

:20:41   24          THE COURT:  I don't need a slide.  Come on.

:20:47   25          MR. SAVIT:  In the patent, they talk about the

:20:50   1   advantage of having the repeat length be as long as, in

:20:55   2   other words, being the entire width of the cylinder.  If you

:20:58   3   can just imagine, you are printing -- when I say printing,

:21:01   4   it's actually how they lay down the adhesive on the

:21:04   5   substrate as it's going through the manufacturing process.

:21:08   6   And that cylinder is turning around.  So one circumference,

:21:13   7   obviously, it gets back to the original point.  Then

:21:15   8   whatever is on that cylinder is then the shape of the

:21:18   9   adhesive put down.

:21:19  10            Okay.  So we have one turn of that.  That puts

:21:22  11   down the entire circumference amount on the substrate as it

:21:27  12   passes through the processing.  Then you go again and it

:21:30  13   repeats again.

:21:31  14            Now, what they talk about, then, in the patent,

:21:34  15   is saying, hey, in order to increase as much as possible the

:21:39  16   variation of the pattern, just make the repeat length long,

:21:44  17   and the longest you can make the repeat length is the

:21:47  18   circumference of the cylinder, remember, because you can't

:21:50  19   make it longer than that because whatever you have in that

:21:52  20   cylinder, it's just going to keep repeating.

:21:55  21            So when they are talking about repeat length,

:21:57  22   they are talking about having one repeat length being the

:22:02  23   circumference of the cylinder.  Now, if you take their

:22:06  24   definition, that would obliterate that benefit, because you

:22:09  25   could say, oh, the repeat length could be, let's say, five

:22:13  1    repeats of the same pattern, like they just say it's five

:22:17  2    times this (indicating).  And they would say five times that

:22:21  3    is also the repeat length.

:22:24  4            But that would not gain the benefit that they

:22:27  5    were talking about when they talked about the repeat length

:22:30  6    being equivalent to the entire term of that cylinder.

:22:35  7    That's a benefit, by having a different pattern experienced

:22:39  8    by the substrate as it passes through the processing until

:22:43  9    it gets back to the beginning again, and then it just

:22:46  10   repeats that.  If you take their definition, you now say,

:22:49  11   you know what?  You could have a very short repeat length,

:22:53  12   and have five times that, and that five times that would

:22:56  13   also be the repeat length.  But you wouldn't get the benefit

:22:59  14   that the patent talks about, because you would have five

:23:02  15   variations or five repeats within that turn of the cylinder.

:23:05  16           I realize, Your Honor, it is a little

:23:08  17   complicated.  But it -- it's implicit, the repeat length

:23:13  18   can't be multiple numbers.

:23:14  19           THE COURT:  It is not stem cell biology.  I

:23:18  20   should be able to understand it, even as layperson.  And I

:23:23  21   am struggling with your argument.

:23:24  22           I would like to hear from Mr. Ferrario.

:23:30  23           Again, every time the drum revolves, the pattern

:23:35  24   repeats.  How you get to -- I will maybe have you back.  Go

:23:41  25   ahead.

:23:42   1      MR. FERRARIO:  Your Honor, I think if you look

:23:44   2   at our construction, it's much more workable.  It does

:23:48   3   discuss distance along the web in which the adhesive pattern

:23:50   4   is repeated.

:23:52   5      So there is a pattern, it's repeated, and that

:23:56   6   distance is the repeat length.

:23:59   7      THE COURT:  Why isn't it the shortest distance,

:24:02   8   as he says.

:24:03   9      MR. FERRARIO:  It is not the shortest distance

:24:04   10   of the repeated unit, because that's the problem, when you

:24:10   11   get into -- one, when you get into this example here, first

:24:14   12   of all.  The other problem is, what is the unit?  Who knows

:24:22   13   what that is?

:24:24   14      So that, I think, is the problem.

:24:26   15      The other question --

:24:28   16      THE COURT:  You are saying the problem is, it's

:24:29   17   not so much -- I thought you said it was the shortest, is

:24:32   18   where the rubber meets the road here.  Now you are saying,

:24:36   19   no, it is not the shortest distance between the repeated

:24:38   20   unit.  So it's both issues.  You have an issue with both.

:24:41   21      MR. FERRARIO:  We do have issues with both.

:24:43   22      The other example that I haven't used here is

:24:46   23   where you have identical shape.  The question then becomes,

:24:53   24   what is the repeat length?  And for us, we think that our

:24:59   25   definition fits that better, "distance along the web in

| :25:04 | 1 | which the adhesive pattern is repeated," it captures all of |

:25:04    1    which the adhesive pattern is repeated," it captures all of

:25:07    2    these different variations.

:25:08    3         THE COURT:  With respect, Mr. Ferrario, Mr.

:25:12    4    Savit, why don't you -- I am not issuing an advisory opinion

:25:16    5    here.  Why isn't indefiniteness an issue here?

:25:21    6         MR. SAVIT:  I think it is.

:25:22    7         THE COURT:  You don't raise it.

:25:23    8         MR. FERRARIO:  I don't think it is, Your Honor.

:25:25    9         THE COURT:  I might disagree.  I don't know.  I

:25:28   10    frankly don't know.  I am struggling with both your

:25:31   11    arguments.

:25:32   12         Let's move on to the next term.

:25:34   13         MR. FERRARIO:  So the next term, Your Honor, is

:25:38   14    custom cut.  The question is, what does it mean to be custom

:25:41   15    cut?  Our proposal indicates that a label configured to be

:25:48   16    cut at different, specified lengths from the roll of media

:25:52   17    by a thermal printer at different, specified lengths.

:25:56   18         DRI's construction requires a label that

:26:01   19    contains a continuous pattern of adhesive -- we don't think

:26:05   20    that is required -- and does not contain adhesive-free

:26:10   21    spaces or index marks for cutting the media.

:26:14   22         So custom cuts is used in the specification of

:26:17   23    the patent.  It relates to varying the location of the cut,

:26:21   24    meaning that the receipt is not cut at the same length each

:26:28   25    time.  It means it can be ten millimeters long, 12

:26:31    1    millimeters long, 14 millimeters long.  It can, for example,

:26:36    2    vary based on how much information is on the receipt.  It

:26:39    3    can also vary in terms of increments.  Cut at the first

:26:43    4    index mark, cut at the second one and the next one, those

:26:46    5    are also custom cuts.

:26:47    6         And the patent states very clearly, it can be

:26:50    7    based on the length of the receipt or transaction data, or

:26:54    8    it can be based on printer control logic.  Printer control

:27:00    9    logic can include sensing index marks.

:27:05   10         Our problem here, again, with DRI's construction

:27:11   11    is that A limits it to a continuous pattern of adhesive and

:27:14   12    one that does not contain adhesive-free spaces.

:27:18   13         We think that this issue is simply resolved by

:27:21   14    looking at Figure 2 of the patent and its corresponding

:27:25   15    description, which states that the label 202 that is shown

:27:30   16    can be custom cut.  The label shown is neither one that

:27:36   17    contains a continuous band of adhesive and it does, in fact,

:27:40   18    contain adhesive-free spaces.

:27:44   19         THE COURT:  What is your reaction, Mr. Ferrario,

:27:45   20    to "a label configured to be cut by a thermal printer at any

:27:49   21    location along the web to form a label of any length"?

:27:53   22         MR. FERRARIO:  Just listening to that --

:27:58   23         THE COURT:  Do you want me to repeat it?

:28:00   24         MR. FERRARIO:  Would you?

:28:01   25         THE COURT:  "A label configured to be cut by a

:28:03     1      thermal printer at any location along the web to form a

:28:06     2      label of any length."

:28:08     3                  MR. FERRARIO:  Yes.  I think that's okay.

:28:09     4                  THE COURT:  Mr. Savit, you get a chance to shoot

:28:13     5      at that.

:28:14     6                  MR. SAVIT:  Your Honor, I do think you have put

:28:17     7      your finger on it.

:28:19     8                  The real dispute between us is -- I think right

:28:30     9      here, again, I mention that the '811 patent which is being

:28:33    10      asserted by NCR as prior art, that shows, it is essentially

:28:37    11      easier to show what it is not configured to be custom cut.

:28:41    12      In our proposal we say there are gaps and index marks.  When

:28:45    13      you have gaps and index marks, again, as I previously

:28:47    14      described, you have to go to the next gap and index mark in

:28:50    15      order to make the cut.  So that's not custom cut.

:28:56    16                  That's here.  See, there are no gaps or index

:29:00    17      marks here, as the example.  The example that Mr. Ferrario

:29:03    18      gave was another figure that has gaps, and we would -- now

:29:10    19      there are some figures that have some gaps but none of them

:29:13    20      have index marks.  So in fact a pattern that's configured to

:29:17    21      be custom cut would be a pattern that doesn't have index

:29:20    22      marks and gaps.

:29:22    23                  Now, just listening to your proposal, it sounded

:29:26    24      good to me, as long as it picks up this idea that you could

:29:29    25      cut anywhere along the pattern.  That's really the

| | | |
|---|---|---|
| :29:33 | 1 | difference that we have with NCR's proposal, because their |
| :29:36 | 2 | proposal said you could make a label of variable lengths. |
| :29:39 | 3 | But it's more than being variable.  It has to be variable, |
| :29:42 | 4 | but it also has to be able to cut through at any spot. |
| :29:45 | 5 | THE COURT:  I think the words that I suggested |
| :29:47 | 6 | were a label configured to be cut by a thermal printer at |
| :29:51 | 7 | any location. |
| :29:52 | 8 | MR. SAVIT:  I think that will work for us. |
| :29:54 | 9 | THE COURT:  I think you have an agreement.  Is |
| :29:56 | 10 | that acceptable to both of you? |
| :29:57 | 11 | MR. FERRARIO:  Yes, Your Honor. |
| :29:58 | 12 | THE COURT:  You have got an agreement. |
| :30:01 | 13 | Let's go to the next one. |
| :30:02 | 14 | MR. FERRARIO:  Your Honor, we are on JCCS 19, |
| :30:32 | 15 | the "information for a transaction."  The question is, what |
| :30:34 | 16 | does the front portion displaying information for a |
| :30:37 | 17 | transaction means.  We think it's pretty clear what that |
| :30:43 | 18 | means.  DRI's proposed construction that the label has been |
| :30:46 | 19 | printed with information that is visually displayed, that |
| :30:50 | 20 | has been printed meaning it already contains information. |
| :30:55 | 21 | We think this is answered by the rest of the claim, that |
| :30:58 | 22 | simply states, "the front portion displaying information for |
| :31:02 | 23 | a transaction when the ink is activated by the thermal |
| :31:07 | 24 | printer." |
| :31:07 | 25 | So we don't think that this is one that we |

:31:10    1    should really be spending a lot of time talking about.

:31:14    2            MR. SAVIT:  Your Honor, one point.  I don't want

:31:16    3    to belabor it.  I think the briefs do justice to this.

:31:19    4    Which is that that would have to happen before there would

:31:22    5    be infringement.  That's all.

:31:25    6            THE COURT:  Thanks, Mr. Savit.

:31:28    7            Let's move on to the next one.

:31:29    8            MR. FERRARIO:  Your Honor, we are on the '190

:31:31    9    patent.  The '190 patent is similar to the '184, other than

:31:36   10    it's the method version of this.

:31:38   11            I think a lot of this we already have discussed.

:31:41   12            THE COURT:  I think so.

:31:42   13            MR. FERRARIO:  The pattern of adhesive.  I am

:31:44   14    not sure if there is one you would like me to cover in

:31:47   15    particular.  Only that we think -- let's see, we are stuck

:32:00   16    on this slide.

:32:02   17            There we go.

:32:06   18            So we have a lot of slides on this pattern.  I

:32:10   19    think that, we are proposing this construction such that

:32:14   20    it's clear that there are areas with and without adhesive.

:32:18   21    We think that that is what the patent teaches, that is what

:32:22   22    the patent shows.  And we think it would be helpful to have

:32:25   23    this construction for the jury so that they understand

:32:28   24    exactly what the pattern is.

:32:30   25            And we have some cites to the specification here

:32:36    1    where we have support for the idea that you are minimizing

:32:41    2    contact, that you are varying the contact, that you are

:32:45    3    evenly distributing the adhesive.  And all of that relates

:32:48    4    to a pattern that comprises a plurality of transverse areas

:32:54    5    with and without adhesive.

:32:59    6          Here I think we can show you, again, where that

:33:02    7    occurs in the various drawings, that each of these would

:33:06    8    have transverse areas with and without adhesive.

:33:09    9          For that reason, we would ask the Court to adopt

:33:12   10    our construction.

:33:13   11          THE COURT:  Mr. Savit, you said plain and

:33:16   12    ordinary meaning.

:33:16   13          MR. SAVIT:  Yes, Your Honor.  Let me just

:33:21   14    explain that -- I wanted to go to Figure 4 of the '264

:33:26   15    patent.

:33:27   16          THE COURT:  I want to just take advantage of DRI

:33:30   17    saying plain and ordinary meaning.

:33:32   18          MR. SAVIT:  What we are really saying is they

:33:35   19    are trying --

:33:37   20          THE COURT:  I am teasing.

:33:39   21          MR. SAVIT:  What they are trying to do is to get

:33:41   22    a narrow interpretation of just the word pattern so that

:33:45   23    they avoid their prior patents as prior art.  But if you

:33:48   24    look at the prior patents, that's the irony of it,

:33:52   25    specifically, the '264 patent, this is not embraced

:33:54    1   because -- this came up in their second brief.  We didn't

:33:57    2   have the time to address this.  This is our first

:33:59    3   opportunity.

:34:00    4          In the '264 patent, Column 7, Lines 12 through

:34:05    5   14, NCR -- let me see if I can find this.  I have to go all

:34:15    6   the way back to the '264.

:34:29    7          Figure 4 is shown on the left here in this

:34:32    8   drawing.  You have seen this a lot already today.  In that,

:34:37    9   as described at Column 7, Line 12, starting at Line 12 of

:34:42   10   the '264 patent, as saying the circular and oblong patches

:34:48   11   illustrated in Figure 4 alternate between the running axis

:34:52   12   and the series of labels and repeat in pattern -- in

:34:56   13   pattern -- they are calling that a pattern -- identically

:34:59   14   from label to label.

:35:00   15          So guess what?  The transverse direction that

:35:03   16   they are talking about, about there being gaps between

:35:10   17   pieces of patches, there would be patches here, patches

:35:12   18   here, patches here, according to their transverse language.

:35:16   19   They are trying to distinguish this as prior art.  But guess

:35:18   20   what?  When you look at this patent, they talk about this as

:35:22   21   being a pattern.  And there are no other patches.  There are

:35:24   22   no other spaces in the transverse direction.

:35:27   23          So that's really what they are trying to

:35:29   24   accomplish here.  It's terribly improper.

:35:31   25          THE COURT:  Okay.  Mr. Ferrario.

:35:34   1       MR. FERRARIO:  Your Honor, I disagree with the

:35:37   2   characterization of what we are trying to do here.  I don't

:35:42   3   think that is correct.

:36:00   4       So, Your Honor, the next term is I think a joint

:36:04   5   claim construction statement 21, that is the repeat

:36:07   6   distance.  I think it embraces the same issues.  So I won't

:36:10   7   cover it much.  Only to sort of show you that what we really

:36:14   8   think this is is a design choice when someone is configuring

:36:19   9   these labels.  There is disclosure in the specification that

:36:21   10  describes that design choice.

:36:24   11      So next is "providing the pattern."  As you

:36:27   12  know, this is a method claim.  So there is the step of

:36:30   13  providing the pattern.  We think it's very plain and

:36:34   14  ordinary meaning.  Their construction says "electronically

:36:37   15  communicating the pattern."

:36:39   16      THE COURT:  Let me hear from Mr. Savit on that,

:36:42   17  because I think he is swimming upstream on this one.

:36:45   18      Mr. Savit, why not plain and ordinary meaning?

:36:47   19  Come on.

:36:48   20      MR. SAVIT:  Your Honor, repeat distance for No.

:36:51   21  21, or No. 22?

:36:53   22      THE COURT:  I am at "providing the pattern."

:36:56   23      MR. SAVIT:  Your Honor, I want to show you

:36:59   24  something --

:37:00   25      THE COURT:  Where do you get "electronically

:37:02   1   communicating the pattern and repeat distance to a printing

:37:04   2   press or cutter"?  Keeping in mind this case is going to be

:37:09   3   tried to a jury, number one.  And what is the support for?

:37:09   4   this?

:37:12   5            MR. SAVIT:  We could address that directly to

:37:13   6   the jury as the plain and ordinary meaning.

:37:17   7            THE COURT:  Plaintiffs proposed plain and

:37:18   8   ordinary meaning.  I am inclined toward plain and ordinary

:37:20   9   meaning.  Tell me why that inclination would be incorrect.

:37:23   10           MR. SAVIT:  Your Honor, if you go to the actual

:37:25   11   drawing that is in the front of the '190 patent, you will

:37:28   12   see in Box No. -- this is the process.  This is the process

:37:46   13   flowchart.  What they describe as what is happening here is

:37:50   14   it provides security, "obtaining the pattern as a distinct

:37:57   15   image or text message which provides security to each label

:38:01   16   subsequently cut from the roll by the slitter of the thermal

:38:04   17   printer."

:38:05   18           What they are talking about is changing the

:38:07   19   pattern and repeat length on the fly.  That is why we say

:38:11   20   it's got to be electronic.  It just can't be where you are

:38:15   21   providing -- it just has no meaning otherwise to say --

:38:19   22           THE COURT:  Where in the intrinsic record do you

:38:22   23   derive support for that comment, it's got to be electronic?

:38:25   24   Where does that come from?

:38:27   25           MR. SAVIT:  I don't know how else --

:38:29 1     THE COURT:  No.  In the intrinsic record.  Not

:38:31 2 there.  What you have up on the screen is not the answer to

:38:35 3 my question, in my view.

:38:38 4     MR. SAVIT:  Your Honor, I cannot say that there

:38:43 5 is a reference, specific reference --

:38:45 6     THE COURT:  Then let's move on.  This one is

:39:00 7 yours.

:39:01 8     That is the ruling from the Bench on this

:39:02 9 particular term.

:39:05 10     MR. FERRARIO:  I know we are short on time.  I

:39:09 11 would offer to the Court that we would rest on our briefs on

:39:12 12 the remaining terms.

:39:12 13     THE COURT:  I am content to have you do that.

:39:14 14     Mr. Savit?

:39:15 15     MR. SAVIT:  I am fine with that, Your Honor.

:39:17 16     THE COURT:  Counsel, you will get an order from

:39:20 17 me, give or take, 30 days.

:39:21 18     Is there anything, since you are in town, that

:39:23 19 we need to discuss?  Is discovery moving along well?

:39:26 20     MR. FERRARIO:  Yes, Your Honor.  Discovery is

:39:28 21 moving along well.  Thank you for your guidance on that

:39:31 22 previously.  And we are close to wrapping up some last

:39:34 23 depositions and that we had some scheduling issues with.

:39:38 24     THE COURT:  Counsel, travel safely.  We will see

:39:40 25 you along the way.

:39:43   1                    **(Hearing concluded at 12:40 p.m.)**

:39:43   2                                    **-   -   -**

:39:43   3        **Reporter:   Kevin Maurer**